## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

KIMBRA CRISWELL                      :
                                     :
    Plaintiff,                   :
                                     :
v.                                   :     C.A. No. 05-00321 GMS
                                     :
LYDIA ADAIR MCFADDEN                 :     JURY TRIAL DEMANDED
                                     :
    and                          :
                                     :
CHRISTIANA CARE HEALTH               :
SERVICES, INC.,                      :
                                     :
    Defendants.                  :

## APPENDIX TO PLAINTIFF'S ANSWERING BRIEF
## IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Richard R. Wier, Jr. (#716)
Daniel W. Scialpi (#4146)
**RICHARD R. WIER, JR., P.A.**
1220 Market St., Suite 600
Wilmington, DE 19801
(302)888-3222

September 6, 2005

## TABLE OF CONTENTS

Plaintiff's Supplemental Memorandum of Law in Opposition to
Defendants' Preliminary Objections to Improper Personal Jurisdiction
and Venue, filed September 27, 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit A

Unreported cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit B

Exhibit A

KATS, JAMISON, VAN DER VEEN & ASSOCIATES
MICHAEL T. VAN DER VEEN, ESQUIRE
Identification No. 75616
NELSON LEVIN, ESQUIRE
Identification No. 49761
25 Bustleton Pike
Feasterville, PA 19053
(215) 396-9001                              **Attorneys for Plaintiff**

| | | |
|---|---|---|
| KIMBRA CRISWELL | : | **COURT OF COMMON PLEAS** |
| | : | **PHILADELPHIA COUNTY** |
| Plaintiff, | : | **MAY TERM, 2004** |
| | : | |
| vs. | : | |
| | : | **Docket No. 002750** |
| LYDIA ADAIR MCFADDEN | : | |
| and | : | |
| CHRISTIANA HOSPITAL | : | |
| | : | |
| Defendants. | : | **CIVIL ACTION – LAW** |
| | : | |

## PLAINTIFF'S SUPPLEMENTAL MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' PRELIMINARY OBJECTIONS TO IMPROPER PERSONAL JURISDICTION AND VENUE

### I.    INTRODUCTION

Defendants have filed Preliminary Objections to Improper Jurisdiction and Venue claiming that Defendant Christiana Care Health Services, Inc. does not conduct regular and continuous business within the County of Philadelphia and the Commonwealth of Pennsylvania.

On August 5, 2004, the Court heard oral argument on Defendants' Motion, and ordered that discovery be conducted on the venue issue. On September 14, 2004 Plaintiff's counsel took the deposition of Buddy Elmore, Corporate Designee of Christiana Health Services. Mr. Elmore's testimony, as discussed below, establishes

1

regularly conducted, quality and quantity business activities by the Defendant in Philadelphia County. As such, Defendant's Motion must be denied.

## II.    Argument.

### A.    The Christiana Care Health System/Jefferson Health System, LLC.

Christiana Care Corporation is the parent of Defendant, Christiana Health Services. *See* Deposition of Elmore at 11 attached as Exhibit "A". Defendant Christiana Hospital is owned 100% by Christiana Health Services. *See* Elmore at 25, attached as Exhibit "A". In the summer of 1999, Christiana Care Corp. established and incorporated The Christiana Care Health System/Jefferson Health System, LLC. The LLC was registered to do business in Pennsylvania with the Pennsylvania Corporation Bureau. See Elmore at 37-38, attached hereto as Exhibit "A". The business objective of the Jefferson/Christiana LLC (hereinafter "The LLC") was to establish a joint venture between Jefferson Health Systems and Christiana to provide medical equipment and home care services.    There were four members of Christiana and four members of Jefferson on the Board. Christiana and Jefferson each owned a 50% interest in the LLC; and each health care provider contributed $25,000.00. *See* Elmore at 31-35, attached hereto as Exhibit "A". The joint venture was to provide home services and medical equipment to pediatric patients who had been discharged from Dupont's Children's Hospital, **including Pennsylvania residents.** *See* Elmore at 36, attached hereto as Exhibit "A". A facility was established in Radnor, PA at the offices of Jefferson Health System, the registered address of the LLC. If a child was discharged from Dupont certain insurance carriers would have **authorized Jefferson nurses to come to the child's home.** Additionally, if a **Pennsylvania health insurance provider** had a **Pennsylvania**

2

resident, the medical equipment would have come from **Jefferson**. *See* Elmore at 40-41, attached hereto as Exhibit "A". Additionally, during the year and a half after the LLC was incorporated, there were meetings attended by both the Jefferson and Christiana Nurses' Association and home care medical equipment divisions discussing the business plan which were held in **both Wilmington and Jefferson Health Systems' office in Radnor**. *See* Elmore at 48-49, attached hereto as Exhibit "A". In fact, according to Elmore, the Chief Operating Officer of Christiana, Ronda Ketcham, was present at these meetings between the two medical providers. *See* Elmore at 50-52, attached hereto as Exhibit "A". Mr. Elmore himself rotated between the Delaware and Radnor offices. *See* Elmore at 53, attached hereto as Exhibit "A".

Accordingly, Christiana and Jefferson anticipated and commenced a significant joint business venture sharing financial, personnel and administrative commitments between the two medical providers **to the benefit of patients in Southeastern Pennsylvania and Philadelphia, in furtherance of the business objective of the LLC**. These contacts alone are more than sufficient to establish Christiana conducting business in Pennsylvania/Philadelphia. However, as will be discussed _infra_ there is much more.

### B. The Mid Atlantic Health Plan.

Christiana Care Corp., the parent of Defendant Christiana Health Services, owns Mid Atlantic Health Plan, a health insurance plan sold to employers for their employee health benefits. Mid Atlantic has health care provider contracts with, Crozer Chester, **Jefferson**, and **The Hospital of the University of Pennsylvania**. Specifically, as to **HUP**, Mid Atlantic contracts to insure heart and organ transplants performed there. *See* Elmore at 56-58, attached hereto as Exhibit "A".

3

In addition to hospitals in Philadelphia, there are **200 to 600 physicians practices in Philadelphia alone with which Mid Atlantic has contracts.** *See* Elmore at 59-60, attached hereto as Exhibit "A".

Most significantly, according to Mr. Elmore, **10%** of Mid Atlantic's billings come from Pennsylvania physicians and hospitals. *See* Elmore at 65-66, attached hereto as Exhibit "A".

Accordingly, Christiana Corp., parent and sole owner of the Defendant, Christiana Health Services owns a health insurance plan which derives **10%** of it's revenue from hospitals and 200-600 physician's practices in Philadelphia. This alone establishes regular and continuous quality and quantity business contacts with Philadelphia. However, as will be discussed, <u>infra</u>, there is even more.

