# EXHIBIT A

Westlaw.

Not Reported in F.Supp.2d, 1999 WL 166968 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Briefs and Other Related Documents
Kappes v. E.I. DuPont de Nemours & Co., Inc.D.Del.,1999.Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
Jerry KAPPES, Plaintiff,
v.
E.I. DUPONT DE NEMOURS & CO., INC., Individually, and in its capacity as Administrator of the DuPont Pension and Retirement Plan, and the Dupont Pension and Retirement Plan, Defendants.
**No. CIV. A. 97-443-SLR.**

March 18, 1999.

Robert Jacobs, Esquire of Jacobs & Crumplar, Wilmington, Delaware. Counsel for Plaintiff. Of Counsel: James H. Rion, Esquire and Paul J. Doolittle, Esquire of Ness, Motley, Loadholt, Richardson & Poole, Charleston, North Carolina. Gary W. Kendall, Esquire and J. Greg Webb, Esquire of Miche, Hamlett, Lowry, Rawsmussen & Tweel, P.C., Charlottesville, Virginia. Kenneth Henley, Esquire, Bala Cynwyd, Pennsylvania. Dennis Ventriglia, Esquire, Wilmington, North Carolina.
Eileen M. Filliben, Esquire and Kathleen Furey McDonough, Esquire of Potter Anderson & Corroon LLP, Wilmington, Delaware. Counsel for defendants.

MEMORANDUM OPINION
ROBINSON, District J.

I. INTRODUCTION

*1 Jerry Kappes ("plaintiff") filed this action against E.I. du Pont de Nemours & Co., individually and in its capacity as administrator of the DuPont Pension and Retirement Plan, and against the DuPont Pension and Retirement Plan (collectively "defendant"). This action arises from plaintiff's discharge during a Reduction in Force (" RIF") at defendant's Seaford, Delaware Nylon manufacturing plant. Plaintiff, a Caucasian male, asserts claims of reverse race and gender discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII" ), and age discrimination under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(a)(1). Plaintiff also asserts claims arising under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1140 *et seq.*[FN1] Currently before the court is defendant's motion for summary judgment. The court has jurisdiction over plaintiff's federal claims pursuant to 28 U.S.C. § 1331. For the reasons that follow, the court shall grant defendant's motion for summary judgment.

> FN1. In his initial complaint, plaintiff raised several claims founded on state common law theories. (D.I.1, ¶¶ 52-79) The court ruled, however, that ERISA preempted these state claims. (D.I.17) Nonetheless, in counts five through nine of his second amended complaint, plaintiff again raised state common law fraud claims as well as state breach of fiduciary duty and breach of covenant of good faith and fair dealing claims. (D.I.38, ¶¶ 52-79) In his answer to defendant's motion for summary judgment, plaintiff voluntarily dismissed these state claims. (D.I. 69 at 16-17) Accordingly, the court shall grant defendant's motion for summary judgment with respect to counts five through nine of the second amended complaint. Defendant also has moved for sanctions under Fed.R.Civ.P. 11 for costs associated with briefing a response to plaintiff's state claims. (D.I. 72 at 3-4) Defendant's motion for sanctions is denied.

II. BACKGROUND

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 1999 WL 166968 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

At the time of his termination, plaintiff was fifty-three years old and had worked in defendant's Seaford, Delaware plant for twenty-seven years. The Seaford plant manufactures synthetic Nylon fibers.[FN2] From 1969 to 1983, plaintiff held various posts on the plant's Bulk Continuous Filament ("BCF") manufacturing line. In November 1983, plaintiff left the manufacturing floor for a labor planning and development position. From 1983 to 1991, he served as a labor planning supervisor-a position that entailed cost accounting and cost reduction planning. From 1991 until the termination of plaintiff's employment, plaintiff served as a Benefits Specialist in the plant's human resources department. Plaintiff's duties entailed employee recruiting as well as compensation and medical benefits counseling. (D.I. 65 at A143-44, A375, A378-80)

> FN2. According to defendant, there are three types of Nylon fiber products manufactured at its Seaford plant: Bulk Continuous Filament, Staple, and Textile/Apparel. (D.I. 64 at 7)

Defendant eliminated plaintiff's human resources position during a 1996 RIF. During a subsequent work-force restructuring at the Seaford plant, defendant rehired certain employees for new, consolidated positions. Plaintiff's federal claims arise out of defendant's refusal to rehire him.

A. The RIF Process

Increased competition in the global Nylon industry forced defendant's Seaford plant managers to initiate two RIFs during the 1990s in order to increase competitiveness.[FN3] During the first round of cost-cutting measures, managers eliminated approximately fifty nonmanufacturing positions at the Seaford plant. (D.I. 65 at A461) The plant's human resources department, where plaintiff worked, bore the brunt of these reductions. Defendant consolidated several human resources positions, and it "outsourced" the administration of the plant's health benefits to its Wilmington corporate headquarters. In 1995, defendant also shifted employee compensation responsibilities from the Seaford plant's human resources department to Wilmington. (D.I. 65 at A239, A249, A291-92, A406-07, A452)

> FN3. Defendant cites low growth in the Nylon market and customer demand for less labor intensive Nylon products as additional reasons for reducing its labor force. (D.I. 64 at 6)

*2 In 1996, defendant's Vice President in charge of Nylon production ordered defendant's entire Nylon division to cut an additional $150 million in costs. (D.I. 65 at A147, A149-55) Management at the Seaford plant contributed to this sum by committing to a plant-wide eighteen million dollar cost reduction, which necessitated another round of work force reductions and consolidations.[FN4] (D.I. 65 at A247-48; D.I. 70 at B50) During this RIF, plant managers eliminated plaintiff's human resources position and reduced the human resources department to a staff of two. (D.I. 65 at A259)

> FN4. Specifically, the cost-cutting measures included the discontinuation of an entire line of Staple production, consolidations of manufacturing positions, and the elimination or consolidation of " support" positions in the plant's finance and human resources departments. (D.I. 65 at A248-49)

Employees whose positions were eliminated during the 1996 RIF could retire voluntarily [FN5] or nominate themselves for new, consolidated positions at the plant. (D.I. 65 at A161) Plant management developed a complex performance evaluation process to evaluate employees for placement in these new positions. A "Selection Team" composed of plant managers conducted the evaluation process. (D.I. 65 at A181-85) Management guidelines required that Selection Team members know both the duties of the vacant positions and the candidates under consideration for those positions.[FN6] (D.I. 65 at A170) The Selection Team also included "outside" members

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 1999 WL 166968 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

who monitored the fairness of the evaluations. (D.I. 65 at A253-54)

> FN5. According to defendant, thirteen employees-all males over the age of forty-opted for early retirement. (D.I. 72 at 10 n. 2)

> FN6. Apparently, self-nominations were not a prerequisite for consideration by defendant for new positions. It appears that the Selection Team also nominated candidates on its own in addition to considering self-nominations. (*See* D.I. 64 at 10 ("For each position the Team went through the list of all available employees and suggested candidates for the position at issue."))

