# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| KIMBRA CRISWELL, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No.  05-CV-00321 GMS |
| v. | ) | |
| | ) | |
| LYDIA ADAIR MCFADDEN and CHRISTIANA | ) | JURY TRIAL DEMANDED |
| CARE HEALTH SERVICES, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' APPENDIX TO THEIR OPENING BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

WHITE AND WILLIAMS LLP


_____/s/  Deborah J. Massaro_____
JOHN D. BALAGUER (#2537)
DEBORAH J. MASSARO (#4280)
WILLIAM L. DOERLER (#3627)
824 N. Market Street, Suite 902
P.O. Box 709
Wilmington, DE 19899-0709
302-467-4526
*Attorneys for defendants Lydia A. McFadden and Christiana Care Health Services, Inc.*

Date: October 24, 2006

# TABLE OF CONTENTS

Deposition Transcript of Kimbra Criswell ............................................................ A1–A88

Proposal letter from Aureus to CCHS dated April 15, 2002 ......................................... A89

Contract between Aureus and CCHS.................................................................... A90–A94

Affidavit of Maryellen Hofmann ........................................................................ A95–A96

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| KIMBRA CRISWELL, | ) |
| | ) |
|                 Plaintiff, | ) |
|   v. | )   C.A. No.  05-CV-00321 GMS |
| | ) |
| LYDIA ADAIR MCFADDEN and CHRISTIANA | )   JURY TRIAL DEMANDED |
| CARE HEALTH SERVICES, INC., | ) |
| | ) |
|              Defendants. | ) |

**CERTIFICATE OF SERVICE**

I, Deborah J. Massaro, Esquire, do hereby certify that on this 24th day of October,

two copies of **DEFENDANTS' APPENDIX TO THEIR OPENING BRIEF IN**

**SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** was served via

electronic filing and delivered U.S. First Class Mail, postage prepaid upon the following:

Richard R. Wier, Jr., Esquire
Law Offices of Richard R. Wier, Jr., P.A.
Two Mill Road
Suite 200
Wilmington, DE   19806

Nelson Levin, Esquire
Kats, Jamison, Van Der Veen &
  Associates
25 Bustleton Pike
Feasterville, PA   17044

**WHITE AND WILLIAMS LLP**

   /s/  Deborah J. Massaro
JOHN D. BALAGUER (#2537)
DEBORAH J. MASSARO (#4280)
WILLIAM L. DOERLER (#3627)
824 N. Market Street, Suite 902
P.O. Box 709
Wilmington, DE 19899-0709
302-467-4526
*Attorneys for defendants Lydia A.*
*McFadden and Christiana Care*
*Health Services, Inc.*

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

KIMBRA CRISWELL,                    )
                                    )
            Plaintiff,              )
                                    )
     v.                             )  Civil Action
                                    )  No. 05-CV-00321 GMS
LYDIA ADAIR MCFADDEN and            )
CHRISTIANA CARE HEALTH              )  JURY TRIAL DEMANDED
SERVICES, INC.,                     )
                                    )
            Defendants.             )

            Deposition of KIMBRA CRISWELL, taken
pursuant to notice at the law offices of White and
Williams, LLP, 824 North Market Street, Suite 902,
Wilmington, Delaware, beginning at 11:01 a.m., on
Friday, July 14, 2006, before Julie H. Parrack,
Registered Merit Reporter, Certified Realtime Reporter
and Notary Public.

APPEARANCES:

        NELSON LEVIN, ESQUIRE
        KATS, JAMISON, van der VEEN & ASSOCIATES
           25 Bustleton Pike
           Feasterville, Pennsylvania  19053
           On behalf of Plaintiff

        DEBORAH J. MASSARO, ESQUIRE
        WHITE AND WILLIAMS, LLP
           824 North Market Street, Suite 902
           Wilmington, Delaware  19899-0709
           On behalf of Defendants

                    WILCOX & FETZER
        1330 King Street - Wilmington, Delaware 19801
                    (302) 655-0477
                    www.wilfet.com





A000001

Kimbra Criswell                                    2

1                          KIMBRA CRISWELL,

2                 the deponent herein, having first been duly

3                 sworn on oath, was examined and testified as

4                 follows:

5     BY MS. MASSARO:

6        Q.    Hi, Kimbra.

7        A.    Hi.

8        Q.    My name is Debbie Massaro, and I represent

9     Christiana Care in this lawsuit which you filed.  I

10    have a few just housekeeping things to go over before

11    we start the deposition.  Have you ever given a

12    deposition before?