### C.    The Christiana/Jefferson Medical College Teaching Faculty and Resident Exchange.

Jefferson Medical College clinical students rotate regularly to Christiana and Wilmington Hospitals. However, while Christiana and Wilmington Hospitals do not have a medical school, Christiana it has its own community teaching residency program with over 200 residents. *See* Elmore at 75-78, attached hereto as Exhibit "A". According to Mr. Elmore, these Christiana residents may rotate to **Jefferson** for classes or specific services. *See* Elmore at 78, attached hereto as Exhibit "A". Some Christiana faculty teaching at the community residence program have faculty appointments at Jefferson Medical College.    See Elmore at 79, attached hereto as Exhibit "A". Christiana itself employs physicians, some of whom are involved in medical education. According to Mr. Elmore, those Christiana employed physicians probably have teaching appointments at

4

Jefferson or other Philadelphia hospitals. *See* Elmore at 83-84, attached hereto as Exhibit "A".

Therefore, the Christiana/Jefferson resident and faculty program is not unilateral. Christiana employeed physicians teach at Jefferson Medical College; Christiana residents rotate there. These activities are occurring **not in Delaware but in Philadelphia County, all in furtherance of the business objective of Christiana in providing medical care to their patients through the education of the residents in the community teaching program.**

**III.    Conclusion.**

Through the establishment of the Christiana/Jefferson LLC's joint business venture to provide home care and equipment to Philadelphia patients; through the 10% of the Mid Atlantic Health Plan's revenue generated by the 200-600 Philadelphia physicians and two hospitals which participate in Christiana Care's Health Plan, and through Christiana's physicians teaching and its residents participating in classes and services at Jefferson Medical College, there is and has been the quality and quantity of business contacts with Philadelphia, which establishes proper venue in Philadelphia County.

**WHEREFORE,** Plaintiff, Kimbra Criswell, respectfully requests that Defendants' Preliminary Objections be **DENIED.**

KATS, JAMISON, van der VEEN &
ASSOCIATES

Dated: 9/27/04

NELSON LEVIN, ESQUIRE
Attorney for Plaintiff

11

ELMORE

```
 1   You're giving me a one-page document.  Is
 2   this it?
 3          A.     That's it.
 4          Q.     Now, my understanding is
 5   that Christiana Health Services, and for
 6   the purposes of this deposition because
 7   there's a few Christiana entities
 8   involved, let's just call it Health
 9   Services, is that fair?  So when I say
10   Health Services, you'll know what I mean?
11              MR. BALAGUER:  Using Health
12          Services to be Christiana Care
13          Health Services?
14              MR. LEVIN:  Yes.
15              THE WITNESS:  Oh, Health
16          Services, that's fine.
17   BY MR. LEVIN:
18          Q.     Now, my understanding is
19   that there is a legal entity called
20   Christiana Care Corporation; is that
21   correct?
22          A.     Yes, there is.
23          Q.     Christiana Care Corporation
24   is the parent of Health Services?
```

25

ELMORE

1        Q.      Since the late '90s your

2    testimony is that Health Services has

3    employed no physicians that practice

4    medicine in the Commonwealth in

5    Pennsylvania?

6        A.      Yes, they have not

7    practiced.

8        Q.      No?

9        A.      The answer is, there's no

10   additional physicians that practice in

11   Pennsylvania.

12       Q.      Christiana Hospital is owned

13   a hundred percent by Health Services?

14       A.      Yes.

15       Q.      In 2002 does Health Services

16   own any property in the Commonwealth of

17   Pennsylvania?

18       A.      No.

19       Q.      Currently does Health

20   Services own any property in the

21   Commonwealth of Pennsylvania?

22       A.      No.

23       Q.      In 2002 did Health Services

24   own or operate any medical facilities in

ELMORE

```
 1          A.      What time is that question?

 2          Q.      Let's start with today.

 3          A.      No.

 4          Q.      Let's go back to 2002.

 5          A.      No.

 6          Q.      Prior to 2002?

 7          A.      Health Services?  No.

 8          Q.      The way you answer that
 9  question, you were thinking Health
10  Services, no.  Was there another entity
11  that came under the Christiana Care
12  Corporation umbrella that prior to 2002
13  in furthering its business objective had
14  a relationship with any medical providers
15  in Pennsylvania?

16              MR. BALAGUER:  Just object
17          to the form of the question, but
18          you can answer it.
19  BY MR. LEVIN:

20          Q.      If you can understand.

21          A.      There's no affiliated other
22  division but the parent itself.  The
23  parent itself had -- Christiana Care
24  Corporation had a LLC relationship with
```

ELMORE

```
 1   Jefferson Health System.
 2          Q.     That brings me to what I
 3   guess we'll call the Christiana Care
 4   Health System/Jefferson Health System
 5   alliance, is that what you were referring
 6   to?  LLC?
 7          A.     The LLC is what I'm
 8   referring to.
 9          Q.     For the purposes of this
10   deposition, to be clear, can we refer to
11   it as the Jefferson/Christiana alliance
12   and you'll know what I'm talking about
13   referring to the LLC?
14          A.     To me alliance is much
15   broader.  If you refer to it as the LLC
16   then I could -- it would be easier for me
17   to answer the questions.
18          Q.     That's fair enough.
19          MR. BALAGUER:  Why don't we
20          call it the Jefferson/Christiana
21          LLC.
22          MR. LEVIN:  That's fine with
23          me.
24   BY MR. LEVIN:
```

ELMORE

```
 1              Q.    The Jefferson/Christiana
 2    LLC.  Your counsel has provided us
 3    documents in connection with the
 4    Christiana/Jefferson LLC and I believe
 5    this is an Article of Incorporation.  Are
 6    you familiar with the document?  I'm not
 7    going to ask you specific questions about
 8    it, I just wanted to know if you reviewed
 9    it before today?
10              A.    I've seen the document
11    before several years ago.
12              Q.    Did you review it in
13    preparation for today's deposition?
14              A.    No.
15              Q.    What was the business
16    objective of the LLC?
17              A.    This happened a long time
18    ago so I'm just sort of remembering from
19    long-term memory.  Primarily was to
20    initially explore opportunities -- we
21    each are two provider systems in Delaware
22    and Pennsylvania and we were looking at
23    our homecare division which involves V
24    and A, Visiting Nurse Homecare Division,
```

ELMORE

1   providing services to the Alfred I.

2   DuPont Children's Hospital, which is

3   located here in Delaware.

4                    They were looking at

5   opportunities of how they had a similar

6   division at Jefferson that provided

7   similar home medical equipment to

8   homecare services to patients that were

9   being discharged from Alfred DuPont

10  Children's Hospital.  And they were

11  looking to see how they could do

12  something together to better serve those

13  patients.  That was the initial thought

14  that they had in working on the pediatric

15  program homecare and home medical

16  equipment.

17           Q.     Did this LLC become a legal

18  entity?

19           A.     Yes, the LLC was a legal

20  entity.

21           Q.     When was the LLC

22  incorporated?

23           A.     Sometime in the summer of

24  '99, as best I recall.

ELMORE

1          Q.      In reviewing the document

2     your counsel prepared to you, you

3     yourself was on this board of the LLC?

4          A.      Yes, that's correct.

5          Q.      In reviewing the document,

6     there were four members of Christiana on

7     the board and four members of Jefferson;

8     is that correct?

9          A.      As I recall, yes.

10         Q.      In reviewing the document,

11    provided Christiana and Jefferson would

12    own a 50 percent interest in this LLC?

13         A.      Yes, the way it was

14    structured.  The way it was structured.