For each position, the Selection Team conducted an evaluation of whether, and to what extent, candidates exhibited DuPont's "Five Leadership Criteria" [FN7] and whether or not candidates possessed the particular skills required for each position. The ranking form used by the Selection Team provided three ratings ("exceeds," "meets," and "does not meet") for the required leadership and job qualification skills. (D.I. 65 at A165) According to the plant manager, a "meets" ranking denotes that a person possesses the skill in question, while "does not meet" means that a person "does not possess the qualifications ... need[ed] for the task involved." (D.I. 65 at A264) These rankings facilitated discussions of a candidate's suitability for a position. The Selection Team filled positions after reaching a consensus about the most qualified candidate for each position. Where discussion augmented a candidate's raw ranking, the Team noted the substance of the discussion on the selection process documents. (*See, e.g.,* D.I. 65 at A192, A194, A196, A198) The Team removed those selected for a given position from further consideration for other positions.

> FN7. Defendant's "Five Leadership Criteria " are "Business Direction," " Implementation," "

Networking/Teambuilding," "People Development," and "Personal Leadership Characteristics." (D.I. 65 at A180)

After the Selection Team filled vacant positions at the plant, defendant discharged all remaining employees who had not volunteered for early retirement or who had not received new assignments.[FN8] Plaintiff was among those employees terminated. Terminated employees could participate in a severance package known as the Career Transition Plan ("CTP"). Under the CTP, management permitted terminated employees to remain on the payroll for sixty days following notice of their termination. (D.I. 65 at A201) During this period, employees had no job duties except to find new employment. (D.I. 65 at A201) The CTP also included a severance package that offered one month's salary for every two years of service (not to exceed one year's salary), as well as medical, dental, and life insurance coverage, and up to $5,000 in educational assistance. (D.I. 65 at A206-12)

> FN8. Defendant conducted an adverse impact study to determine the RIF's effect on the plant's minority population. (D.I. 65 at A187) Of the 123 males affected by the RIF, eighty-three were hired for other positions while defendant eventually terminated forty. Of the fifteen women affected by the RIF, defendant rehired eleven while terminating five. Roughly thirty-four percent of Caucasians and fifteen percent of African-Americans affected by the RIF were terminated. (D.I. 65 at A187) According to the Seaford plant manager, Caucasian males constituted the majority of the plant's population prior to the 1996 RIF. (D.I. 70 at B49) Although defendant's study did not measure the 1996 RIF's impact on its older workers, defendant admits that employees over the age of forty constituted the majority of those terminated during the RIF. (D.I.38, ¶ 16) Defendant explains this disparity by noting that the average age of the plant prior to the 1996 RIF was "

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                   Page 4

Not Reported in F.Supp.2d, 1999 WL 166968 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

forty-seven or forty-eight." (D.I. 70 at B49)

*3 Following his termination, plaintiff enrolled in the CTP and appealed the Selection Team's decision. (D.I. 65 at A217-18; D.I. 70 at B33-36) The plant manager denied plaintiff's appeal, and plaintiff's employment at the plant officially ended on May 1, 1996.[FN9] (D.I.38, ¶ 24) Plaintiff then filed a complaint with the Delaware Department of Labor ("DDOL") and the Equal Employment Opportunity Commission ("EEOC"). (D.I. 65 at A219) Neither party has informed the court of the DDOL's disposition of plaintiff's complaint. The EEOC issued plaintiff a "Right to Sue" letter [FN10] on April 28, 1997, and plaintiff filed the case at bar ninety days thereafter.

>   FN9. Plaintiff contends that this appeal process was a "farce" because the plant manager did not discuss plaintiff's case with other members of the appeal board. (D.I. 70 at 34-38) Accepting this as true, the court still is unable to find evidence that discriminatory animus motivated the denial of plaintiff's appeal.

>   FN10. In order to bring suit under Title VII, a party must receive a right to sue letter from the EEOC. *See* 42 U.S.C. §§ 2000e-5(e)-5(f).

### III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 n. 10 (1986). "Facts that could alter the outcome are 'material,' and disputes are ' genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Federal Kemper Life*

*Assurance Co.,* 57 F.3d 300, 302 n. 1 (3d Cir.1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with ' specific facts showing that there is a genuine issue for trial." ' *Matsushita,* 475 U.S. at 587 (quoting Fed.R.Civ.P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pennsylvania Coal Ass'n v. Babbitt,* 63 F.3d 231, 236 (3d Cir.1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

In the Title VII [FN11] context, the defendant is entitled to summary judgment if it can demonstrate that: (1) the plaintiff is unable to establish a *prima facie* case of discrimination; or (2) if the plaintiff can establish a *prima facie* case, the plaintiff cannot produce sufficient evidence of pretext to rebut the defendant's legitimate, nondiscriminatory reason for discharging the plaintiff. *See Stinson v. Delaware River Port Auth.,* 935 F.Supp. 531, 539 (D.N.J.1996). The court evaluates defendant's summary judgment motion as follows:

>   FN11. Title VII of the 1964 Civil Rights Act provides in pertinent part:
>   (a) Employer practices. It shall be an unlawful employment practice for an employer-(1) to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate or classify his employees

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 1999 WL 166968 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a).

**\*4** The district court must determine whether the plaintiff has cast sufficient doubt upon the employer's proffered reasons to permit a reasonable factfinder to conclude that the reasons are incredible ....
*Sheridan v. E.I. DuPont de Nemours & Co.,* 100 F.3d 1061, 1072 (3d Cir.1996) (en banc). The plaintiff can demonstrate that there is "sufficient doubt" by showing " 'weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action [such] that a reasonable factfinder could rationally find them 'unworthy of credence." " *Id.* (quoting *Fuentes v. Perskie,* 32 F.3d 759, 765 (3d Cir.1994) (citations omitted)). Alternatively, a Title VII plaintiff can defeat a motion for summary judgment by showing "that the reason for the employer's act was discrimination." *Bray v. Marriott Hotels,* 110 F.3d 986, 990 (3d Cir.1997).

### IV. PLAINTIFF'S DISCRIMINATION CLAIMS

Plaintiff's reverse race and gender discrimination claims, as well as his age discrimination claims, rest on his contention that plant management specifically targeted Caucasian males over the age of forty for termination during the 1996 RIF. In asserting these claims, plaintiff proceeds under a disparate treatment theory. The court will address each of plaintiff's discrimination claims in order.

### A. Reverse Race Discrimination

In *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), the United States Supreme Court articulated the analytical framework applicable to disparate treatment suits brought under Title VII. [FN12] According to that framework, a plaintiff has

the initial burden of establishing a *prima facie* case. To establish a *prima facie* case of unlawful race discrimination based on disparate treatment, the plaintiff must show that: (1) he is a member of a protected group, (2) that he applied and was qualified for a job for which the employer was seeking applicants, (3) that, despite his qualifications, he was rejected, and (4) members outside the protected group received more favorable treatment. *See McDonnell Douglas,* 411 U.S. at 802; *Weldon v. Kraft, Inc.,* 896 F.2d 793, 796-97 (3d Cir.1990).