13       A.    No.

14       Q.    Okay.  Before we start, you were just sworn in,

15    so do you understand that that means that's the same

16    as if you're in a court of law?

17       A.    Yes.

18       Q.    Okay, so for that reason, if you don't

19    understand a question that I ask you, let me know.  I

20    can rephrase it, I can repeat it.  If you have any

21    problems, just let me know with that.  Okay?

22       A.    (Nodded affirmatively.)

23       Q.    Also, you'll notice she's typing everything

24    that we say, and it's important -- because we tend to



Kimbra Criswell                                              3

1    nod -- it's important to say yes or no, rather than

2    nod.

3        A.    Okay.

4        Q.    And also, and I'm the most guilty of this, we

5    tend sometimes to talk over each other.  You know, let

6    me finish my question first, because sometimes you may

7    be thinking that I'm going in one direction, and I may

8    be going in the totally opposite direction.  So let me

9    finish my question completely before you answer.  And

10   again, I'll try not to do it, but if I do, just give

11   me a holler if I talk over you.  But let's just be

12   careful with that, not to talk over one another, okay?

13       A.    Okay.

14       Q.    And as I told you earlier, if you need a break,

15   just let me know.  Also, we're talking about a pretty

16   long history here.  If there's something you don't

17   remember, just feel free to say so, because we'll be

18   going back over your medical history.

19       A.    Okay.

20       Q.    To start, could you please state and spell your

21   name for the record?

22       A.    Kimbra, K-i-m-b-r-a, Criswell, C-r-i-s-w-e-l-l.

23             MR. LEVIN:  Kim, I'm going to give you one

24   additional instruction.  You're kind of soft spoken.

1    There is an air conditioner on today.  Could you just

2    speak up and pretend you're speaking towards the

3    window or the back of the courtroom, okay?

4              THE WITNESS:  Okay.

5              MR. LEVIN:  Great.

6      Q.    Thanks.  Are you on any medications today that

7    would affect your memory or judgment?

8      A.    No.

9      Q.    Okay.  Are you on any medications today?

10     A.    Yes.

11     Q.    What are they?

12     A.    Nortriptyline, Bextra, and I also take the

13   birth control pill.

14     Q.    What is the Nortriptyline for?

15     A.    It's for neurologic pain in my leg.

16     Q.    And the Bextra?

17     A.    Excuse me, I'm on Celebrex now.  They switched

18   it.

19     Q.    Okay, and what is that for?

20     A.    Inflammation.

21     Q.    Where?

22     A.    In my leg.

23     Q.    Did you review any documents today in

24   preparation for your deposition?



1     A.   No.

2     Q.   And where do you live currently?

3     A.   Phoenix, Arizona.

4     Q.   And the address?

5     A.   1814 East Bell, B-e-l-l, Road, No. 2120,

6  Phoenix, Arizona, 85022.

7     Q.   And how long have you lived there?

8     A.   Nineteen months.

9     Q.   And prior to that where did you live?

10    A.   Pennsylvania.

11    Q.   Okay, what brought you to Arizona?

12    A.   Better weather and hopes of obtaining a job

13  there.

14    Q.   And you say you lived in Pennsylvania prior to

15  that?

16    A.   Yes.

17    Q.   Immediately prior to Bell Road you lived in

18  Pennsylvania?

19    A.   No.

20    Q.   Where did you live immediately prior to Bell

21  Road?

22    A.   In Phoenix with my friends.

23    Q.   And what is that address?

24    A.   2109 East Wahalla, W-a-h-a-l-l-a, Road.



Kimbra Criswell                                      6

1      Q.    And how long did you live there?

2      A.    Eleven months.

3      Q.    And then when did you live in Pennsylvania?

4    Was it prior to that?

5      A.    Yes.

6      Q.    So you didn't go from Florida to Arizona, you

7    went from Pennsylvania to Arizona; is that correct?

8      A.    Correct.

9      Q.    When were you living in Pennsylvania?

10     A.    April of '04 till December of '04.

11     Q.    So just two months -- I mean just actually

12   eight months?