15         Q.      Was money actually

16    contributed by both medical providers

17    towards the formation of the LLC?

18         A.      Each ownership of the LLC

19    contributed 50 percent of the capital,

20    which was about $50,000.  25 by

21    Christiana Care Corporation and 25 by

22    Jefferson Health System.

23         Q.      This joint venture was to

24    provide home services or home services to

ELMORE

1  pediatric patients who had been

2  discharged from DuPont?

3       A.    DuPont Children's Hospital,

4  that's correct.

5       Q.    Did this LLC envision

6  providing homecare or services to

7  patients who were being discharged from

8  Jefferson University Hospital?

9       A.    No.

10       Q.    Were the patients that had

11  been discharged from DuPont Pennsylvania

12  residents?

13            MR. BALAGUER:  Were any of

14        them Pennsylvania residents?

15            MR. LEVIN:  Yes.

16            THE WITNESS:  I'm sure some

17        of them were.

18  BY MR. LEVIN:

19       Q.    What was Christiana's role

20  going to be in this LLC?  How was it

21  going to work?

22       A.    Well --

23       Q.    From Christiana's

24  perspective?

ELMORE

1          A.          -- the original business
2     plan, as I mentioned, was the pediatric
3     at Alfred I. DuPont Children's Hospital.
4     That business plan never got implemented,
5     so what was thought of being the
6     opportunity did not materialize.
7          Q.          How many steps were taken
8     before the business plan ceased to be
9     implemented?
10         A.          I'm not sure how you mean
11     how many steps were taken.
12         Q.          Okay.  All right.  I'll
13     break it down.  The business was
14     registered as a corporation, the LLC,
15     correct?
16         A.          Yes, it was incorporated.
17     That's correct.
18         Q.          It was registered to do
19     business in Pennsylvania, correct?
20         A.          It was incorporated, I
21     believe, in Delaware.
22         Q.          Was it registered with the
23     Pennsylvania Corporation Bureau?
24         A.          Yes.  If I recall there was

ELMORE

```
 1   a registration.
 2           Q.      Was an office in
 3   Pennsylvania given as a registered
 4   address?
 5           A.      I believe so.  In order to
 6   have that, yes, you had to have a
 7   Pennsylvania office.
 8           Q.      I'll submit to you that that
 9   was in Radnor, Pennsylvania, does that
10   refresh your memory?
11           A.      It was probably the
12   Jefferson Health System office in Radnor.
13           Q.      That is correct.  At that
14   facility in Radnor were there offices set
15   up that where Health System employees
16   were going to work -- come to work
17   everyday?
18           A.      No.
19           Q.      What activities were going
20   to occur at the Radnor address?
21           A.      My recollection it was just
22   a holding spot for the potential business
23   plan.  If it got approved it was just
24   going to be a holding address for that
```

Case 1:05-cv-00321-GMS    Document 13    Filed 09/06/2005    Page 19 of 51
09/06/2005 15:48    12153350380    KATS AND ASSOCIATES    PAGE    12/36

39

ELMORE

1   service which never got implemented.

2           Q.      What do you mean by holding

3   address?

4           A.      The Radnor office where it

5   was registered.

6           Q.      Well, these services were

7   going to be provided by nurses, correct?

8           A.      This was going to be home

9   medical equipment.

10          Q.      Home medical equipment?

11          A.      Or home nurse visits for

12  patients discharged from Alfred I. DuPont

13  Children's Hospital.

14          Q.      Let's start with the nurses.

15  They come, a child is discharged from

16  Alfred DuPont with, say, a brain injury,

17  the child required a feeding tube, just

18  as an example, I'm familiar with DuPont,

19  it's a fine organization.

20                  The child is discharged

21  home.  The nurse comes to the house,

22  shows the parents how to set up a feeding

23  tube, for example, who employs the nurse

24  -- or who was going to employ the nurse?

09/06/2005 15:48 12153363980   Case 1:05-cv-00321-GMS   Document 13   KATS AND ASSOCIATES   Filed 09/06/2005   Page 20 of 51   PAGE 13/36

40

ELMORE

1          A.     Where is the patient?

2          Q.     The patient is in

3    Pennsylvania.  Who would employ the

4    nurse?

5          A.     It's a tricky question.

6          Q.     Why?

7          A.     It depends on who the

8    insurance carrier is as to who they

9    authorize to service that patient then

10   once they're going to be discharged to

11   home.

12         Q.     Were there insurance

13   carriers that would have authorized

14   Jefferson nurses to come to those

15   children's homes?

16         A.     Probably.

17         Q.     In addition to providing

18   individuals to come to the children's

19   homes there would have been a provision

20   of medical equipment, is that true?

21         A.     Probably, yes.

22         Q.     Of the two medical

23   providers, Jefferson or Christiana, who

24   would have provided the medical equipment

ELMORE

1    to the children's homes?

2            A.      It was dependent upon which

3    insurance company the contract was sold

4    in.  And if it was a Delaware Health Plan

5    that had a member that lived in

6    Pennsylvania -- the patient lived in

7    Pennsylvania it would have been more than

8    likely Jefferson would have provided it.

9            It could have been

10   Christiana could have provided it.  It's

11   up to the insurance company as to who

12   they authorize, who's in their network

13   providers and who has the specialty

14   equipment they need.

15           Q.      Then from your answer I'm

16   taking that if it was a Pennsylvania

17   provider -- health insurance provider and

18   that health insurance provider had a

19   Pennsylvania resident, the medical

20   equipment would have come from Jefferson?

21           A.      I believe, yes.

22           Q.      What's that, sir?

23           A.      Yes, probably.

24           Q.      This sounds like a good

48

ELMORE

1    went forward with that type of

2    opportunity, there was no contacts being

3    made, there was no need.  There was no

4    businesses.

5            Q.    Were there any meetings

6    between, say, a representative from the

7    visiting nurses and Christiana and

8    visiting nurses organization at

9    Jefferson?

10           A.    In what time frame?

11           Q.    In that year-and-a-half.

12           A.    During that year,

13   year-and-a-half?

14           Q.    Uh-huh.

15           A.    Yes, there were meetings

16   from both Jefferson and Christiana

17   Visiting Nurses Associations, homecare

18   medical equipment divisions discussing

19   the business plan.

20           Q.    Fair enough.  Were you

21   present at the meetings?

22           A.    No.

23           Q.    Were records kept of those

24   meetings?

ELMORE

1          A.      I'm not aware of any.

2          Q.      Where were the meetings

3    being held?

4          A.      Most of our meetings were

5    rotated.  Depending on when they had the

6    meeting we rotate between here in

7    Wilmington and at Radnor.

8          Q.      At Jefferson Health Systems'

9    office in Radnor?

10         A.      That's correct.

11         Q.      Do you know during that

12   year-and-a-half how many such meeting

13   there were between the two medical

14   providers, visiting nurses

15   representatives?

16         A.      I would not know exactly,

17   no.

18         Q.      That's fair.  Could you

19   estimate for me?

20         A.      Well, probably two to four.

21         Q.      Do you know who ran those

22   meetings?