> FN12. Plaintiff's brief does not present his purported evidence of discrimination in terms of the *McDonnell Douglas* burden-shifting framework. Oddly, plaintiff does not cite (let alone discuss) any of the Supreme Court's leading Title VII cases.

In reverse discrimination cases, courts must modify the first prong of the *McDonnell Douglas* test.[FN13] *See Murphy v. Housing Auth. & Urban Redevelopment Agency,* No. Civ.A.97-1558, 1999 WL 31207, at \*10 (D.N.J. Jan. 22, 1999). Although "Title VII ... prohibits racial and gender discrimination against all people, including members of the majority," *McDonald v. Sante Fe Transp. Co.,* 427 U.S. 273, 280 (1976), courts in this Circuit have held that plaintiffs alleging reverse discrimination also must show "background circumstances supporting the suspicion that the defendant is that unusual employer who discriminates against the majority." *Davis v. Sheraton Soc'y Hill Hotel,* 907 F.Supp. 896, 899 (E.D.Pa.1995). Background circumstances that support an inference of reverse discrimination fall into two categories: (1) evidence that the employer has "some reason or inclination" to discriminate against the majority and (2) any other evidence that raises an inference of reverse discrimination. *See Harel v. Rutgers, the State Univ.,* 5 F.Supp.2d 246, 265 (D.N.J.1998); *Murphy,* 1999 WL 31207, at \*12.

> FN13. Although the Third Circuit has not adopted a definitive analytical framework

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 1999 WL 166968 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

for reverse discrimination claims brought under Title VII, the court will adopt the framework used by other district courts in this Circuit. *See Murphy v. Housing Auth. & Urban Redevelopment Agency,* No. Civ.A.97-1558, 1999 WL 31207, at *10 (D.N.J. Jan. 27, 1999); *Harel v. Rutgers, the State Univ.,* 5 F.Supp.2d 246, 265 (D.N.J.1998); *Davis v. Sheraton Soc'y Hill Hotel,* 907 F.Supp. 896, 899 (E.D.Pa.1995) ; *see also Harding v.. Gray,* 9 F.3d 150, 153 (D.C.Cir.1993).

**\*5** Where, as here, the plaintiff asserts a disparate treatment theory of discrimination, the plaintiff may present either direct evidence of discriminatory intent, *see Price Waterhouse v. Hopkins,* 490 U.S. 228 (1989), or indirect, pretextual evidence of discrimination, *see Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252-55 (1981); *McDonnell Douglas,* 411 U.S. at 802. In the case at bar, plaintiff has presented only indirect evidence of reverse race discrimination; none of plaintiff's evidence "proves [reverse race discrimination] without inference or presumption." *Nixon v. Runyon,* 856 F.Supp. 977, 983 (E.D.Pa.1994). If the plaintiff presents competent indirect evidence of discrimination, the burden of going forward shifts to the defendant who must then articulate a legitimate, nondiscriminatory reason for the challenged employment action. *See Burdine,* 450 U.S. at 252-55; *McDonnell Douglas,* 411 U.S. at 802.

If the defendant is successful in meeting its burden of production, the presumption of discrimination created by the *prima facie* showing drops from the case, and the plaintiff must show by a preponderance of the evidence that the defendant's proffered reason for the employment decision was merely a pretext for discriminatory animus. *See Burdine,* 450 U.S. at 256. The plaintiff can satisfy his burden of proof "either directly by persuading the [fact finder] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.; see also Armbruster v. Unisys Corp.,* 32 F.3d 768, 783 (3d Cir.1994). At all times, the ultimate burden of persuading the trier of fact of the defendant's discriminatory intentions

remains with the plaintiff. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507 (1993).

### 1. BCF Shift Team Leader and Quality Planning Resource Positions

Plaintiff premises his claim of reverse race discrimination upon the appointment of Brenda Johnson and Randy Jones (both African-Americans) as BCF Shift Team Leader and Quality Planning Resource, respectively. (D.I. 69 at 15) The Selection Team did not appoint plaintiff to either of these positions. Plaintiff, however, cannot state a *prima facie* case of reverse race discrimination because he has not shown that defendant has an inclination or tendency to discriminate against Caucasians. *See Davis,* 907 F.Supp. at 899.

Indeed, defendant's adverse impact report indicates that defendant rehired more Caucasians at its plant than African-Americans following the 1996 RIF. ( *See* D.I. 65 at A187) A review of *in camera* materials reveals that, of the seven employees hired as BCF Shift Team Leaders, five were Caucasians and only two were African-Americans. Defendant's current human relations officer also testified that defendant had no specific goals for increasing the population of racial minorities at the Seaford plant. (D.I. 65 at A454-55) Plaintiff has proffered no testimony suggesting that race motivated the Selection Team's employment decisions. (D.I. 65 at A418-19) In short, plaintiff has offered absolutely no evidence that raises an inference that defendant is "that unusual employer who discriminates against the majority." *Id.* Thus, plaintiff cannot state a *prima facie* case of reverse race discrimination.

**\*6** Even assuming, *arguendo,* that plaintiff has stated a *prima facie* case, defendant has established "legitimate, nondiscriminatory reasons" for not hiring plaintiff. *See McDonnell Douglas,* 411 U.S. at 802. Defendant claims that plaintiff lacked the requisite skills for either BCF Shift Team Leader or Quality Planning Resource. The Selection Team's documentation reveals that Brenda Johnson outranked plaintiff in the areas of team building and knowledge of the technological processes of BCF production. (D.I. 65 at A199-200) Moreover,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 1999 WL 166968 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Johnson had served as a BCF Shift Leader [FN14] since 1993, while plaintiff had not worked on the plant's manufacturing floor since 1983. (D.I. 65 at A142-43, A464) Similarly, defendant asserts that plaintiff was not "well-suited" in a manufacturing position like the Quality Planning Resource. (D.I. 65 at A222, A233) Defendant contends that the Selection Team ultimately appointed Jones as Quality Planning Resource because he had extensive and recent experience in Staple quality control-a position analogous to Quality Planning Resource. (D.I. 65 at A286, A328-29, A465) In its performance evaluation of Jones, the Selection Team awarded him five "exceeds" and "eight" meets in the various leadership and job skills categories.[FN15] (D.I. 86 at A190) Thus, defendant has produced legitimate, nondiscriminatory reasons for hiring Randy Jones and Brenda Johnson rather than plaintiff.

> FN14. This position was renamed BCF Shift Leader following the 1996 RIF. (D.I. 65 at A464)

> FN15. The Selection Team did not consider plaintiff for this position because it determined that plaintiff was not qualified. Hence, there are no rankings available for plaintiff. (D.I. 86 at 1)

Plaintiff offers no relevant evidence from which a factfinder could infer that defendant's proffered reasons for not hiring him were pretextual. *See Burdine,* 450 U.S. at 256. With respect to the Quality Planning Resource position, plaintiff merely offers his unsupported assertion that he was "clearly qualified." (D.I. 69 at 14) In a motion for summary judgment, however, the nonmoving party "cannot rely upon conclusory allegations in its pleadings or in memoranda and briefs to establish a genuine issue of material fact." *Pastore v. Bell Tel. Co.,* 24 F.3d 508, 511 (3d Cir.1994).