13     A.    Yes.

14     Q.    And where did you live in Pennsylvania?

15     A.    818 West 5th Street, Lewistown.

16     Q.    Were you working there?

17     A.    No.

18     Q.    And then where were you living prior to that?

19     A.    Fort Myers, Florida.

20     Q.    And the address there, if you know it?  If you

21   don't, that's fine.

22     A.    Corbel Circle.

23     Q.    Okay, and how long were you there?

24     A.    Sixteen months.

1    Q.    What brought you from Florida to Pennsylvania?

2    A.    I had gotten out of a relationship and moved

3    home with my family.

4    Q.    Is your family here in Pennsylvania?

5    A.    Yes.

6    Q.    Are they currently still here in Lewistown; is

7    that correct?

8    A.    Yes.

9    Q.    And then prior to that where did you live?

10   A.    Newark, Delaware.

11   Q.    And you don't need to give me the addresses,

12   but for approximately how long were you in Newark?

13   A.    Seven months, April till November, seven or

14   eight months.

15             MR. LEVIN:  Of what year?

16             THE WITNESS:  '02.

17   Q.    And during that seven-month period, did you

18   work that whole time for Aureus?

19   A.    No.

20   Q.    Okay, who else did you work for?

21   A.    I worked the first six weeks for Aureus, and

22   then I was there for my medical care after the injury.

23   Q.    We'll talk a little more about that later.

24   Okay, prior to Delaware, where did you live?



1     A.   Fort Myers, Florida.

2     Q.   And when did you live in Fort Myers, if you

3  remember?

4           MR. LEVIN:  She said prior to Delaware.

5  Before Delaware, did you live in Fort Myers?

6           THE WITNESS:  Yes.

7     A.   From January till April of '02.

8     Q.   And what brought you from Florida to Delaware?

9     A.   My job.

10    Q.   Was that Aureus?

11    A.   Yes, ma'am.

12    Q.   Then prior to Florida, where did you live?

13    A.   Cambridge, Massachusetts.

14    Q.   For how long?

15    A.   Fifteen weeks.  I was there 15 weeks.

16    Q.   And what did you do there?

17    A.   I worked for Aureus.

18    Q.   And prior to that where did you live?

19    A.   Las Vegas, Nevada.

20    Q.   And what did you do there?

21    A.   Worked for Aureus.

22    Q.   And for how long were you there?

23    A.   Sixteen weeks.

24    Q.   And prior to that?



1    A.    Phoenix, Arizona.

2    Q.    How long?

3    A.    Five months.

4    Q.    Is that Scottsdale, Arizona?  Was it near

5    Scottsdale?

6    A.    Yeah, my address was Scottsdale, yeah.

7    Q.    And what were you doing there?

8    A.    Worked for Aureus.

9    Q.    And prior to that?

10    A.    Charlottesville, Virginia.

11    Q.    What was the year?

12    A.    September through December 2001.

13    Q.    And what brought you from Charlottesville to

14    Arizona?

15    A.    My job with Aureus.

16    Q.    Same company.  How long had you been working

17    with Aureus at the date of this incident?

18    A.    I started September 17th, 2001; about 19

19    months.

20    Q.    And could you explain to me what you did with

21    Aureus, what exactly your job title was and job

22    responsibilities were?

23    A.    I was a full-time traveling x-ray tech and

24    filled in at hospitals that were short-staffed.



1   Q.   And what education did you have for that?

2   A.   I have my associate's degree in radiography.

3   Q.   And where did you get that?

4   A.   Pennsylvania College of Technology,

5   Williamsport, Pennsylvania.

6   Q.   When did you graduate?

7   A.   August 13th, 1999.

8   Q.   Is that the highest degree that you have?

9   A.   Yes.

10  Q.   And how old are you today?

11  A.   Twenty-seven.

12  Q.   How young are you, is what I should say.   Okay.

13       You said that you live in Arizona.   Who

14  lives with you, your immediate family?

15  A.   I live by myself now.

16  Q.   Okay.   So you live in Arizona by yourself.   And

17  you said you had moved to, I believe it was Florida in

18  a relationship.   Have you ever been married?

19  A.   No.

20  Q.   Back to your employment, at the time of the

21  incident, you said you had been working with Aureus

22  for six weeks.   Is that correct?

23  A.   Six weeks at that hospital at the time of the

24  accident.