23         A.      No.

24         Q.      Do you know the name of the

ELMORE

1   Christiana visiting nurse representative

2   who would have been present at these

3   meetings?

4          A.     Yes.  We've had several

5   changes in that division so I say yes and

6   if you'd ask me then for a name I'd have

7   to think twice as far as the present and

8   retired.  And I'm not sure he was

9   involved.  The chief operating officer at

10  that time is still there and so she

11  probably was involved.

12             And the home medical

13  equipment individual, we've had two or

14  three changes in that position so I would

15  not recall which one from the home

16  medical equipment was involved, but there

17  were probably three people out of that

18  division would have probably been

19  involved.

20          Q.     What's the name of the COO?

21          A.     The COO is Ronda Ketcham,

22  K-E-T-C-H-A-M.

23          Q.     Do you know who her mirror

24  is at Jefferson?

1          A.      No.

2          Q.      Do you know the names of any

3     Jefferson individuals who would have been

4     present at these meetings?

5          A.      No, because I did not know

6     them that well.

7          Q.      Fair enough.  Medical

8     equipment representative from Christiana,

9     you said there were two or three, could

10    you give me those names?

11         A.      I don't recall.  The first

12    individual that was in that position left

13    our employment.  And there was a young

14    lady, I can't recall her name.  I can

15    probably find it.

16              MR. LEVIN:  Ask that you do

17         so.

18    BY MR. LEVIN:

19         Q.      Are there any individual

20    names that you can recall from Christiana

21    medical equipment who would have been

22    present at these meetings?

23         A.      Repeat the question again?

24         Q.      Sure.  Any names you can

ELMORE

```
 1   recall from Christiana who would have

 2   been supervising medical equipment or

 3   would have been the medical equipment

 4   person?

 5        A.    It would have been the

 6   director of that division who's name I am

 7   not recalling right now.

 8        Q.    Forgive me if I asked you

 9   this.  Do you know the name of the

10   Christiana visiting nurse representative

11   who would have been present at these

12   meetings?

13        A.    Probably the chief operating

14   office.

15        Q.    Ketcham?

16        A.    Rhonda Ketcham.

17        Q.    This business would have --

18   its headquarters would have been at the

19   Radnor address, correct?

20             MR. BALAGUER:  Objection to

21        the form of the question.  You can

22        answer.

23   BY MR. LEVIN:

24        Q.    Where would this business
```

ELMORE

1    have been headquartered?

2          A.      Are you talking about the

3    LLC or the business plan?

4          Q.      The LLC, I'm sorry.

5          A.      It was incorporated in

6    Delaware.  I was responsible for the

7    accounting records for the corporation

8    and we rotated meetings of the board

9    between the two offices of the systems.

10         Q.      You rotated between Delaware

11   and the Radnor office?

12         A.      That's correct.

13         Q.      Where would the interface

14   with the visiting nurses, the medical

15   equipment providers, where would that

16   have occurred?

17         A.      Let me make sure I

18   understand your question.  When we were

19   doing the business planning process the

20   people that were involved, where would

21   those meetings have occurred?

22         Q.      Yes.  Where those meetings

23   would have occurred.

24         A.      They would have occurred at

56

ELMORE

```
 1   entities that Care Corporation owns is an
 2   insurer, MidAtlantic Health Care; is that
 3   correct?
 4           A.      Christiana Care Health Plan.
 5           Q.      What is the relationship
 6   between MidAtlantic Health Plan and
 7   Christiana Care Health Plan?
 8           A.      MidAtlantic is the
 9   commercial product that they offer for
10   commercial carriers.  The other product
11   they offer was a Medicaid contract for
12   Medicaid members in Delaware.
13           Q.      So MidAtlantic is the name
14   of the --
15           A.      Commercial.
16           Q.      Pardon me?
17           A.      MidAtlantic Health Plan is a
18   commercial product, developers insured,
19   produced and administrative services to
20   employers for their employee health
21   benefits.
22           Q.      You mentioned another
23   entity?
24           A.      Health Initiatives?
```

ELMORE

1          Q.      No.

2          A.      First State Health Plan.

3          Q.      That's it.

4          A.      First State Health Plan --

5          Q.      First State Health Plan by

6   Delaware the first state.

7          A.      First State Health Plan, and

8   that primarily is a Medicaid contract

9   with the state to provide Medicaid

10  coverage.

11         Q.      Does First State do any

12  business in Pennsylvania?

13         A.      It's contract was with

14  Delaware Medicaid program.

15         Q.      Is it contracted with any

16  entity, corporation, local municipality

17  in Pennsylvania?

18         A.      It has provider contracts.

19  Christiana -- First State Health Plan and

20  Christiana MidAtlantic Health Plan both

21  have provider contracts with many

22  providers.

23         Q.      When you mean providers, you

24  mean healthcare providers?

ELMORE

1          A.      Healthcare providers,

2    correct.

3          Q.      Are some of these healthcare

4    providers Pennsylvania hospitals, doctors

5    offices?

6          A.      Pennsylvania Hospital and

7    physicians, as well as New Jersey and

8    Maryland.

9          Q.      Being more specific then,

10   which hospitals in Philadelphia does

11   MidAtlantic have contracts with?

12         A.      The best I can recall, the

13   listing that was in the provider

14   handbook, and again, I --

15         Q.      The best you can recall,

16   sir.

17         A.      There were probably all the

18   Jefferson Health Systems, Crozer Chester

19   and some Quaternary services at the

20   University of Pennsylvania Hospital.

21         Q.      Some what, sir?

22         A.      Quaternary services.

23         Q.      New term for me.  What is

24   it?

09/06/2005  15:46  12153556388    KATS AND ASSOCIATES    PAGE  24/36

59

ELMORE

1          A.      Heart transplants, organ

2    transplants.

3                  MR. BALAGUER:  Could you

4          spell that, Quaternary?

5                  THE WITNESS:  I'd ask

6          assistance from my counsel.

7    BY MR. LEVIN:

8          Q.      Those Quaternary services

9    are with The Hospital of the University

10   of Pennsylvania?

11         A.      Yes.

12         Q.      Did MidAtlantic also have

13   these contracts with these hospitals in

14   2002?

15         A.      Yes, I think so.

16         Q.      In addition to hospitals in

17   Philadelphia there were physician

18   practices that MidAtlantic had contracts

19   with, correct?

20         A.      Yes, that's correct.

21         Q.      Some of the information that

22   I received indicated that there were

23   several physicians' practices in

24   Philadelphia that MidAtlantic had

09/06/2005   15:56   4253350500   KATS AND ASSOCIATES   PAGE   25/36

ELMORE

60

1  contracts with, do you know how many or

2  can you estimate for me how many?

3            MR. BALAGUER:  You're

4        talking about Philadelphia now not

5        Pennsylvania.

6            MR. LEVIN:  Yes.

7  BY MR. LEVIN:

8        Q.    Just Philadelphia I'm

9  narrowing it.

10       A.    I couldn't even estimate it.

11 It could have been two to 600.  I have no

12 idea.

13       Q.    200 to 600?

14       A.    Possibly.

15       Q.    MidAtlantic advertises on

16 its web site a listing of these hospitals

17 and physician practices in Philadelphia,

18 is that true?