Plaintiff also offers the testimony of Ben Culver, the Seaford plant's former human resources director, who testified that plaintiff was "better qualified" than Brenda Johnson for the BCF Shift Team Leader position. (D.I. 70 at B78) Culver, however,

did not participate in the selection of BCF Shift Team Leaders. (*See* D.I. 65 at A128) Moreover, Culver provides no foundation for his opinion that plaintiff was more qualified than Brenda Johnson. He does not state the basis for his conclusion or the facts upon which he relied in reaching this conclusion. Culver also does not state how he would have rated plaintiff in terms of the specific job criteria used by the Selection Team. Given these deficiencies, Culver's testimony does not demonstrate that defendant's proffered reasons for not hiring plaintiff were mere pretexts for unlawful reverse race discrimination.[FN16] *See Burdine,* 450 U.S. at 256.

> FN16. Plaintiff also asserts a reverse gender discrimination claim arising from Brenda Johnson's appointment to BCF Shift Team Leader. In support of this claim, plaintiff merely repeats Ben Culver's testimony. (D.I. 69 at 16-17) Therefore, summary judgment shall be granted with respect to plaintiff's reverse gender discrimination claim, as it relates to Brenda Johnson.

None of the witnesses deposed in this case testified that race entered into the Selection Team's hiring decisions. (*See, e.g.,* D.I. 70 at B51, B94, B118-19) Indeed, the record is wholly devoid of any evidence suggesting invidious race discrimination by the defendant. Accordingly, plaintiff has failed to carry the ultimate burden of proving intentional reverse race discrimination. *See Hicks,* 509 U.S. at 507. The court shall grant summary judgment on plaintiff's reverse race discrimination claims.[FN17]

> FN17. Plaintiff has argued reverse race discrimination only with respect to the hiring of Randy Jones and Brenda Johnson. The court has reviewed the record independently and has found no other possible claims of reverse race discrimination.

B. Reverse Gender Discrimination

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                           Page 8

Not Reported in F.Supp.2d, 1999 WL 166968 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

*7 Plaintiff asserts reverse gender discrimination claims in connection with the Selection Team's appointment of allegedly less qualified females, instead of him, to three positions at the plant. Those positions are Business Planning Resource (for which the Team selected Diane Spicer), a P & PS Shift Team Leader post (to which the Team appointed Eugenia Horseman), and a BCF Shift Team Leader position (to which the Team hired Brenda Johnson).[FN18] Plaintiff has offered no evidence to support a *prima facie* case of reverse gender discrimination. Plaintiff has not shown that defendant gave female employees preferential hiring treatment or that defendant hired and promoted a disproportionate number of females. Indeed, defendant's adverse impact study reveals that the vast majority of new hires following the 1996 RIF were males. (D.I. 65 at A187) The human resources director also testified that defendant did not have any programs designed to increase the number of females at its plant. (D.I. 65 at A455) Thus, plaintiff has not shown that defendant is "that unusual employer" who discriminates against men. *See Davis,* 907 F.Supp. at 899. Even assuming that plaintiff could state a *prima facie* claim of reverse gender discrimination, plaintiff cannot rebut the legitimate business reasons proffered by defendant for not hiring plaintiff to the following positions.

> FN18. For the reasons stated above, the court has denied plaintiff's reverse gender discrimination claim as it relates to Brenda Johnson. *See supra* note 16.

### 1. Business Planning Resource

Defendant contends that it hired Diane Spicer as the Business Planning Resource because she had significant experience in the synthetic fiber industry. (D.I. 64 at 29) Prior to her employment with defendant, she served as a quality control specialist with another synthetic fiber manufacturer. (D.I. 66 at C475) She also earned several promotions at defendant's Seaford plant prior to the 1996 RIF. (D.I. 65 at A466-67) The Selection Team also rated her significantly higher than any other candidate considered for the Business Planning Resource position.[FN19] (D.I. 86 at A188) She

received nine "exceeds" and two "meets" in the leadership and job skills categories.

> FN19. The Selection Team did not consider plaintiff for this position because it felt that he did not possess the requisite qualifications. (*See* D.I. 86 at 1, A188)

Plaintiff has offered no competent evidence of pretext [FN20] to rebut these legitimate reasons for hiring Spicer. Plaintiff merely asserts that he was " better qualified" for this position. Unsupported assertions of fact, however, cannot overcome a motion for summary judgment. *See Anderson,* 477 U.S. at 249; *Pastore,* 24 F.3d at 511.

> FN20. As evidence of pretext, plaintiff offers a performance evaluation, generated by defendant's attorneys during the Seaford plant's 1993 RIF, in which plaintiff "ranks" higher than Spicer. (D.I. 70 at B221-30) Defendant claims that this document enjoys work product privilege and that it was stolen by plaintiff before his termination. After an *in camera* review of the original document, the court is satisfied that it enjoys work product protection. Moreover, the document is not relevant to the case at bar because it relates to the 1993 RIF and not to the 1996 RIF.

### 2. P & PS Shift Team Leader

Plaintiff contends that defendant should have hired him, instead of Eugenia Horseman, for the P & PS Shift Team Leader post. (D.I. 65 at 16) Defendant, however, has offered legitimate reasons for choosing Horseman instead of plaintiff. The Selection Team awarded her a total of eight " exceeds" in various skills categories. (D.I. 65 at A195-96) Plaintiff received only three "exceeds" in the same evaluation. (D.I. 65 at A196) Horseman outranked plaintiff both in the Superior Leadership Criteria and in the job-specific skills categories. (*See* D.I. 65 at A196) This ranking reflected her extensive manufacturing experience at the Seaford plant, which included a recent manufacturing

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 9

**Not Reported in F.Supp.2d, 1999 WL 166968 (D.Del.)**
**(Cite as: Not Reported in F.Supp.2d)**

position in the plant's P & PS division and service as "Section Resource" in the plant's BCF division. (D.I. 65 at A462) Plaintiff, on the other hand, had not worked on the plant's manufacturing floor since 1983.

*8 Plaintiff presents no evidence of pretext to rebut these legitimate reasons for hiring Horseman instead of him. Plaintiff only offers Ben Culver's unsupported assertions of plaintiff's superiority. (D.I. 70 at B78) Culver, however, admits in his deposition that he was only "somewhat familiar" with the job requirements of the P & PS position. (D.I. 70 at B78) Moreover, he did not participate in the Selection Team's evaluation of plaintiff for the P & PS Shift Team leader position. (*See* D.I. 65 at A184) Therefore, Culver's conclusory assertions are neither relevant nor probative of pretext.

As the foregoing analysis reveals, plaintiff has failed to carry his burden of showing intentional discrimination by defendant in its hiring of Diane Spicer, Eugenia Horseman, and Brenda Johnson. Plaintiff has presented neither evidence sufficient to support a *prima facie* case of reverse gender discrimination nor evidence of pretext. Accordingly, the court shall grant defendant's motion for summary judgment on plaintiff's reverse gender discrimination claims.