1    Q.    That's what I meant.   And what type of duties

2    did you perform at Christiana Hospital then?

3    A.    I took x-rays.

4    Q.    And who did you report to at Christiana

5    Hospital?   Did you work, first of all, only at

6    Christiana Hospital, or did you also work at

7    Wilmington Hospital?

8    A.    Just Christiana.

9    Q.    Who did you report to at Christiana Hospital?

10   A.    Dawn.

11   Q.    Do you remember Don's last name?

12   A.    "Spitnik" or something.   It was something odd.

13   Q.    And do you remember what his title was?

14   A.    It's a her.   She's a supervisor.

15   Q.    Okay, Dawn, D-a-w-n?

16   A.    Yes.

17   Q.    Okay.   And do you remember her title?

18   A.    She was lead tech.

19   Q.    Did you have any other supervisor there at

20   Christiana Hospital?

21   A.    No.

22   Q.    And what were your hours?

23   A.    7 to 3:30 or 7:30 to 4.

24   Q.    And was this full time?



Kimbra Criswell

12

1    A.    Yes.

2    Q.    So was this Monday through Friday typically or

3    did the days vary?

4    A.    Typically it was Monday through Friday, but I

5    was required to cover weekends at times.

6    Q.    When you were there, did Christiana Care or

7    Christiana Hospital provide you the supplies that you

8    needed to do your job?

9    A.    Supplies, as in?

10   Q.    What you needed to take x-rays?

11   A.    The x-ray machine, yes.

12   Q.    And if you had to do any patient care when you

13   were there, did they supply you with bandages, that

14   type of thing, if you needed them?

15   A.    Yes.

16   Q.    When you were there were you ever disciplined?

17   A.    No.

18   Q.    And were you ever evaluated?

19   A.    No.

20   Q.    Let's talk a little bit about the incident that

21   occurred on May 23rd of 2002.  First, before we get

22   into that, do you know Lydia McFadden?

23   A.    Know of her.

24   Q.    She's the defendant in this case?



1    A.    Yes.

2    Q.    One of the defendants.   And I represent her as

3    well as the hospital.   Did you speak with her on the

4    day of the incident?

5    A.    Yes.

6    Q.    Have you spoken with her since the day of the

7    incident?

8    A.    No.

9    Q.    Have you ever seen her since the day of the

10   incident?

11   A.    No.

12   Q.    Had you worked with her every day?

13   A.    No.

14   Q.    How often had you worked with her?

15   A.    Two to three days a week.

16   Q.    And had you known her pretty much since you'd

17   been there, the six weeks that you had been there?

18   A.    Just as a fellow employee.

19   Q.    And --

20          MR. LEVIN:  Well, that's incorrect.

21          THE WITNESS:  Fellow worker.

22          MR. LEVIN:  You were not an employee of

23   Christiana Hospital, correct?

24          THE WITNESS:  Right, correct.

1          MR. LEVIN:  You were always employed at

2   Aureus, correct?

3          THE WITNESS:  Correct.

4          MS. MASSARO:  Okay, let her testify, okay?

5   It's her testimony.

6   BY MS. MASSARO:

7   Q.   What was your relationship with her in terms of

8   was she a supervisor or anything like that?

9   A.   No.

10  Q.   Could you describe the incident that occurred

11  that day?

12  A.   We were, Lydia and I were walking down the hall

13  side by side having a conversation.  And we approached

14  the portable x-ray machine which was parked in the

15  hallway.  She went to the control part of the machine.

16  I went to the front of the machine and unplugged it

17  from the wall.  We continued our conversation

18  face-to-face.  Once the conversation was finished, I

19  turned 180 degrees with my back towards her, took one

20  step with my right foot, and she ran the machine over

21  the back of my left leg.

22  Q.   And then what did you do?  What did your body,

23  physically what did your body do?

24  A.   Pain immediately.  I was down to my knees.

1    Q.    And then what did you do?

2    A.    I sat there for a while.

3    Q.    Was Lydia there with you?

4    A.    Yes, then she went to do the x-ray that we were

5    going to go do together.

6    Q.    Is that where you were on the way to, to

7    perform an x-ray together?