19       A.    I'm not sure what they have

20 on the web site.

21       Q.    Have you seen their web

22 site?

23       A.    If I have it's been a long

24 time.

ELMORE

```
1              Q.      When these 200 to 600
2    Philadelphia doctors and medical
3    practices bill MidAtlantic for their
4    services, MidAtlantic has records of
5    that, correct?
6              A.      Correct.
7              Q.      Obviously.  If I wanted to
8    obtain those records how would I get
9    them?
10             A.      You probably would have to
11   approach counsel.
12             Q.      For MidAtlantic?
13             A.      For MidAtlantic, for
14   Christiana Care Health Plan.  Because
15   there are HIPAA regulations that would
16   require consents for leases and things
17   like that probably could access billing
18   formation.
19             Q.      Do you know when MidAtlantic
20   began its affiliation with these
21   hospitals in Philadelphia?
22                 MR. BALAGUER:  Objection to
23          the form of the question.  You can
24          answer.
```

09/06/2005 15:46  12253398300          Case 1:05-cv-00321-GMS          Document 13          KATS AND ASSOCIATES          Filed 09/06/2005          Page 34 of 51          PAGE 27/36

64

ELMORE

1              THE WITNESS:  Well, I would

2        say they probably contracted with

3        various hospitals probably back in

4        1996 when we started the Medicaid

5        program because a lot of the

6        Medicaid needed other services

7        that we could not provide within

8        Delaware or DuPont Children's

9        Hospital and so we had to have for

10       the Medicaid contract other backup

11       hospitals that could provide those

12       services.

13              So '96, '97, '98, somewhere

14       in there, when the Medicaid

15       program started had contracts with

16       a lot of the providers in the

17       Pennsylvania market.

18  BY MR. LEVIN:

19       Q.    They would be the hospitals

20  you mentioned and these 200 to 600

21  physicians; is that correct?

22       A.    Initially it was probably a

23  fewer number of those.  Later on it was

24  probably a larger number because it takes

ELMORE

1   a long time to get contracts with

2   providers out of state.

3         Q.     Do you know what percentage

4   of the billings for MidAtlantic come from

5   Pennsylvania physicians and hospitals?

6         A.     A small percentage.  I don't

7   have an exact number.  Very small.

8         Q.     You say it's a small

9   percentage, what percentage?

10        A.     I'd say probably 10 percent

11  or less.

12       Q.     When you say that you have a

13  number in your head, can you tell me in

14  an estimate dollar amount what is the

15  percentage that MidAtlantic bills from

16  hospitals and physicians in the, we'll

17  call it, Philadelphia market?

18       A.     I probably couldn't give you

19  a number.

20       Q.     You gave me a percentage,

21  ten percent, what do you base that on?

22       A.     If you look at where the

23  place of business, primarily the Medicaid

24  contract, they're all -- unless they have

ELMORE

```
 1   transportation they don't go out of state
 2   for services unless they're burn
 3   patients, a baby that even Alfred I.
 4   DuPont can not take care of or an adult,
 5   which again, the Medicaid, some adults in
 6   there and sometimes they need organ
 7   transplants and things like that.
 8            I know that we look at in
 9   the health plan how much of the business
10   goes out of state because primarily the
11   contracts are focusing on Delaware
12   providers and we look and see how much
13   goes into the various states.
14            Part of it is I know how
15   much our business comes from outside of
16   the state too as we provide services too.
17        Q.    So with those, I think, four
18   Philadelphia hospitals and those 200 to
19   600 physicians in Philadelphia, you are
20   telling that -- you're estimating that
21   only 10 percent of MidAtlantic's billing
22   comes from those providers?
23        A.    About 10 percent or less.
24        Q.    Can you tell me what the
```

ELMORE

```
 1   referring to and other relationships, is

 2   that we've always had a teaching

 3   relationship with Jefferson that predates

 4   me.  And that would be my assumption as

 5   to why it's on here.

 6          Q.    You handed me a document,

 7   we'll have this marked.  This is a

 8   document generated by Christiana?

 9          A.    Yes.  It's part of our

10   official bond statement.

11          Q.    Tell me what this document

12   discusses.

13          A.    It just explains how back in

14   the early '60s the State of Delaware,

15   which I wasn't here at that point in

16   time, general assembly passed legislation

17   to create the DIMER program, Delaware

18   Institute of Medical Education and

19   Research.

20                And it was a relationship

21   between the State of Delaware and

22   Jefferson Medical College and it provides

23   funding to Jefferson -- the state

24   provides funds for a certain number of
```

Case 1:05-cv-00321-GMS    Document 13    Filed 09/06/2005    Page 38 of 51
09/06/2005 15:46  1225356390         KATS AND ASSOCIATES                PAGE  31/36

76

ELMORE

1   medical student slots in their program up

2   there.

3              And it also provides for the

4   opportunity for those clinical students

5   that are in the medical college to rotate

6   down here to Christiana Hospital or to

7   Wilmington Hospital under our residency

8   program where our residents then they can

9   work alongside our residents and receive

10  education and training.  And that's the

11  purpose of the medical school

12  affiliation.

13       Q.    Does Christiana or

14  Wilmington Hospital have a medical

15  school?

16       A.    No.

17       Q.    So then you have Jefferson

18  students rotating down at Christiana for

19  say a obstetrical residency, for example?

20  I'm just using that as a medical.

21       A.    Well, first of all, we have

22  our own residency program.  We're a

23  community teaching residency program.  We

24  have over 200 residents.

77

ELMORE

1          It's our program, it's not
2   Jefferson and their medical students
3   rotate down here.  Some of the residents
4   may rotate down here but usually it's
5   their medical students.
6          Q.    Years one, two, three and
7   four, correct?  They're students years
8   one, two, three and four?
9          A.    The residents' programs are
10  Program one, two, three or four years.
11         Q.    Now, you said that this is a
12  community teaching program here?
13         A.    Yes.
14               MR. BALAGUER:   Christiana
15         is.
16               THE WITNESS:   Christiana.
17  BY MR. LEVIN:
18         Q.    I'm sorry, Christiana.  What
19  do you mean by community teaching
20  program?
21         A.    Well, first of all, most
22  residency programs if they're not
23  affiliated through the university,
24  they're there --

ELMORE

1          Q.      What university are you

2     referring to?

3          A.      A medical school.

4          Q.      Okay.  I'm sorry.

5          A.      In other words, if it's a

6     residency program through the university

7     like Jefferson Health System or through

8     the University of Pennsylvania, we don't

9     have a medical college here in Delaware

10    and therefore we are considered a

11    community teaching residency program.

12         Q.      Do any of the we'll call

13    them Christiana students rotate to

14    Jefferson?

15              MR. BALAGUER:  You mean

16         residents.

17    BY MR. LEVIN:

18         Q.      Residents, I'm sorry.

19         A.      It's possible.  I don't know

20    what their schedules are but it's

21    possible they could rotate up there for a

22    class or a specific service.