C. Age Discrimination

Where, as here, plaintiff's ADEA claims [FN21] rest on indirect evidence of age discrimination, courts in the Third Circuit must apply a "slightly modified version" of the *McDonnell Douglas* three-step shifting burden analysis used in Title VII cases. *See Connors v. Chrysler Fin. Corp.,* 160 F.3d 971, 973 (3d Cir.1998); *Keller v. Orix Credit Alliance, Inc.,* 130 F.3d 1101, 1108 (3d Cir.1997) (en banc). In order to state a *prima facie* case of age discrimination under this modified test, the plaintiff must show that he

FN21. The ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual ... with respect to

his compensation, terms, conditions, or privileges of employment, because of such individual's age ...." 29 U.S.C. § 623(a).

(1) was a member of a protected class, *i.e.,* that he was over 40, (2) was qualified for the position at issue, (3) suffered an adverse employment action [,] and (4) was ultimately replaced, or the position was filled by, a younger person. The evidence must be " sufficient to convince a reasonable factfinder to find all of the elements of [the] *prima facie* case."
*Connors,* 160 F.3d at 973-74 (citation omitted). If plaintiff satisfies his *prima facie* case, the court proceeds with the final two steps of the *McDonnell Douglas* analysis. *See Keller,* 130 F.3d at 1108. Plaintiff alleges age discrimination with respect to the Selection Team's hiring of James Woodland for P & PS Shift Team Leader, James Simmons and George Chamberlain as BCF Shift Team Leaders, and Keith Mitchell for Polymer Core Process Leader. (D.I. 69 at 9-12) The court shall review these age discrimination allegations in order.

1. P & PS Shift Team Leader and BCF Shift Team Leader

Plaintiff has shown that Woodland, Simmons, and Chamberlain were sufficiently younger than plaintiff to support an inference of age discrimination.[FN22] *See Barber v. CSX Distribution Servs.,* 68 F.3d 694, 698 (3d Cir.1995). Plaintiff also has demonstrated that he belonged to the protected class (those over the age of forty) at the time defendant hired these younger men instead of him. *See Lawrence v. National Westminster Bank New Jersey,* 98 F.3d 61, 65-66 (3d Cir.1996). Accordingly, plaintiff has satisfied the first, third, and fourth prongs of the *McDonnell Douglas* test. Plaintiff, however, has not made a *prima facie* showing that he was qualified to serve as a P & PS Shift Team Leader or as a BCF Shift Team Leader. Plaintiff offers only his own conclusory assertions and those of Ben Culver as evidence of his qualifications for these positions. As the court has noted above, conclusory assertions of fact cannot overcome a motion for summary judgment. *Pastore,* 24 F.3d at 511. Thus, plaintiff has failed to state a *prima facie* case of age discrimination.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 10

Not Reported in F.Supp.2d, 1999 WL 166968 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

FN22. At the time of their selection, James Woodland and Goerge Chamberlain were forty years old, while James Simmons was thirty-eight years old. (D.I. 70 at B243)

*9 Even assuming that plaintiff has stated a *prima facie* case, defendant has presented legitimate, nondiscriminatory reasons for hiring Woodland, Simmons, and Chamberlain instead of plaintiff. The Selection Team ranked all three employees higher than plaintiff. (*See* D.I. 65 at A196, A200) Each of these employees had recent and extensive experience on the plant's manufacturing floor. Before the 1996 RIF, Woodland held BCF and P & PS supervisory posts. (D.I. 65 at A462) Prior to their selection, Simmons and Chamberlain served as BCF supervisors. (D.I. 65 at A464) Plaintiff, on the other hand, had not served on the manufacturing floor since the mid-1980s. Plaintiff was a BCF first line supervisor in 1972, but he supervised only twenty people. (D.I. 65 at A339) In 1996, the BCF Shift Team Leader position entailed supervision of approximately sixty people in a "dramatically" changed industry. (D.I. 65 at A268-71, A464) Thus, defendant had legitimate, nondiscriminatory reasons for not hiring plaintiff to these positions.

Under the *McDonnell Douglas* framework, plaintiff must rebut these legitimate reasons with evidence that defendant's proffered reasons for its employment decisions were merely pretexts for discriminatory animus. *See Burdine,* 450 U.S. at 256 . Plaintiff's only evidence of pretext is that the majority of those terminated during the 1996 RIF were over the operative age of forty. Plaintiff argues that defendant terminated its older employees because "a higher cost reduction [could] be obtained by eliminating those individuals with longer years of service and higher rates of pay." (D.I.69 at 12) Plaintiff claims that this "in and of itself is sufficient to present a *prima facie* case of age discrimination." FN23 (D.I. 69 at 12) Plaintiff submits no formal statistical support for this claim. He merely offers defendant's own admission that the majority of those terminated during the 1996 RIF were Caucasian males over the age of forty. (*See* D.I. 70 at B219-20)

FN23. In support of this claim, plaintiff cites *Healy v. New York Life Insurance Co.,* 860 F.2d 1209 (3d Cir.1988) and *Green v. USX Corp.,* 843 F.2d 1511 (3d Cir.1988). Neither case supports this claim. The United States Supreme Court vacated the *Green* decision and, accordingly, it has no precedential force. *See USX Corp. v. Green,* 490 U.S. 1103 (1989). In *Healy,* the court merely permitted an employer to bolster its legitimate business reasons for discharging the plaintiff with the use of statistical evidence suggesting that its RIF did not have a disproportionate impact on older workers. *See Healy,* 860 F.2d at 1217-18. Here, plaintiff does not offer " statistical" evidence in its formal sense. He merely offers an admission that more older workers were terminated than younger workers.

This admission, however, does not necessarily support the proposition for which plaintiff offers it. The mere fact that the majority of those terminated were over forty does not necessarily mean that these "older" workers were paid higher salaries than younger employees retained by defendant. Although statistical evidence could establish such a claim, plaintiff offers no such evidence. His conclusory assertion that defendant saved money specifically by terminating older workers is not admissible evidence and does not establish a genuine issue of material fact.

Accordingly, plaintiff's bare assertion of defendant's sinister motives will not suffice to rebut defendant's legitimate reasons for not hiring him. Because plaintiff has failed to present any evidence of unlawful age discrimination in connection with the hiring of Woodland, Simmons, or Chamberlain, the court shall grant summary judgment with respect to these claims.

### 2. Polymer Core Process Leader

*10 Plaintiff has demonstrated that the Polymer Core Process Leader position was ultimately filled by Keith Mitchell, a significantly younger person.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 11

Not Reported in F.Supp.2d, 1999 WL 166968 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

FN24 The Polymer Core Process Leader post was a manufacturing-intensive position, and defendant asserts that it chose Mitchell instead of plaintiff because plaintiff did not possess the requisite knowledge of manufacturing technology. The evidence reveals that the Selection Team had no such concerns about Mitchell's familiarity with new manufacturing technology. He served as supervisor of the plant's textile manufacturing section since 1992. (D.I. 65 at 464-65) In light of plaintiff's extended absence from the manufacturing floor and Mitchell's recent manufacturing experience, defendant has established a legitimate, nondiscriminatory reason for hiring Mitchell instead of plaintiff.