8    A.    Yes.

9    Q.    Was this a patient there in the hospital?

10   A.    In the operating room.

11   Q.    Was it a stat order?

12   A.    Everything in the OR is stat.

13   Q.    And did you then report to Employee Health at

14   Christiana Hospital?

15   A.    Not immediately.

16   Q.    When did you report to Employee Health?

17   A.    Right after lunch, about --

18   Q.    Okay, can you show me --

19   A.    It was about an hour after that.

20   Q.    About an hour after the incident.

21   A.    Um-hum.

22   Q.    Okay.  And what did you feel?

23   A.    Immediate pain.

24   Q.    Where?



1   A.    The back of my leg, back of my heel.

2   Q.    Could you first, if you can on these pictures,

3   these are pictures that your attorney has provided for

4   us.  Can you show me what part of the machine struck

5   your --

6   A.    That's not an accurate picture.

7   Q.    Okay.

8          MR. LEVIN:  This is a picture of a

9   different machine, off the record.  It's that.

10          MS. MASSARO:  Okay.  That's why I brought

11  both, because I wasn't really sure.

12  Q.    Is this the picture that you're looking at,

13  which I will have marked as an exhibit, does this

14  reflect the machine that was involved in the incident?

15  A.    Yes.

16  Q.    Can you maybe use my pen and draw an arrow as

17  to which part of the machine you believe struck the

18  back of your heel?

19  A.    It's on the other side of this wheel, the

20  bracket on the other side of the wheel.  This same

21  bracket on the other side.

22          MR. LEVIN:  Could you then draw and say

23  "bracket."

24          MS. MASSARO:  "On other side."

1              (Criswell Exhibit No. 1 was marked for

2    identification.)

3       Q.    Now, just for my understanding, because I have

4    a pea brain and I don't really understand, was this

5    wheel -- so you're saying that this wheel, there's a

6    bracket on the other side and this wheel was like

7    turned out?

8       A.    The wheel pivots 360 degrees.

9       Q.    So the wheel was this part, would you say then

10   that that was like inside and then this was on the

11   outside and that struck you?    I guess I'm trying to

12   figure out how the underside of that struck you.

13      A.    I don't understand the question.

14              MR. LEVIN:   Kim, what she's trying to ask

15   is you said there is a wheel here, correct?

16              THE WITNESS:   Yes.

17              MR. LEVIN:   There is a bracket that we see

18   in this picture, right?

19              THE WITNESS:   Yes.

20              MR. LEVIN:   On the other side of the wheel

21   there is a bracket, correct?

22              THE WITNESS:   Yes.

23              MR. LEVIN:   The wheel then was turned, not

24   in the same way it's depicted here, correct?

1          THE WITNESS:  Correct.

2          MR. LEVIN:  And when that wheel is turned,

3    it would be parallel to the front of the machine,

4    correct?

5          THE WITNESS:  When you push the machine

6    forward, the wheel is perpendicular to the front of

7    the machine.

8          MR. LEVIN:  There you go.

9    BY MS. MASSARO:

10    Q.    Okay.  So although this is not the right

11   machine, was the wheel in this fashion?  For example,

12   was the wheel aligned like this as it was going down

13   the hall?

14    A.    These are two different machines.

15    Q.    Right, I understand that.  But I'm trying to

16   get the principle down here in terms of the machine.

17   The wheels are still the same, aren't they, even

18   though the machines obviously are different, they're

19   made like --

20    A.    They're similar but they're not identical, no.

21    Q.    So in terms of the how they go down the hall,

22   you were standing in front here?

23    A.    No.

24    Q.    Okay, were you standing --

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

A000018

1    A.    I was standing in front here.

2    Q.    In front here, okay.  So the person was behind

3    pushing it here and the wheel was there.

4    A.    Lydia was here, I was here.

5    Q.    Got it, okay.  Now my pea brain is a little

6    clearer.

7              MR. LEVIN:  You want to mark that?

8              MS. MASSARO:  Sure.  I'm going to write

9    "front" and "back" on this and I'll show it to you.  I

10   probably shouldn't be writing on this, but just so you

11   know that that's what I'm doing, Nelson.  We'll mark

12   that as Exhibit 2.

13             (Criswell Exhibit No. 2 was marked for

14   identification.)

15   Q.    Okay, now what did Lydia say immediately after

16   the incident to you?

17   A.    There weren't words.  It was more of a "huh,"

18   gasp.

19   Q.    Okay, and you didn't discuss it with her at

20   all?