23         Q.      Do any Christiana doctors --

24    when I mean Christiana, I mean Christiana

ELMORE

1    or Wilmington Hospital doctors teach at

2    Jefferson Medical College?

3                    MR. BALAGUER:  Now you're

4              talking about independent staff.

5              People who have staff privileges

6              at Christiana.

7                    MR. LEVIN:  Yes.  Thank you.

8                    THE WITNESS:  I believe --

9              that's why I printed this out

10             because I'm not as familiar with

11             the teaching relationships with

12             the whole program and it says in

13             here that some of our faculty in

14             our program also provide -- are on

15             faculty appointments up at

16             Jefferson.

17   BY MR. LEVIN:

18             Q.    So that would be yes?

19             A.    It would be yes.

20             Q.    Do you know for how long

21   your faculty has been providing teaching

22   to Jefferson?

23             A.    I would not know.

24             Q.    Before 2002?

ELMORE

1          A.      I would have to say we

2     employ physicians and we have practices

3     that we operate.

4          Q.      Do you know how many

5     practices you operate?  I won't pin you

6     down, just estimate for me.

7          A.      I'm going to estimate we

8     probably have 40 primary care physicians.

9     Primary care physicians that provide

10    services from a patient care side that

11    aren't necessarily in medical education.

12         Q.      Do you employ physicians who

13    are involved in medical education?

14         A.      Yes.

15         Q.      Do any of those physicians

16    that you employ that are involved in

17    medical education have teaching

18    appointments at Jefferson or any other

19    Philadelphia hospital?

20         A.      I don't know.  Probably.

21    Because on this statement here as far as

22    who has dual faculty appointments, they

23    could be private community physicians

24    that are on our medical staff.  It could

84

ELMORE

1   be some of our faculty.  I'm not sure.

2        Q.    How would I find that out?

3        A.    Dr. Little.

4        Q.    Dr. Little?  What is his

5   title?

6        A.    Vice president for medical

7   education.

8        Q.    The document that you gave

9   -- let's just mark it.

10            MR. LEVIN:  Mark it as D-1.

11       This is D-2.

12                  -    -    -

13            (Whereupon the documents

14       were marked for identification as

15       Exhibits D-1 and D-2.)

16                  -    -    -

17            MR. LEVIN:  And while we're

18       marking, mark as D-3, which we

19       previously discussed.

20                  -    -    -

21            (Whereupon the document was

22       marked for identification as

23       Exhibit D-3.)

24                  -    -    -

Exhibit B

LEXSEE 2003 U.S. DIST LEXIS 7589

**PARIS CLOUD, Plaintiff, v. AMQUIP CORPORATION, Defendant.**

**Civil Action No. 02–1316–SLR**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2003 U.S. Dist. LEXIS 7589*

**April 28, 2003, Decided**

**DISPOSITION:** [*1] Motion to dismiss complaint denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff sued for negligence in a Texas state court. Defendant filed a special appearance motion in that case. Defendant's motion was denied by the trial court but upheld by the state court of appeals. Plaintiff filed the instant federal action on July 24, 2002. Defendant moved to dismiss the complaint, arguing that plaintiff's claim was time–barred.

**OVERVIEW:** Defendant argued that plaintiff's claim was untimely as his injury was sustained on February 24, 1999 and, under Delaware's two–year limitations period for negligence, suit had to have been brought prior to February 24, 2001. Plaintiff countered that Delaware's Savings Statute (DSS), Del. Code Ann. tit. 10, § 8118(a), preserved his claim. Defendant argued that, because plaintiff originally filed suit in Texas, DSS did not apply to foreign–filed claims. Delaware state courts had held that DSS applied to actions commenced beyond the boundaries of the state of Delaware. Plaintiff brought the present action because of the failure to obtain personal jurisdiction over defendant in a foreign state. There was no indication that defendant had suffered prejudice by the consecutive filings. The court held that DSS applied to actions initially brought in a foreign jurisdiction and dismissed for reasons other than on the merits of the claim. The court ruled that plaintiff brought his action within the one year time period allowed for the initiation of a subsequent suit by DSS.

**OUTCOME:** The court denied defendant's motion to dismiss.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Motions to Dismiss*

[HN1] In analyzing a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the court must accept as true all material allegations of the complaint and it must construe the complaint in favor of the plaintiff. A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint. Claims may be dismissed pursuant to a Fed. R. Civ. P. 12(b)(6) motion only if the plaintiff cannot demonstrate any set of facts that would entitle him to relief. The moving party has the burden of persuasion.

*Torts > Negligence > Negligence Generally*
*Governments > Legislation > Statutes of Limitations > Time Limitations*

[HN2] Delaware's applicable statute of limitations for negligence is two years. 10 Del. Code Ann. tit. 10, § 8119.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*

[HN3] While generally, a statute of limitations defense cannot be used in the context of a Fed. R. Civ. P. 12(b)(6) motion, an exception can be made when the complaint facially shows noncompliance with the limitations period and the affirmative defense clearly appears on the face of the pleadings.

*Governments > Legislation > Statutes of Limitations > Time Limitations*

[HN4] See Del. Code Ann. tit. 10, 8118(a).

*Governments > Legislation > Statutes of Limitations > Extension & Revival*
*Civil Procedure > Pleading & Practice > Service of Process > Time Limitations*

[HN5] Delaware state courts that have spoken directly to the issue of whether the Delaware Savings Statute, Del. Code Ann. tit. 10, 8118(a), applies to actions commenced beyond the boundaries of the State have concluded that it does.

2003 U.S. Dist. LEXIS 7589, *1

**COUNSEL:** For PARIS CLOUD, plaintiff: James J. Woods, Jr., Connolly, Bove, Lodge & Hutz, Wilmington, DE.

For AMQUIP CORPORATION, defendant: Louis J. Rizzo, Jr., Reger & Rizzo, LLP, Wilmington, DE.

**JUDGES:** Sue L. Robinson, United States District Judge.

**OPINIONBY:** Sue L. Robinson

**OPINION:**

### MEMORANDUM ORDER

### I. INTRODUCTION

Plaintiff initially filed suit against defendant and others on January 7, 2000 in Harris County, Texas. (D.I. 13, P 9) The suit alleged that negligence on the part of defendant caused plaintiff's injuries. (Id. at Ex. B) Defendant filed a special appearance motion on or about February 4, 2000. (Id. at PP 12, 13) The trial court in Texas denied the motion, but it was upheld by the Court of Appeals for the First District of Texas on February 7, 2002. (Id. at PP 14, 18) Plaintiff filed his original complaint in this court on July 24, 2002. (Id. at P 19) Currently before the court is defendant's motion to dismiss plaintiff's complaint pursuant to *Fed.R.Civ.P. 12(b)(6)* ("*Rule 12(b)(6)*". (D.I. 12)

For the reasons that follow, the court shall deny defendant's motion. **[*2]**

### II. BACKGROUND

On February 24, 1999, plaintiff was injured on a job site accident in Delaware City, Delaware. (D.I. 12 at 4) Plaintiff alleges that an employee of defendant improperly operated a forklift causing plaintiff to be injured during the disassembly of a crane. (Id.) Plaintiff seeks compensation for medical expenses, loss of earning capacity, and other damages. (Id., Ex. A at 3–4)

### III. STANDARD OF REVIEW

[HN1] In analyzing a motion to dismiss pursuant to *Rule 12(b)(6)*, the court must accept as true all material allegations of the complaint and it must construe the complaint in favor of the plaintiff. See *Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc., 140 F.3d 478, 483 (3d Cir. 1998)*. "A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint."