> FN24. At the time of his selection, Mitchell was thirty-four years old. (D.I. 70 at B244)

As evidence of pretext, plaintiff points to the fact that his raw rankings were higher than those of Mitchell's.[FN25] The Selection Team concluded nonetheless that plaintiff had an "obsolete knowledge base." (D.I. 65 at A198) Plaintiff argues that the two "does not meets" on Mitchell's evaluation form indicate that defendant appointed Mitchell even though he did not possess the requisite technical know-how for the position.

> FN25. The Selection Team awarded plaintiff three "exceeds," eleven "meets," and no "does not meets" while giving Mitchell two "exceeds," ten "meets," and two "does not meets." (D.I. 65 at A198)

Defendant has established, however, that Mitchell possessed the requisite qualifications for the post. Defendant's plant manager testified that the most important criterion for the Polymer Core Process position was ranking category number six (D.I. 73 at 488-89), which required an "[u]nderstand[ing of] the technology of the process and key factors required to produce a quality product meeting customer requirements." (D.I. 65 at A197) The Selection Team ranked Mitchell higher in this category than plaintiff. (D.I. 65 at A198) (See D.I.

65 at A198; D.I. 72 at 17) Defendant also argues throughout its briefs that plaintiff's technological expertise in Nylon manufacturing faded during his nearly sixteen years away from the manufacturing floor. (See, e.g., D.I. 64 at 25-28, 30-31) This conclusion is supported by testimony that the manufacturing area had changed dramatically in the years since plaintiff left the manufacturing floor to assume more administrative functions in the plant's human resources department. (D.I. 65 at A268-71)

Plaintiff has presented no evidence that Mitchell was unqualified to serve as Polymer Core Process Leader. He merely argues, without supporting evidence, that Mitchell had "no knowledge" of the Core Process Leader position and that "[i]t only makes sense that an individual with obsolete knowledge would be better qualified for a position than one with no knowledge of the position whatsoever." (D .I. 69 at 10) In support of his contention that obsolete knowledge is better than " no knowledge," plaintiff offers the testimony of Will Rogers, an employee in the Seaford plant's personnel department. During a deposition, plaintiff's attorney asked Rogers the following question:
*11 All else being equal, if one has obsolete knowledge and the other has no knowledge, do you consider the obsolete a better candidate to start working with and training than a person with no knowledge?

(D.I. 70 at B137) Rogers responded, "I would think so."

The court finds that Rogers' conclusory response is not competent evidence. Rogers did not serve on the Selection Team, and he has never worked in the Polymer Core Process field. (See D.I. 65 at A446; D.I. 70 at B130-33) Like plaintiff, Rogers has worked in the plant's personnel department since 1985. (D.I. 70 at B131) Moreover, every witness asked this question, including Rogers,[FN26] responded that the answer would depend upon the position at issue. (See D.I. 70 at B137, D.I. 73 at A490-91)

> FN26. When asked this question initially,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 12

Not Reported in F.Supp.2d, 1999 WL 166968 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Rogers responded, "Depends. I believe." (D.I. 70 at B137)

Thus, the Selection Team's choice of Mitchell over plaintiff was reasonable. Mitchell had broader manufacturing experiences than plaintiff, and Mitchell possessed apparently exceptional knowledge of the technological subject matter of the position. (*See* D.I. 65 at A198) Although plaintiff received more favorable raw "rankings" than Mitchell, it is evident that the Selection Team chose Mitchell because of his recent manufacturing experience. Plaintiff's higher raw rank, even taken in the light most favorable to plaintiff, does not constitute evidence sufficient to enable a jury to find that age discrimination infected the Selection Team's hiring of Keith Mitchell. *See Anderson,* 477 U.S. at 249.

Throughout the selection process, plaintiff's lack of recent manufacturing experience weighed against him. Since the mid-1980s, plaintiff voluntarily limited his horizons to the plant's human resources department and did not keep apace of technological advances. Plaintiff has failed to present any competent evidence of age discrimination in defendant's selection of Keith Mitchell. Therefore, the court shall grant summary judgment on this claim.[FN27]

> FN27. Although younger employees were appointed to other positions to which plaintiff applied, plaintiff has not alleged age discrimination with respect to these positions. The court, on its own, has reviewed the record for evidence of age discrimination with respect to these positions and has found none.

### V. PLAINTIFF'S ERISA CLAIMS

Although plaintiff's second amended complaint alleges an ERISA violation (D.I.38, ¶¶ 43-51), plaintiff's answering brief is devoid of any argument in support of his ERISA claim. The court shall deem plaintiff's ERISA claims waived. *See* Local Rule 7.1.3(c)(1)(F)-(G). Summary dismissal is, in any event, appropriate because the evidence proffered by plaintiff fails to show that defendant engaged in prohibited conduct taken for the purpose of interfering with plaintiff's employee benefit plan. *See* 29 U.S.C. § 1140. Accordingly, defendant's motion for summary judgment on plaintiff's ERISA claims is granted.

### VI. CONCLUSION

For the aforementioned reasons, the court shall grant defendant's motion for summary judgment. An order shall issue consistent with this memorandum opinion.

D.Del.,1999.
Kappes v. E.I. DuPont de Nemours & Co., Inc.
Not Reported in F.Supp.2d, 1999 WL 166968 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:97cv00443 (Docket) (Jul. 28, 1997)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B

Westlaw.

Not Reported in A.2d                                                                     Page 1
Not Reported in A.2d, 1986 WL 3637 (Del.Super.)
(Cite as: Not Reported in A.2d)

**H**

Walker v. DunnDel.Super.,1986.Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
Superior Court of Delaware.
Clyde T. WALKER and Sylvia T. Walker
v
Gene DUNN.
March 19, 1986.

Rodney D. Sweet, Seaford, Delaware.
F. Alton Tybout, Tybout, Redfearn, Casarino & Pell, Wilmington, Delaware.
ALBERT J. STIFTEL, President Judge.
**\*1** This action arises out of a motor vehicle accident which occurred on December 10, 1982, in North Carolina. Clyde and Sylvia Walker filed a complaint alleging that defendant Gene Dunn was driving their company's tractor-trailer, in which Walker was a passenger, at the time of the accident which caused serious injuries to Clyde Walker.

Gene Dunn, defendant, moves for summary judgment against the Walkers claiming that their complaint is barred by the Delaware Workers' Compensation Act, *19 Del.C. § 2304.* Dunn contends that the statute precludes an action by one employee against another employee for damages that are compensable under the Workers' Compensation Act and that, at the time of the accident, he was a co-employee of Clyde Walker. Plaintiffs allege that Dunn was an independent contractor at the time of the accident and thus not immune from liability. The sole issue is whether, at the time of the accident, Dunn was a fellow employee of Clyde Walker or an independent contractor.

Clyde T. Walker is president, principal stockholder and an employee of Walker Marine, Inc., a small Delaware business operated by Clyde Walker, his wife, his son and a few other employees. One aspect of its business is hauling cargo by tractor-trailer. Mr. Walker frequently drives one of the corporation's two trucks to haul cargo.