21   A.    All she said was she would go do the x-ray

22   herself and I should go sit down.

23   Q.    And then you sat down for an hour and then you

24   went to Employee Health; is that correct?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Kimbra Criswell

20

1    A.    I got some ice from the PACU first, and I sat

2   with it elevated.

3    Q.    And then, well, before we get to the Employee

4   Health, you have also provided some photographs,

5   actually not photographs, but copies of photographs.

6   And as I understand it --

7            MS. MASSARO:  I really do need color

8   photographs, and I will just put in a request for

9   that.

10           MR. LEVIN:  No problem.

11           MS. MASSARO:  Thank you.

12   Q.    Could you show me on these photographs, I would

13   also like to see your foot, but if you could show me

14   on these photographs where the machine hit your heel.

15   Okay, I'll give you my pen, if you could just mark

16   that for me.

17   A.    (The witness complied with counsel's request.)

18           MR. LEVIN:  And maybe make an arrow on the

19   border saying --

20           MS. MASSARO:  To the more specific area.

21           MR. LEVIN:  -- saying "where machine hit

22   heel."

23   Q.    And that's a pretty wide range.  Can you be any

24   more specific?

1      A.    Well it hit and it -- when it hit it knocked me

2   to my knee and then it ran, you know, because she was

3   still in the forward motion.  So it hit and --

4      Q.    Okay, so the range would be from there to there

5   is what you're saying.  The first impact was here and

6   then the range was up that high?

7      A.    Yes.

8               MS. MASSARO:  If I could have this marked

9   as an exhibit.

10     Q.    And I'd like to see on your heel.

11              (Criswell Exhibit No. 3 was marked for

12   identification.)

13     A.    Okay.  (Indicating).  This is where she hit

14   originally.

15     Q.    All right.

16              MR. LEVIN:  Indicating, for the record,

17   the witness is demonstrating on her left heel in the

18   Achilles tendon region the impact point of the metal

19   bracket of the machine.

20              Is that correct, Kim?

21              THE WITNESS:  Yes.

22     Q.    Which is reflected as well in the photographs

23   which we've marked.

24              And is there a scar on your ankle or no?

1    Okay, all right.  Thanks.

2              You have little feet.  What size feet do

3    you have?

4      A.    Six, six and a half.

5      Q.    Tiny.  Now, when you went to Employee Health an

6    hour later, who did you see?

7      A.    It was a P.A. that works there.  I don't recall

8    her name.

9      Q.    And what did she do?

10     A.    Examined my leg and ordered x-rays and put me

11   on crutches.

12     Q.    And what type of shoes were you wearing at the

13   time of the incident?

14     A.    Medical clogs.

15     Q.    Did they have a back?

16     A.    No.

17     Q.    Did they have a heel?

18     A.    I don't understand.

19     Q.    Did the medical clogs have a heel?

20     A.    You mean like for height?

21     Q.    Yes.

22     A.    No.

23     Q.    So they were flat medical clogs?

24     A.    Yes.

1   Q.   And did she send you for an x-ray?

2   A.   Yes.

3   Q.   And do you remember what the results of the

4   x-ray were?

5   A.   Negative.

6   Q.   And then what happened after that?

7   A.   She told me to come back in two business days

8   and she would re-evaluate me, to stay non-weight

9   bearing.

10  Q.   Did you return to work then at all the next two

11  days?

12  A.   No.

13  Q.   And then did you report back to Employee Health

14  in a couple of days?

15  A.   Yes.

16  Q.   And what happened at that time?

17  A.   A lady by the name of Candace reexamined me and

18  decided there wasn't anything else they could do for

19  me and referred me to Dr. DiPretoro, who is a

20  podiatrist.

21  Q.   Okay.  And before we get to Dr. DiPretoro,

22  prior to this incident had you been to Employee Health

23  at all?

24  A.   No.

1      Q.    And did you ever have any other problems with

2    an x-ray machine prior to this incident?

3      A.    I had hurt my back the week before.

4      Q.    Do you remember reporting to Employee Health

5    for that?

6      A.    I did, because they gave me pain pills for my

7    back.

8      Q.    Do you remember what they gave you?

9      A.    A pain pill and a muscle relaxer.  I don't

10    recall names.