*Id.* Claims may be dismissed pursuant to a *Rule 12(b)(6)* motion only if the plaintiff cannot demonstrate any set of facts that would entitle him to relief. See *Conley v. Gibson, 355 U.S. 41, 45–46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)*. **[*3]** The moving party has the burden of persuasion. See *Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir. 1991)*.

### IV. DISCUSSION

Defendant argues that plaintiff's claim is time barred as his injury was sustained on February 24, 1999 and suit had to have been brought prior to February 24, 2001. n1 (D.I. 12 at 5–6) Plaintiff counters that Delaware's Savings Statute, *10 Del.C. § 8118* n2, preserves his cause of action. (D.I. 13) Defendant claims that the Savings Statute is inapplicable here because plaintiff originally filed suit in Texas and the statute does not apply to foreign-filed claims. (D.I. 12 at 6–7)

    n1 [HN2] Delaware's applicable statute of limitations is two years. *10 Del.C. § 8119*. The court acknowledges that [HN3] while generally, a statute of limitations defense cannot be used in the context of a *Rule 12(b)(6)* motion, an exception can be made when the complaint facially shows noncompliance with the limitations period and the affirmative defense clearly appears on the face of the pleadings. *Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1384 n.1 (3d Cir. 1994)*.

**[*4]**

    n2

> [HN4] If in any action duly commenced within the time limited therefor in this chapter, the writ fails of a sufficient service or return by any unavoidable accident, or by any default or neglect of the officer to whom it is committed; or if the writ is abated, or the action otherwise avoided or defeated by the death of any party thereto, or for any matter of form; or if after a verdict for the plaintiff, the judgment shall be given for the plaintiff because of some error appearing on the face of the record which vitiates the proceedings; or if a judgment for the plaintiff is reversed on appeal or a writ of error; a new action may be commenced, for the same cause of action, at any time within one year after the abatement or other determination

of the original action, or after the reversal of the judgment therein.

*10 Del.C. § 8118(a).*

Defendant relies on *Sorensen v. Overland Corp., 142 F. Supp. 354 (D. Del. 1956)* for the proposition that Delaware's Savings Statute "does not encompass prior actions arising out of foreign courts." *Id. at 363.* **[*5]** That reasoning was only one of several grounds for dismissal in that case and this court declines to follow that court's logic.

[HN5] Delaware state courts that have spoken directly to the issue of whether the Delaware Savings Statute applies to actions commenced beyond the boundaries of the State have concluded that it does. In *Leavy v. Saunders, 319 A.2d 44 (Del. Super. Ct. 1974)*, the court held that "the language of § [8118] does not show an intention to limit the section solely to successive actions brought in the courts of this State," because it "is silent as to place of commencement." *Id. at 47.* The court in Leavy reasoned that "the real function of a statute of limitation[s] is to protect prospective litigants against stale claims." *Id.* The court concluded that it would be "difficult to justify the conclusion that this exception to the statute of limitations should be applied on the basis of judicial jurisdiction or territory." Id.

Defendant also relies on *Morris v. Wise, 1955 OK 297, 293 P.2d 547 (Okla. 1955)* to support its claim that savings statutes do not apply to causes of action initially brought in a foreign jurisdiction. **[*6]** *Id. at 550-51.* This reliance is misplaced. Delaware's statute is different from the Oklahoma statute. The Oklahoma statute specifically limits the applicability of the Oklahoma savings statute to "actions commenced within this state." *12 O.S. 1951 §*

100. Therefore, Morris is inapplicable to the present case.

Additionally, this court finds that the Delaware Supreme Court has held that the purpose of the Delaware Savings Statute is "to mitigate against the harshness of the defense of the statute of limitations raised against a plaintiff who, through no fault of his own, finds his cause technically barred by the lapse of time." *Giles v. Rodolico, 51 Del. 143, 140 A.2d 263, 267, 1 Storey 143 (Del. 1958).* In that case, as well as the Leavy case cited above, the cause of action was dismissed because of failure to obtain personal jurisdiction over the defendant. Id.; *Leavy, 319 A.2d at 47-48.* The present action was brought in this court because of the failure to obtain personal jurisdiction over defendant in a foreign state. (D.I. 13) As in the cases cited above, defendant has been aware of the proceedings and there is no indication defendant **[*7]** has suffered harm or prejudice by the consecutive filings. See *Leavy, 319 A.2d at 48.*

## VI. CONCLUSION

The court holds that the Delaware Savings Statute applies to actions initially brought in a foreign jurisdiction and dismissed for reasons other than on the merits of the claim. The court finds that plaintiff brought this action against defendant within the one year time period allowed for the initiation of a subsequent suit by the Savings Statute.

Therefore, at Wilmington this 28th day of April, 2003;

IT IS ORDERED that defendant's motion to dismiss plaintiff's complaint pursuant to *Rule 12(b)(6)* (D.I. 12) is denied.

Sue L. Robinson

United States District Judge

LEXSEE 1981 DEL. SUPER LEXIS 818

**Mary Welch Gaspero v. Walter M. Douglas, Executor of the Estate of Fred T. Douglas**

**No. 80C–DE–45**

**Superior Court of Delaware, New Castle**

*1981 Del. Super. LEXIS 818*

**Submitted: September 14, 1981**
**November 6, 1981, Decided**

**COUNSEL: [*1]**

Jeffrey M. Weiner, Esquire, Bayard, Brill & Handelman, P.A., Wilmington, DE.

Joseph A. Hurley, Esquire, Wilmington, DE.

Richard Galperin, Esquire, Flanzer & Isaacs, Wilmington, DE.

**JUDGES:**

Andrew D. Christie, Judge.

**OPINIONBY:**

CHRISTIE

**OPINION:**

Andrew D. Christie

This is an action upon personal injuries caused by an automobile accident which occurred on August 13, 1977. A complaint was originally filed on June 22, 1979. Plaintiff, Mary Gaspero, attempted to serve the executor of the estate of Fred T. Douglas (the defendant) under the non–resident motorist statute (*10 Del.C. § 3112*) but service was ineffective and the original action was dismissed by a prior order of this Court dated December 4, 1980.

On December 8, 1980 (more than three years after the accident but only four days after the first action was dismissed) Mrs. Gaspero filed a new complaint based on the same cause of action and this time effective service was made upon defendant Walter Douglas, Executor of the estate of Fred T. Douglas. A motion to dismiss the new suit has been filed by Mr. Douglas on the ground that the applicable two–year statute of limitations (*10 Del.C. § 8119*), as well as principles of res judicata [*2] and estoppel, bar this action. The purpose of this letter is to announce the Court's ruling on defendant's motion to dismiss.

Mary Gaspero relies upon the so–called savings statute (*10 Del.C. § 8118*, formerly *10 Del.C. § 8117*) as providing her with the authority to file and pursue her latest complaint. This statute provides in pertinent part:

§ 8118. Other savings.