On December 9, 1982, Mr. Walker contracted to deliver a load of beer's yeast to Atlanta, Georgia. He picked up the load in Elizabeth, New Jersey, and was told that the load was to be delivered to Atlanta by the following morning, December 10, 1982. As it was late and he was tired, Walker decided to find another driver to accompany him and to assist with driving the tractor-trailer to Atlanta. He stopped at a local truck stop in Laurel, Delaware, to see whether Gene Dunn was available to join him on the trip. Walker was aware that Mr. Dunn was a truck driver who had driven for several truck firms, although he had not previously driven for Mr. Walker. He found Mr. Dunn at the truck stop, asked him to go with him on the trip, and told him he would pay him. Although the specifics of payment for Dunn were not discussed, Walker testified he would have paid him the usual trucking industry rate of 12-15% of the total gross profit of the load upon completion of the job. This method of payment was the same for others who drove for him and who were employees of the corporation. Mr. Dunn agreed to go with Mr. Walker and they left.

Clyde Walker drove the truck for approximately one hour and then Gene Dunn took over the wheel. Mr. Walker observed Mr. Dunn's driving for approximately an hour, "Till I saw that he could drive to suit me and he was a good driver ..." and then he entered the sleeper compartment of the tractor-trailer and went to sleep. Although there is a question as to which person was driving at the time of the accident,[FN*] Walker testified that Dunn was driving when he lost control of the tractor-trailer, ran off the roadway, struck a telephone pole and turned the trailer over. Walker was severely injured in the accident, sustaining injuries to his head, neck and back. He is receiving Social Security disability and workers' compensation benefits for his injuries.

**\*2** The Delaware Supreme Court has interpreted *19 Del.C. § 2304* as providing the sole remedy for an employee who is injured on the job. *Diamond State Telephone Co. v. University of Delaware,* Del.Supr., 269 A.2d 52 (1970). In *Ward v. General Motors Corp.,* Del.Super., 431 A.2d 1277, 1279 (1981), a Superior Court Judge said: "... suit may not be brought by one employee against another employee of the same employer for damages for a condition which is compensable under the Workmen's Compensation Law. *Groves v. Marvel,* Del.Supr., 213 A.2d 853 (1965)." Thus, if Dunn was a co-employee, the Walkers would be barred by the statute from bringing suit against Gene Dunn as a third party for injuries incurred in this accident.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                     Page 2
Not Reported in A.2d, 1986 WL 3637 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

The Walkers allege that the facts show that Dunn was an independent contractor. They point out that Dunn was a truck driver who had worked for various hauling companies; that he was hired by Walker for a single job for a lump sum; and that he testified he was not signing on as a regular employee for Walker Marine. The Walkers claim that Dunn was responsible for driving the truck to Atlanta using his own independent judgment and skill to complete the job and that he was not under Walker's control. The admissible record fails to support Walker's claim of surrender of control to Dunn. Dunn claims that he was a co-employee of Walker at the time of the accident.

The criteria established by Delaware courts in determining whether an individual is an employee include the following: (1) Who hired the employee; (2) who has the right to fire the employee; (3) who pays the employee wages; and (4) who has the power to control the conduct of the employee when he is performing the particular job in question. *White v. Gulf Oil Corp.,* Del.Supr., 406 A.2d 48 (1979); *Lester C. Newton Trucking Co. v. Neal,* Del.Supr., 204 A.2d 393 (1964). See also, *Restatement 2d of Agency § 220.*

Of the factors to consider, the right to control and direct the activities of the employee has been determined to be one of the most important in analyzing the employment relationship. *Weiss v. Security Storage Co.,* Del.Super., 272 A.2d 111 (1970); *White v. Gulf Oil Corp., supra.* In *Melson v. Allman,* Del.Supr., 244 A.2d 85 (1968), the Court stated that, "Although a number of factors are considered in determining whether a given relationship is that of master and servant or that of independent contractor, it is often said that the right to control the mode of doing the work is the principal consideration. In this connection, the word 'control' means the right to control, rather than the actual exercise of that right." Cf., *55 A.L.R. Fed 21, AANO:* "Trucker as Independent Contractor or Employee under § 2(3) of NLRA," (discussion of criteria determining employment status.)

In *Melson,* an auto dealer wanted a car he had just purchased to be driven from Bordentown, New Jersey, to Wilmington, Delaware, as he, the owner, was ill and did not wish to drive. He asked a person, whom he took to be one accustomed to driving cars for dealers, to drive the car to Wilmington for him. He paid him $10 plus $2 for tolls. The driver was involved in an accident on the way to Wilmington,

abandoned the car and disappeared. The issue was whether the driver was an independent contractor or an employee of the owner who had hired him to drive. The Court found that an employer-employee relationship existed based primarily on the fact that the owner "had the right to direct the driver," whether he did so or not. The Court said, "The result is not altered by the fact that the man was hired only for the one job, or that he was to be paid a flat sum, or that the appellant [owner] may not have thought he was creating a master-servant relationship."

**\*3** The record supports a finding that Dunn meets the criteria. Walker had the right, as president of the corporation, to hire Dunn and in fact did so. He also had the right to fire him if Dunn's driving did not suit him, or for any other reason. Walker would determine the amount and method of payment for the completed job. Walker exercised his right to control by observing Dunn's driving for an hour to be sure he was a good driver (CW-37). He told Dunn that if he got sleepy, he should be sure to pull off and try to wake Walker (GD-42). Walker controlled the timing of the trip based on the fact the yeast was due in Atlanta the following morning. He determined the route to take and gave Dunn route directions to follow. At one point, Dunn woke Walker to ask for further instructions as to the route (CW-40, GD-19). Additionally, it was up to Walker whether they were to continue beyond Atlanta to pick up a return load. As Dunn said, he would either go with Walker or walk back to Laurel (GD-35). Of considerable significance is the fact that Walker owned and provided the truck used on the trip. Sec. 44.34, 1C Larson, *Workmen's Compensation Law* (1982), states that "When it is the employer who furnishes the equipment, the inference of right of control is a matter of common sense and business." Further, as stated in *Weiss, supra,* "Usually, when the employer furnishes valuable equipment, the relationship is 'almost invariably' that of employer-employee."

The record indicates that Walker had the requisite right of control over Dunn and that Dunn was not an independent contractor but a co-employee of Walker at the time of the accident. Walker's suit against Dunn is, therefore, barred by the Workers' Compensation Act, 19 *Del.C.* § 2304. As Mrs. Walker's claim for loss of consortium is derivative of Mr. Walker's claim, her suit is similarly barred. *Farrall v. Armstrong Cork Co.,* Del.Super., 457 A.2d 763 (1983).

Motion for summary judgment granted.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                Page 3
Not Reported in A.2d, 1986 WL 3637 (Del.Super.)
**(Cite as: Not Reported in A.2d)**


SO ORDERED.


> FN* Although a factual issue exists as to who was driving the truck at the time of the accident, defendant assumes for purposes of this motion that Dunn was driving at the time of the accident.