11      Q.    And what happened in that incident?

12      A.    I was wheeling a fluoro screen into the room,

13    and the nurse had taped down the doctor's headlight

14    cord to the floor with cushy medical tape versus the

15    plastic.  And when I went to push it over, the machine

16    didn't go.

17      Q.    And then what happened?

18      A.    I had pain in my back.

19      Q.    In your upper back or your lower back?

20      A.    Mid.

21      Q.    And what was the treatment?  I know you said

22    the medicine.

23      A.    They gave me muscle relaxers and pain pills.

24      Q.    Anything else?



1      A.    No.

2      Q.    Was an x-ray done?

3      A.    It was fluoro, it's continuous x-ray.  At that

4  point somebody helped me get the machine in.

5      Q.    I'm sorry.  Was an x-ray done of your back that

6  day --

7      A.    No.

8      Q.    -- when you went to Employee Health?  Now,

9  Dr. DiPretoro, what was his treatment when you went to

10 see him?

11     A.    He ordered an MRI.

12     Q.    And did he tell you what that showed?

13     A.    Yes.

14     Q.    And what was that?

15     A.    A tear of the Achilles tendon.

16     Q.    And what was his treatment?

17     A.    I was casted three separate times.

18     Q.    And then what?

19     A.    Physical therapy.

20     Q.    Did you attend physical therapy?

21     A.    Oh, yeah.

22     Q.    And where did you go for physical therapy?

23     A.    Pro Physical Therapy.

24     Q.    And how long did you undergo physical therapy?

1    A.    With Pro, three hours a day, three days a week

2    for, I was there for four or five months with them.

3    Q.    So that was even after you had gone to the

4    hospital in August, or was that all before you went to

5    the hospital in August?

6    A.    I had been there twice before I was admitted.

7    Q.    Now, what brought you to the hospital August

8    5th?

9    A.    My leg was cold and purple.

10    Q.    So when you reported to the E.D. on August 5th

11    of '02, was your foot cold and purple at that time or

12    had it been previous to?

13    A.    It had been previous.  It was worse, and it was

14    not getting better so I went to the E.R.

15    Q.    And who did you see in the E.D., do you

16    remember?

17    A.    No.

18    Q.    Was it a doctor?

19    A.    Yes.

20    Q.    And did the doctor admit you to the hospital?

21    A.    Yes.

22    Q.    And who was your doctor while you were in the

23    hospital?

24    A.    Dr. Rao.



Kimbra Criswell

27

1    Q.    And what did he do?

2    A.    Ran more tests.

3    Q.    What type of tests did you have, do you

4    remember?

5    A.    Vascular tests, an ultrasound, and they tested

6    my veins and arteries from my waist down, and an MRI.

7    Q.    And what did the doctor ultimately tell you was

8    causing the cold and purple?

9    A.    They ruled out a blood clot.  They didn't know

10   what was causing the cold and purple since there

11   wasn't a clot.

12   Q.    So did they give you a diagnosis before you

13   left the hospital?

14   A.    Yes, but not that doctor.

15   Q.    Who gave you the diagnosis?

16   A.    Dr. Leschek-Gelman.

17   Q.    And what was the diagnosis?

18   A.    RSD.

19   Q.    And what did she use to determine that, do you

20   know?

21   A.    Based on the symptoms.

22   Q.    And you reported to the E.D. with -- what was

23   cold and purple, the whole foot or the toes?

24   A.    My left leg from just below the knee, clear to

Kimbra Criswell                                                    28

1    the toes.

2        Q.    And how long did that last?

3        A.    I still have it today.

4        Q.    Well, I'm talking about in August 5th of '02

5    when you went to the emergency department, was it nine

6    hours?

7        A.    It had been cold and purple five hours before I

8    went to the E.R.

9        Q.    And then how long after you went to the E.R.

10   did it last after that?

11       A.    Twenty-four hours.

12       Q.    And then when you were in the hospital for that

13   time frame, did it ever turn cold and purple again

14   while you were in the hospital?

15       A.    Yes.

16       Q.    How often?

17       A.    Two to three times a day.

18       Q.    Every day?

19       A.    Yeah.

20       Q.    And you just said that it's still cold and

21   purple today.  Now I just looked at it and it wasn't

22   purple, so how often does it occur?  Is it a

23   continuous thing or an intermittent thing?

24       A.    It's an intermittent thing.