(a) If in any action duly commenced within the time limited therefor in this chapter, the writ fails of a sufficient service or return by any unavoidable accident, or by any default or neglect of the officer to whom it is committed; or if the writ is abated, or the action otherwise avoided or defeated by the death of any party thereto, or for any matter of form; or if after a verdict for the plaintiff, the judgment shall not be given for the plaintiff because of some error appearing on the face of the record which vitiates the proceedings; or if a judgment for the plaintiff is reversed on appeal or a writ of error; a new action may be commenced, for the same cause of action, at any time within one year after the abatement or other determination of the original action, or after the reversal of the judgment [*3] therein.

* * *

It is clear that, but for the exception which this savings statute may create in this case, Mrs. Gaspero's action would be barred by the statute of limitations contained in *10 Del.C. § 8119*. The statute of limitations provides that personal injury claims must be brought within two years "from the date upon which it is claimed that such alleged injuries were sustained." The question thus presented is whether the savings statute applies to this case. It is the plaintiff's position that any prior difficulties encountered in properly serving process upon the defendant must be regarded as resulting in an "abatement" of the original timely complaint within the meaning of *10 Del.C. § 8118*. n1

n1 As a general rule, any informality, irregu-

larity, or defect in the terms, forms or structure of a writ or summons, or in the service or return of process, which is sufficient to render it invalid, is ground for abating the writ. *Howmet Corporation vs. City of Wilmington, Del.Super., 285 A.2d 423 (1971); See C.J.S., Abatement and Revival, § 87.*

As discussed in this Court's letter opinion dated December 4, 1980, the service of the complaint originally [*4] filed by the plaintiff was ineffective because plaintiff failed to comply with the technical provisions of *10 Del.C. § 3112* regarding service of process on non-resident motorists. Specifically, the notice sent by the plaintiff to the defendant was deficient because copies of the papers served on the Secretary of State could not have been enclosed, as required by § 3112(b), since service had not taken place. The attorney who then represented plaintiff's learned of this error sometime in December of 1979. Had the attorney acted diligently and promptly at that time in perfecting service by having an alias summons issue, the statute of limitations might have been regarded as having been tolled. *Biby vs. Smith, Del. Super., 272 A.2d 116 (1970); Sines vs. Wyatt, Del.Super., 281 A.2d 499 (1971).* Plaintiff's attorney waited over a month, however, before taking any action. Because of the time lapse, he was then forced to seek leave of the Court to have an alias summons issue. Permission was summarily granted by the Court on February 8, 1980. The writ was thereafter issued and steps were taken to correctly comply with the statutory provisions regarding service of process. Under [*5] all of these circumstances I concluded that service of process had not been obtained within a reasonable time after the filing of the original complaint and that the only effective service of process occurred after the time specified in the statute of limitations had run.

I

The savings statute was not before the Court at the time of the earlier ruling. This statute has been described as "designed to mitigate against the harshness of the defense of the statute of limitations against a plaintiff who, through no fault of his own, finds his cause technically barred by lapse of time." *Giles vs. Rodolico, Del.Supr., 140 A.2d 263, 267 (1958);* Annot. *6 ALR3d 1043 (1966).* It is remedial in nature and is to be liberally construed. *Purnell vs. Dodman, Del. Super., 311 A.2d 877 (1973).* The statute has been said to "embrace cases which equitably ought to be covered by it." *Id., at 880.* Where a defendant's insurance company is in contact with a plaintiff's counsel and knows of problems encountered in effecting service, a defendant cannot be prejudiced by a plaintiff's improper service of process. *Giles, supra; Purnell, supra; Viars vs. Surbaugh, Del.Super., 335 [*6] A.2d 285 (1975).*

Plaintiffs seeking relief under the savings statute in

these circumstances must meet two requirements: (1) they must have commenced an action before the statute of limitations barred the action, and (2) the writ which subsequently issues must have been "abated." In this case it is clear that plaintiff duly commenced her action by filing the complaint n2 prior to the expiration of the statute of limitations. It is also clear that the writ which thereafter issued was rendered invalid by virtue of an attorney's failure to comply with the technical provisions of *10 Del.C. § 3112.* It would therefore seem that the plaintiff meets the requirements of the savings statute.

> n2 Superior Court Civil Rule 3(a) states: "Except amicable actions, an action is commenced by filing with the Prothonotary a complaint or, if required by statute, a petition or statement of claim, all hereafter to be referred to as a 'complaint' and a praecipe directing the Prothonotary to issue the writ specified therein."

I am also of the opinion that the equities of the case weigh in favor of the plaintiff. As mentioned in this Court's earlier letter opinion, the record shows that both the [*7] deceased and his insurer had been aware of the existence of a claim by a few days after the accident. Thereafter, the plaintiff's attorney engaged in correspondence with the deceased's insurer. The defense of the case has suffered no pertinent prejudice as a result of the difficulties plaintiff's attorney has encountered in obtaining proper service on the defendant.

I know that I have previously found that the plaintiff's attorney was remiss in not promptly effecting proper service of process once the inadequate nature of the original service of process became apparent. This finding was significant under the rules of law discussed in this Court's prior letter opinion. The present cause of action has been filed under a different statute. The equitable policies underlying the savings statute convince me that under the circumstances here present substantive rights should not be forfeited where the deceased and his insurer had actual (albeit defective) notice of the existence of an outstanding claim shortly after the accident occurred, and the statute was invoked as soon as the Court ruled that the earlier attempts at service were ineffective. I also note that the carrier had notice that [*8] plaintiff had filed suit and that the defect in the service was a technical defect.

II

Defendant argues that the plaintiff should be barred by principles of res judicata and estoppel from instituting this second cause of action. *Ezzes vs. Ackerman, Del.Supr., 234 A.2d 444 (1967).* Defendant states that the plaintiff should have asserted the savings statute, if at all, in the prior litigation, and that after losing a case on one theory

1981 Del. Super. LEXIS 818, *8

he may not pursue a different theory in a second action based on the same proof which has been rejected in the first action.

The savings statute confers upon a plaintiff the independent right to bring a second cause of action where a prior timely action has been dismissed because of a failure to perfect service of process within the period of limitations. See *Giles, supra; Purnell, supra.* The doctrine of res judicata does not apply in this case because the savings statute, as the Court in Purnell noted, "grants an absolute right to the litigant to elect renewal." *Id., at 879.* Under the circumstances I find no estoppel.

Defendant's motion to dismiss is denied. IT IS SO ORDERED.

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 6th day of September, 2005, that I electronically filed the attached

Appendix with the Clerk of the Court using CM/ECF, which will send notification of such filing

to the following:

Natalie L. Palladino, Esq.
White and Williams LLP
824 N. Market St., Suite 902
Wilmington, DE 19899

**RICHARD R. WIER, JR., P.A.**

   /s/ Daniel W. Scialpi   
Richard R. Wier, Jr. (#716)
Daniel W. Scialpi (#4146)
1220 Market St., Suite 600
Wilmington, DE 19801
(302)888-3222
DScialpi@Wierlaw.com