Del.Super.,1986.
Walker v. Dunn
Not Reported in A.2d, 1986 WL 3637 (Del.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT C

Westlaw.

Not Reported in A.2d

Page 1

Not Reported in A.2d, 1988 WL 4741 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

C
Horsey v. Contractual Carriers, Inc.Del.Super., 1988.Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
Superior Court of Delaware.
Larry J. HORSEY
v.
CONTRACTUAL CARRIERS, INC.
Submitted: December 8, 1987.
Decided: January 14, 1988.

Mark D. Sisk, Hughes & Sisk, Wilmington.
Robert W. Ralston, Wilmington.
BIFFERATO, Judge.
*1 This is the opinion of the Court of the appeal filed by the claimant, Larry J. Horsey ('Horsey'), of the decision of the Industrial Accident Board (' Board') dismissing Horsey's petition for workmen's compensation benefits.

On November 25, 1986, the Board held a conference to determine whether Horsey was an employee of Contractual Carriers, Inc. ('Contractual ') or an independent contractor. The Board found that Horsey was an independent contractor at the time of the accident. Since Horsey was not an employee of Contractual, the Board dismissed his petition for workmen's compensation benefits.

The Court's scope of review is to determine whether the Board's decision is supported by substantial evidence in the record, and is free from legal error. Hensley v. Artic Roofing, Inc., Del. Supr., 369 A.2d 678 (1976).

In arriving at its decision, the Board relied on Dickinson v. Eastern R. R. Builders, Inc., Del. Supr., 403 A.2d 717 (1979). In Dickson, the Court held that in determining the existence of the employer-employee relationship, the right to control and direct activities of the employee in performance of the act which caused the injury does not apply if there is a contractor-subcontractor relationship on the employer side. The Dickinson holding does not apply to the case sub judice since a subcontractor situation is not involved. The Board, therefore, erred as a matter of law.

The determination of an employer-employee relationship is crucial to the receipt of workmen's compensation. See, 19 Del. C., §§ 2304, 2311. The four-pronged test for determining whether there exists an employer-employee relationship is well established in Delaware: (1) who hired the employee; (2) who may discharge the employee; (3) who pays the employee's wages; and (4) who had the right to control his conduct while performing the particular work in question. Lester C. Newton Trucking Company v. Neal, Del. Supr., 204 A.2d 393 (1964). The first two prongs of the test are not applicable where there is one alleged employer and the question is whether the claimant is an independent contractor or an employee. Patterson v. Blue Hen Lines, Inc., Del. Supr., C.A. No. 84A-FE-3, Bush, J. (January 28, 1986). As to the third prong, the Board determined that Contractual paid Horsey's wages. The dispositive factor is, therefore, whether Contractual had the right or power to control the conduct of Horsey.

In E. I. DuPont DeNemours & Co. v. I. D. Griffith, Inc., Del. Supr., 130 A.2d 783, 784-785 (1957), the Delaware Supreme Court explained the definition of control in the context of an independent contractor:
The test of independency consists of the amount of control retained or exercised by the owner, particularly with respect to the absolute right to direct the manner and method of proceeding with the work rather than with respect to the end result only. A requirement that the work be performed according to standards and specifications imposed by the owner is not sufficient to establish the degree of control necessary to make a presumably independent contractor the agent of the owner. But retention of the right not only to insure conformity

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 1988 WL 4741 (Del.Super.)
(Cite as: Not Reported in A.2d)

with specifications but the retention or exercise of the right to direct the manner in or means by which the work shall be performed will destroy the independent status of the contractor.

While most of the rules and regulations required of Horsey are required of the employer by the Department of Transportation, Contractual did establish other company policies which suggest an element of control. Contractual had complete control of the delivery schedules. Steven Dawson, Vice President of Contractual, testified that all drivers were required to check in daily to inform Contractual of their locations and update it as to their delivery schedules. The drivers were prohibited from changing or deviating from such schedules. All drivers were required to use non-toll roads, when possible, and were further required to get prior approval to drive a toll road. A driver, including Horsey, must call Contractual when a delivery is completed, when any sort of problem arises or when a driver will be absent. The windshield and the interior of the truck was to be kept clean. The drivers' checklist specified that the drivers dress presentably and act courteously to the customers. The foregoing is substantial evidence that Contractual exercised control over Horsey to an extent greater than requiring work to set a standard, and supports a finding that an employer-employee relationship existed.

*2 Another element which supports a finding that Horsey was an employee is the fact that Contractual supplied the truck and fuel. When an employer furnishes valuable equipment, the relationship is almost invariably that of employer-employee. Weiss v. Security Storage Company, Del. Super., 272 A.2d 111 (1970). The reason is explained by Professor Larson:
When it is the employer who furnishes the equipment, the inference of right of control is a matter of common sense and business. The owner of $10,000 truck who entrusts it to a driver is naturally going to dictate details such as speed, maintenance, and the like in order to protect his investment. Moreover, since he has capital tied up in this piece of equipment, he will also want to ensure that it is kept as productive and busy as

possible. For these reasons, it is not surprising that there seems to be no case on record in which the employer owned the truck but the driver was held to be an independent contractor.

Larson, Workmen's Compensation Law § 4434(b) (1986).

The Board found that the truck used by Horsey was either owned by Contractual or leased by Contractual from D & S Warehousing and the value of the truck was at least $20,000. Horsey was required to return the truck to Contractual's terminal at the end of each haul. Contractual dictated the appropriate method for parking trucks. The Board also found that Horsey was given a company credit card for fuel. Steven Dawson testified that Contractual paid the credit card bill and did not deduct Horsey's fuel and oil purchases from his pay. The fact that Contractual supplied the truck, fuel and oil is most persuasive in finding that Horsey was an employee of Contractual.

Contractual contends that since the Board accepted the testimony of Contractual's witnesses that Horsey was not considered an employee but an independent contractor over Horsey's conflicting testimony, the Board was justified in ruling against Horsey. The Court recognizes that it does not sit as a trier of fact with authority to weigh the evidence, determine questions of credibility and make its own factual findings and conclusions. Johnson v. Chrysler Corp. , Del. Supr., 213 A.2d 64, 66 (1965). Although the Board found that Horsey was told that he would be a contract hirer and not an employee of Contractual, the fact that an employment contract indicates the nature of the relationship is not conclusive of the issue. Loden v. Getty Oil Company, Del. Super., 316 A.2d 214 (1974). The nature of the relationship between the parties is determined from the facts of the relationship and not the name given in the contract. E. I. DuPont, supra.

In conclusion, Horsey has established that the findings of the Board are unsupported by substantial evidence and that the Board erred as a matter of law. The Board's dismissal of Horsey's petition for workmen's compensation benefits is, therefore, REVERSED. The case is REMANDED to the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 1988 WL 4741 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

Board for a finding that Horsey was an employee and for further proceedings consistent with such findings.

**\*3** IT IS SO ORDERED.

Del.Super., 1988.
Horsey v. Contractual Carriers, Inc.
Not Reported in A.2d, 1988 WL 4741 (Del.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.