## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

KIMBRA CRISWELL    :
   Plaintiff,    :
          :
   v.       :  **C.A. No. 05-00321 GMS**
**LYDIA ADAIR MCFADDEN**  :  **JURY TRIAL DEMANDED**
   and     :
**CHRISTIANA CARE HEALTH**  :
**SERVICES, INC.,**    :
    **Defendants.**  :

### APPENDIX TO PLAINTIFF'S ANSWER TO DEFENDANTS' OPENING BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Richard R. Wier, Jr., (#716)
Richard R. Wier, Jr, P.A.
Two Mill Road, Suite 200
Wilmington, DE 19806

**OF COUNSEL:**
Nelson Levin, Esq.
Kats, Jamison, van der Veen & Associates
25 Bustleton Pike
Feasterville, PA 19053

Date: December 11, 2006

<u>**TABLE OF CONTENTS**</u>

Deposition Transcript of Kimbra Criswell …………………………………………Exhibit A

Deposition Transcript of Dawn Shutak …………………….........................Exhibit B

Exhibit A

```
1        IN THE UNITED STATES DISTRICT COURT
2           FOR THE DISTRICT OF DELAWARE
3                   -   -   -
4   KIMBRA CRISWELL            :    CIVIL ACTION
                               :
5           v.                 :
                               :
6   LYDIA ADAIR McFADDEN       :    ORIGINAL
    and CHRISTIANA CARE        :
7   HEALTH SERVICES,           :
    INC.                       :    NO. 05-CV-00321
8
                    -   -   -
9
              NOVEMBER 21, 2006
10
                    -   -   -
11
12              Oral deposition of
13  DAWN C. SHUTAK taken pursuant to notice,
14  was held at the law offices of CHRISTIANA
15  CARE HOSPITAL, Newark, Delaware beginning
16  at 10:05 a.m., on the above date, before
17  Dottyann Y. Walsh, a Certified Shorthand
18  Reporter and Notary Public in the State
19  of Delaware.
20
21                  -   -   -
22          ESQUIRE DEPOSITION SERVICES
                   Suite 1210
23       1600 John F. Kennedy Boulevard
         Philadelphia, Pennsylvania 19103
24              (215) 988-9191
```

2

```
1    APPEARANCES:

2

        KATS JAMISON van der VEEN
3       & ASSOCIATES
        BY:  NELSON LEVIN, ESQUIRE
4       25 Bustleton Pike
        Feasterville, Pennsylvania 19053
5       (215) 396-9001
        Representing the Plaintiff

6

7       WHITE and WILLIAMS LLP
        BY:  DEBORAH J. MASSARO, ESQUIRE
8       825 Market Street
        Suite 902
9       Wilmington, Delaware 19899
        (302) 654-0424
10      Representing the Defendants

11

        ALSO PRESENT:  Sandy Basara, RN
12
                  -   -   -

13

14

15

16

17

18

19

20

21

22

23

24
```

3

```
1                         -   -   -

2                    I  N  D  E  X

3                         -   -   -

4   Testimony of:   DAWN  C.  SHUTAK

5

        By Mr. Levin                      5, 49, 54
6

        By Ms. Massaro                      46, 53
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

4

```
 1                    -   -   -

 2            DEPOSITION SUPPORT INDEX

 3                    -   -   -

 4

 5   Direction to Witness Not to Answer

 6   Page Line           Page Line          Page Line

 7   None

 8

 9

10   Request for Production of Documents

11   Page Line           Page Line          Page Line

12   None

13

14

15   Stipulations

16   Page Line           Page Line          Page Line

17   None

18

19

20   Question Marked

21   Page Line           Page Line          Page Line

22   None

23

24
```

-DAWN C. SHUTAK

```
1                   -  -  -
2               DAWN  C.  SHUTAK,  after  having
3          been  duly  sworn,  was  examined  and
4          testified  as  follows:
5                   -  -  -
6               DIRECT  EXAMINATION
7                   -  -  -
8  BY  MR.  LEVIN:
9          Q.      Good  morning.   Is  it  Shutak?
10         A.      Yes.
11         Q.      Good  morning  Ms.  Shutak.   My
12  name  is  Nelson  Levin.   I  represent  Kimbra
13  Criswell  in  a  lawsuit  against  Christiana
14  Hospital  and  Lydia  Adair  McFadden.   I
15  will  be  taking  your  deposition  today.   I
16  don't  think  we  will  be  very  long,  but  I
17  would  like  to  give  you  some  instructions.
18  I  know  you  met  with  counsel.   Have  you
19  ever  had  your  deposition  taken  before?
20         A.      Yes.
21         Q.      And  the  same  instructions
22  you  have  will  also  apply.   I  want  you  to
23  listen  to  my  question,  if  you  don't
24  understand  my  question,  I  want  you  to
```

-DAWN C. SHUTAK

1  tell me that.  If you didn't hear my

2  question, I want you to tell me that.

3  Will you obey that instruction?

4         A.    Yes.

5         Q.    By the same token, the court

6  reporter is here, and I don't want us to

7  talk over each other.  So let me finish

8  my question completely even if you can

9  anticipate what I'm going to say.  Do you

10  understand that instruction?

11         A.    Yes.

12         Q.    Since the court reporter is

13  here and generating a transcript, I need

14  to have a verbal response.  Shakes of the

15  head or nods cannot be taken down by the

16  court reporter.  You have to answer

17  verbally.  Can you do that?

18         A.    Yes.

19         Q.    If you need to take a break

20  at any time, let us know and we will

21  certainly accommodate you.  Can you give

22  us your name and address for the record.

23         A.    Dawn Shutak, 106 Spaniel

24  Court, Townsend, Delaware.

-DAWN C. SHUTAK

1        Q.      You told me you have been
2    deposed before.  How many times have you
3    been deposed before?
4        A.      Once.
5        Q.      Was it in connection with a
6    case arising from care at Christiana
7    Hospital?
8        A.      Excuse me?
9        Q.      Was it in connection with a
10   case arising from care at Christiana
11   Hospital?
12       A.      Yes.
13       Q.      Was the case filed in
14   Delaware?
15       A.      To my knowledge.
16       Q.      Briefly, could you tell me
17   what your role was in that case?
18       A.      Supervisor on duty.
19       Q.      Did you review any documents
20   before today in preparation for this
21   deposition?
22       A.      Yes.
23       Q.      What did you review?
24       A.      I reviewed an Affidavit from

-DAWN C. SHUTAK

1   Maryellen Hoffman.

2           Q.      What else did you review?

3           A.      I reviewed employee health

4   record for the day Kimbra went down to

5   employee health.

6           Q.      What else did you review?

7           A.      That's it.

8           Q.      Are you aware that the issue

9   in this case is whether Kimbra was an

10  independent contractor versus a special

11  employee of Christiana Hospital?

12          A.      Yes.

13          Q.      And an issue -- a sub issue

14  of that case is whether Christiana

15  Hospital controlled Kimbra's activity.

16  Are you aware that is an issue in this

17  case?

18          A.      Yes.

19          Q.      Are you aware that is the

20  reason or one of the reasons I have

21  requested your deposition today?

22          A.      Yes.

23          Q.      The employee health record

24  that you reviewed, that had to do with

9

-DAWN C. SHUTAK

```
 1   Kimbra's  treatment  at  the  hospital  after
 2   her  accident?
 3          A.      The  day  it  happened.
 4          Q.      The  day  it  happened.
 5          A.      Yes.
 6          Q.      There  is  no  record  that  you
 7   reviewed  in  connection  with  Kim  before
 8   this  accident?
 9          A.      No.
10          Q.      And  Maryellen  Hoffman,  we
11   will  talk  about  her  in  a  minute,  but  she
12   was  also  a  supervisor  here  at  Christiana?
13          A.      Yes.
14          Q.      Ms.  Shutak,  can  you  briefly
15   give  us  your  educational  background.
16          A.      I  have  an  associates  in
17   allied  health  science  and  I'm  pursuing  my
18   bachelors  now.
19          Q.      How  long  have  you  worked  at
20   Christiana?
21          A.      Since  1993.
22          Q.      What  were  you  hired  as?
23          A.      An  x-ray  tech.
24          Q.      What  is  your  present
```

ESQUIRE  DEPOSITION  SERVICES

-DAWN C. SHUTAK-

```
 1    position?
 2           A.      I am now a clinical
 3    instructor with the School of Radiology
 4    through Christiana Care.
 5           Q.      So your duties have changed
 6    since you were hired?
 7           A.      Yes.
 8           Q.      And what are the duties of
 9    an x-ray tech?
10           A.      To perform radiographs on
11    patients, patient care, their paperwork
12    involved, working closely with the
13    radiologists and other staff to take care
14    of our patients.
15           Q.      And now you are a clinical
16    instructor?
17           A.      Yes.
18           Q.      Who are your students?
19           A.      They are through Delaware
20    Tech.  There will be 60 come this time
21    next year.
22           Q.      So you train the students
23    here at Christiana?
24           A.      And other clinical sites.
```

-DAWN C. SHUTAK

1      Q.      And what do you train them

2  to do?

3      A.      Take radiographs, patient

4  care.

5      Q.      When we were talking about

6  taking radiographs, that is the same as

7  x-rays?

8      A.      Yes.

9      Q.      Are we using portable x-ray

10  machines or stationary x-ray machines?

11      A.      Both.

12      Q.      In May 2002, the month that

13  this accident happened, what was your

14  position?

15      A.      I was a senior technologist,

16  supervisor on dayshift.

17      Q.      What were your duties in

18  that position?

19      A.      I helped staff the

20  department, I did their schedules, I

21  oversaw the goings on in the department.

22      Q.      And when you say department,

23  you mean the department of radiology?

24      A.      Yes.

-DAWN C. SHUTAK

1          Q.      What do you mean by help
2     staff the department?
3          A.      I did their daily schedules,
4     Maryellen did their schedules for weeks
5     at a time.  She put them on the days they
6     would work, and I would put them in the
7     slots they needed to be in to cover the
8     staffing.
9          Q.      So who did their daily
10    schedules?
11         A.      I did.
12         Q.      And Maryellen did their
13    weekly schedules?
14         A.      Yes.
15         Q.      Tell me how the daily
16    scheduling worked.
17         A.      We usually have between 13
18    to 17 techs on.  We have different areas
19    we have to cover such as the operating
20    room, fluro, inpatient, emergency
21    department, portable.  So I would put
22    people in those slots to cover those
23    areas where all of these x-rays are
24    taken.

-DAWN C. SHUTAK

```
 1            Q.      For example, if I was an
 2    x-ray tech at Christiana, you would say
 3    to me, Nelson, I want you to be in OR 2
 4    at 3 p.m.?
 5            A.      You would be scheduled in
 6    the OR and as the OR unfolds, but yes.
 7            Q.      Would I report to you each
 8    day and you would tell me where to go?
 9            A.      I have a weekly schedule
10    done and they would know where they are
11    to be.  There is a schedule hanging so
12    they would know on Tuesday, they are in
13    the operating room, on Tuesday they are
14    in portables.  It comes from me but it is
15    done on a weekly basis.
16            Q.      So then I would check in at
17    the beginning of each week to see where I
18    would be going?
19            A.      Yes.
20            Q.      And I would look at the
21    schedule that was posted on the wall?
22            A.      Yes.
23            Q.      If I was to look in on a
24    Monday, would I need to see you on
```

14

-DAWN C. SHUTAK

```
 1   Tuesday to see where I was going or it
 2   would just be my responsibility to know
 3   that?
 4          A.     It is your responsibility.
 5   If things were to change, I would notify
 6   them before.
 7          Q.     You said help staff is one
 8   of your duties, what do you mean by that?
 9          A.     At times Maryellen would do
10   the big schedule, and if I didn't have
11   enough staff, then I could call on other
12   people to fill those slots.
13          Q.     Give me an example how that
14   would work.
15          A.     An example, we had 13 techs
16   on, I knew there was going to be extra
17   cases in the operating room that day.  I
18   could call a tech at home and see if they
19   would come in and work so I could cover
20   all of the areas.
21          Q.     We covered scheduling, we
22   covered staffing, any other duties you
23   had May of 2002?
24          A.     I also took x-rays, I did
```

15

-DAWN C. SHUTAK

```
 1    all of this.
 2           Q.      You yourself was a
 3    hands-on --
 4           A.      Uh-huh.
 5           Q.      -- operator of an x-ray
 6    machine?
 7           A.      Correct.
 8           Q.      Besides help staffing,
 9    scheduling and operating the x-ray
10    machine, did you have any other duties at
11    that time?
12           A.      I handled problems coming
13    from different departments.  Like if they
14    ordered a stat and we were not there, I
15    could send a tech up.  Just general
16    problems through the day.  What a
17    supervisor would do.
18           Q.      Anything else?
19           A.      No.
20           Q.      On May 23, '02, were you
21    working at Christiana Hospital?
22           A.      Yes.
23           Q.      Was Kim working that day?
24           A.      Yes.
```

-DAWN C. SHUTAK

1          Q.      When did you first meet Kim
2    Criswell?
3          A.      When she first started.  The
4    exact date I don't know.
5          Q.      Do you know how long she was
6    working at Christiana before this
7    incident?
8          A.      Give or take a few months.
9    I'm not a hundred percent sure on that.
10         Q.      What did she do here?
11         A.      She was an x-ray tech and
12   she took x-rays on patients, provided
13   patient care.
14         Q.      What are the duties of an
15   x-ray tech?
16         A.      We take x-rays, we provide
17   patient care, we develop our films.  When
18   we take x-rays it can take us anywhere
19   from an ICU unit doing a portable x-ray,
20   to the department or into the operating
21   room.  It is a very wide area we cover.
22   The emergency department, inpatients.
23         Q.      At this time and I mean this
24   time unless I change my question to be

-DAWN C. SHUTAK-

```
1    specific, at this time I'm talking
2    May 2002, how many approximately x-ray
3    techs did Christiana have?
4           A.    An average for the whole
5    entire department or dayshift?
6           Q.    Well, for the whole entire
7    department.
8           A.    Approximately 50 give or
9    take.
10          Q.    And of those 50, how many
11   would be assigned to a dayshift?
12          A.    Approximately 14.
13          Q.    And what is the hours of the
14   dayshift?
15          A.    They can range anywhere from
16   7:30 to 4, 8 to 4:30, 10 to 6 at that
17   time.
18          Q.    Do you remember what Kim
19   Criswell looked like?
20          A.    Yes.
21          Q.    Can you describe her?
22          A.    Freckles, red hair, it was
23   shoulder length at the time, not a big
24   girl, average.
```

18

-DAWN C. SHUTAK

1        Q.      Was Kim Criswell an employee

2   of Christiana Hospital?

3        A.      She was working for us

4   through Aurius.

5        Q.      When you mean she was

6   working with you through Aurius, what is

7   your understanding of that?

8        A.      Aurius is a company we

9   contracted to help cover our empty slots

10  within our department.  So she worked as

11  a Christiana Care employee while she was

12  here.  But we contracted her through her

13  company.

14       Q.      And you contracted her --

15  were you involved in the contracting

16  between Aurius and Christiana?

17       A.      Not with her, but I have

18  helped hire, I have done interviews with

19  other people we have contracted with

20  them.

21       Q.      So explain to me how Aurius

22  supplies techs to Christiana.

23       A.      It is my understanding that

24  where there is a need, there are these

-DAWN C. SHUTAK

1    companies who can provide x-ray

2    technologists or nursing or whatever.    In

3    our case it is x-ray technologists.    We

4    contact them, we have a shortage, we need

5    X amount of techs or one tech, and an

6    interview process usually takes place.

7    And then we tell them the ones we want,

8    and they come in and work for us and do

9    the same things our techs do, just we

10   have contracted them through the company.

11        Q.    Did you interview Kim

12   Criswell?

13        A.    No.

14        Q.    Do you know who did?

15        A.    No.

16        Q.    So then if your department

17   is short an x-ray tech, you contact

18   Aurius, Aurius then supplies the x-ray

19   tech, is that correct?

20        A.    Correct.

21        Q.    And that is pursuant to a

22   contract between Aurius and Christiana?

23        A.    Yes.

24        Q.    Did Aurius hire Kim

-DAWN C. SHUTAK

1    Criswell?

2            A.       Explain.

3            Q.       Well, you contract with

4    Aurius to provide x-ray techs.

5            A.       Yes.

6            Q.       At that time when you make

7    that contract, is Aurius working for --

8    is Kim Criswell working for Aurius?

9            A.       It is my understanding they

10   are.

11           Q.       Have you ever heard of a Ray

12   Petty?

13           A.       No -- yes, I have.

14           Q.       Is it your understanding

15   that Ray Petty is an employee of Aurius?

16           A.       Yes.

17           Q.       And what is your

18   understanding of what Ray Petty does?

19           A.       He is a recruiter, and it is

20   my understanding he is our contact when

21   we need an x-ray tech, we would go

22   through him to hire one.

23           Q.       And then Ray would say I

24   have this x-ray tech Kim Criswell or

-DAWN C. SHUTAK

```
 1    Susie Smith?
 2            A.      He would give us a few
 3    usually.
 4            Q.      Have you spoken to him?
 5            A.      In a telephone meeting one
 6    time.
 7            Q.      Are you familiar with the
 8    contract between Aurius and Christiana as
 9    it relates to Kim Criswell?
10            A.      No.
11            Q.      Do you know who issues Kim
12    Criswell's paychecks?
13            A.      No.
14            Q.      Do you know if Kim Criswell
15    was covered by workers' comp?
16            A.      I'm not sure.
17            Q.      Do you know who provided Kim
18    Criswell with workers' comp?
19            A.      I'm not sure.
20            Q.      Who issues your paychecks?
21            A.      Christiana Care.
22            Q.      Do they offer you workers'
23    comp?
24            A.      Yes.
```

-DAWN C. SHUTAK-

1          Q.      Did Kim Criswell receive a

2    vehicle allowance?

3          A.      I don't know the specifics

4    of her contract, but I know other people

5    have.  So I could not answer for Kim.

6          Q.      And when you mean specifics

7    of her contract, contract with who?

8          A.      Christiana Care and Aurius,

9    and Kim.

10          Q.      Did Kim Christiana receive a

11    per diem allowance?

12          A.      I don't know.

13          Q.      Did Kim Criswell receive a

14    401K?

15          A.      I don't know.

16          Q.      Do you receive a 401K?

17          A.      Yes.

18          Q.      Do you receive it through

19    Christiana Hospital?

20          A.      Yes.

21          Q.      Do you receive a vehicle

22    allowance?

23          A.      No.

24          Q.      Do you receive a per diem

23

-DAWN C. SHUTAK

1    allowance?

2           A.    No.

3           Q.    Does Aurius -- did Aurius

4    provide Kim Criswell with a vehicle

5    allowance?

6           A.    I don't know.

7           Q.    Did Aurius provide Kim

8    Criswell with a 401K?

9           A.    I don't know.

10          Q.    Did Christiana Hospital

11   issue Kim Criswell's paycheck?

12          A.    I don't know.

13          Q.    How often do you get paid by

14   Christiana Hospital?

15          A.    Every two weeks.

16          Q.    And is that how it was in

17   May 2002?

18          A.    Yes.

19          Q.    Were you receiving -- were

20   you covered by workers' compensation by

21   Christiana Hospital in May 2002?

22          A.    Yes.

23          Q.    In May 2002, Kim was an

24   x-ray tech here?

-DAWN C. SHUTAK

1          A.      Yes.

2          Q.      What kind of x-rays was she

3    taking?

4          A.      She was performing any body

5    radiographs, chest x-rays, OR studies,

6    portable studies, fluoro studies.

7          Q.      This may be hard to answer,

8    so I will ask you to estimate, on a

9    typical day, how many x-rays would she

10   take?

11         A.      Depends on your rotation.

12   Portables, you could take anywhere from

13   40 to 50 a day.  Inpatient, usually

14   between 15 and 25.

15         Q.      A day?

16         A.      Yes, a day.  Operating room,

17   their cases tend to go longer, so you may

18   not do as many.

19         Q.      Did you train her on the

20   x-ray machines?

21         A.      I don't remember if I

22   specifically trained her.  I know she had

23   an orientation of two weeks to our

24   hospital.

-DAWN C. SHUTAK

1          Q.     Did you give that

2    orientation?

3          A.     I ran the inpatient front

4    area, so the areas that she was rotating

5    in, the people there would orient her.

6          Q.     What did this orientation

7    cover?

8          A.     How our rooms were, because

9    every x-ray room from where she's been --

10   where she came from might have not been

11   quite the same.  So we oriented her to

12   our x-ray rooms, how we developed our

13   films, the process in which we get films

14   read, how we handle stats versus routine

15   x-rays.

16         Q.     And you say orientation --

17   strike that.  Did that orientation cover

18   how to take an x-ray?

19         A.     No, she should know how to

20   take an x-ray.

21         Q.     Because Aurius is in

22   business, is it not, to supply qualified

23   techs --

24         A.     Correct.

26

-DAWN C. SHUTAK

1          Q.        -- to the hospital?

2          A.        Correct.  Her orientation

3    was basically to learn our layout of

4    things, how we ran things.

5          Q.        And when you mean how we ran

6    things, in other words the physical

7    layout of the hospital --

8          A.        It was all included, the

9    physical layout, how we call down

10   patients, where the patients -- what

11   patients took priority over other

12   patients, deciphering stats versus as

13   soon as possible.  Operating room, the

14   layout of the operating room, the

15   equipment up there, the paperwork trail.

16         Q.        Did Kim -- did you

17   personally review -- strike that.  Did

18   Kim ever ask you to watch her take an

19   x-ray to make sure she was doing it

20   right?

21         A.        No, not to my knowledge.

22         Q.        Did Kim ever ask you or say

23   to you I don't know how to take an x-ray

24   of this and that body part?

-DAWN C. SHUTAK

1   A.  Not to my knowledge.

2   Q.  Did Kim ever say to you, I

3 don't know how to use such and such x-ray

4 machine?

5   A.  I can't remember.  This is

6 four years ago.

7   Q.  And it was your

8 understanding that Kim was qualified to

9 use the x-ray machines that were here?

10   A.  Yes.

11   Q.  Did you personally review

12 any protocols with Kim?

13   A.  I can't remember.

14   Q.  Did you ever do an

15 evaluation of Kim?

16   A.  Written evaluation?

17   Q.  Yes.

18   A.  No.

19   Q.  Did you have authority to

20 fire Kim?

21   A.  No.  I could have input

22 towards it.

23   Q.  Did Aurius have authority to

24 fire Kim?

-DAWN C. SHUTAK-

1          A.      I don't know.

2          Q.      If Aurius fired her, could

3   she have another job in another Aurius

4   client?

5          A.      I don't know.

6          Q.      And incidentally, I use the

7   word client, is it your understanding

8   that Aurius -- that Christiana Care was a

9   client of Aurius?

10          A.      Yeah.

11          Q.      Did you ever personally go

12   with Kim and show her how to use an x-ray

13   machine?

14          A.      I can't remember.  I think I

15   did, but I can't remember.

16          Q.      Before this accident, did

17   you believe that Kim was qualified to

18   operate the machinery on her own?

19          A.      Yes.

20          Q.      Before this accident, was it

21   your understanding that Kim was qualified

22   to operate the machinery on her own

23   without your supervision?

24          A.      Yes.

-DAWN C. SHUTAK

1          Q.      On the day of the accident
2    which is May 23, do you remember that
3    day?
4          A.      Part of it.
5          Q.      Did you see Kim before she
6    had her accident?
7          A.      I can't remember.
8          Q.      Did you speak with her
9    before she had her accident?
10         A.      I can't remember.
11         Q.      Did you tell her where to
12   report that day?
13         A.      I can't remember if I told
14   her or if she was already scheduled in
15   the operating room and she just went
16   there.
17         Q.      Is it fair to say that the
18   week of her accident your role vis-a-vis
19   Kim Criswell was to schedule her?
20         A.      And if there were any
21   problems, I would handle them.
22         Q.      So your role would be to
23   schedule her, correct?
24         A.      Uh-huh -- yes.

-DAWN C. SHUTAK

1          Q.      And if there were any

2    problems, what do you mean by that?

3          A.      If anything were to happen

4    on our shift, they would report to me,

5    whether it be a film lost, something were

6    to happen to a tech or a patient, it

7    would come to me.

8          Q.      Did anything like that

9    happen that week?

10          A.      Not to my knowledge.

11    Before?

12          Q.      Yes.  Did anything like that

13    happen from the time that you were aware

14    of Kim working here until the time of her

15    accident?

16          A.      I can't remember.

17          Q.      So then it would be fair to

18    say that your interaction with Kim while

19    she was here was to post her schedule?

20          A.      Yes.

21          Q.      Let's talk about --

22          A.      I had other interactions

23    with her besides the schedule.  I just

24    can't remember specifics.  I had quite a

ESQUIRE DEPOSITION SERVICES

-DAWN C. SHUTAK

1   few conversations with her.

2           Q.      Of those conversations --

3   strike that.  Do you recall any specifics

4   of those conversations?

5           A.      I remember talking about a

6   car.  I had recently purchased a car, a

7   Tahoe.  And she was going to get a

8   Denali.  I remember the conversation

9   because she was getting the top of the

10  line, the leather seats and I just

11  remember that sticking out.  I remember

12  her I think we talked about her license

13  plate because it said x-ray, and just

14  little things about her boyfriend and

15  stuff.  Just, you know, pleasant

16  conversation, an everyday conversation.

17          Q.      Take you back to the day.  I

18  think you told me you don't recall

19  whether you saw her or spoke to her

20  before this incident.

21          A.      Right.

22          Q.      Do you know where she was

23  supposed to report to that day?

24          A.      I believe it was the

32

-DAWN C. SHUTAK

1    operating room.

2         Q.    And that would have been

3    scheduled earlier in the week?

4         A.    Correct.  From time to time

5    if the operating room gets busy, if we

6    need to pull somebody to send them up to

7    cover, we can.  I think she was scheduled

8    in the operating room that week, I don't

9    know if she was pulled up or not.  I

10   can't remember that.

11        Q.    Could Christiana fire her?

12        A.    Yes.  We have had people,

13   somebody from a traveling company come in

14   with alcohol on their breath and they

15   were dismissed.

16        Q.    If Christiana wanted to fire

17   her, would they have to go through

18   Aurius?

19        A.    I don't know.

20        Q.    Did you have any interaction

21   with Aurius about Kim's performance

22   before this incident?

23        A.    No, I didn't.

24        Q.    Do you know if anyone did?

-DAWN C. SHUTAK

1         A.      I don't know.

2         Q.      If Kim was not performing

3   satisfactorily, did you have to contact

4   Aurius?

5         A.      I would contact Maryellen

6   who would contact Aurius.

7         Q.      And then what would Aurius

8   do?

9              MS. MASSARO:  Object to form

10         of the question.  You can answer

11         if you know.

12              THE WITNESS:  I don't know.

13  BY MR. LEVIN:

14         Q.      If you wanted -- put it this

15  way, if Kim was not performing her job,

16  what would you do?

17         A.      I would probably talk to her

18  first.  I would talk to Maryellen and we

19  would make a decision from there.

20         Q.      Would you have to talk to

21  Aurius?

22         A.      Maryellen would do that,

23  have that step.

24         Q.      And Maryellen would be the

34

-DAWN C. SHUTAK

1    person who would talk to Aurius?

2           A.      Correct.

3           Q.      And what would be the

4    purpose of her talking to Aurius?

5           A.      If we had a problem.  But we

6    would try to address it within first.

7           Q.      And then it would be Aurius'

8    job to pull her out of this environment?

9           A.      I don't know how that

10   transpires, if we make the decision or

11   they make the decision, I don't know

12   that.

13          Q.      Before Kim came here -- at

14   the time Kim came here, she was

15   contracted with Aurius, correct?

16          A.      Correct.

17          Q.      Do you know what other

18   hospitals Aurius had put her in?

19          A.      No.

20          Q.      That was my question.

21          A.      No.

22          Q.      You said there was a

23   traveling tech who was fired for showing

24   up intoxicated?

-DAWN C. SHUTAK

1          A.      Smelling of alcohol.

2          Q.      Am I correct in assuming if

3    anyone who worked in this hospital showed

4    up smelling of alcohol, they would be

5    terminated?

6          A.      Correct.  Or discipline

7    action would be taken.  That comes above

8    me.

9          Q.      But -- he -- by the way, at

10   this time, were there other techs from

11   Aurius working at Christiana?

12         A.      I think so, but I can't

13   remember.

14         Q.      Do you recall if there were

15   any problems with any of those techs?

16         A.      No, not at that time.

17         Q.      While you may not remember

18   their names, do you remember

19   approximately how many other techs from

20   Aurius were here at that time?

21         A.      I don't remember.

22         Q.      Is it 10, two?

23         A.      Less than 10.

24         Q.      You mentioned Maryellen and

-DAWN C. SHUTAK

1    I'm taking that to mean the woman --
2    Maryellen Hoffman.  Was she your
3    supervisor?
4         A.    She was a supervisor, a
5    section supervisor.  So yes, she was
6    above me.
7         Q.    And if there was a problem
8    with an Aurius tech, would she be the one
9    who would pick up the phone and call
10   Aurius?
11        A.    Yes.
12        Q.    And then what would Aurius
13   do to remedy the situation?
14        A.    I don't know.
15        Q.    Could Aurius remove the
16   tech?
17        A.    I guess they could.
18        Q.    You said I guess they could?
19        A.    I don't know.
20        Q.    But it is reasonable to you
21   that they could do that?
22        A.    I don't know.
23        Q.    If Aurius wanted to put Kim
24   Criswell to Thomas Jefferson University

-DAWN C. SHUTAK

```
 1   Hospital, could they do that?
 2           A.      During our contract?  Just
 3   in general?
 4           Q.      In general.
 5           A.      Yes.  If they contracted
 6   Aurius.
 7                   MS. MASSARO:  It is late,
 8           but it is an objection to the form
 9           of the question in terms of she
10           can answer if she knows.
11   BY MR. LEVIN:
12           Q.      If Maryellen called Aurius,
13   do you know who she would speak to?
14           A.      I believe it was Ray Petty.
15           Q.      And what would be the
16   purpose for her speaking with Ray Petty?
17           A.      If we needed to hire staff
18   to come cover our empty slots.
19           Q.      Or if there was a problem
20   with an Aurius tech.
21           A.      Yes.
22           Q.      Is there an employment
23   contract between Christiana Hospital and
24   Kim Criswell?
```

-DAWN C. SHUTAK

1        A.      I don't know.

2        Q.      Are you aware of any

3  employment contracts between Aurius techs

4  and Christiana Hospital?

5        A.      I don't know.

6        Q.      The day of the accident, did

7  you go with Kim to the OR?

8        A.      No.

9        Q.      How did you find out the

10 accident happened?

11       A.      Lydia called me from the OR

12 to tell me.

13       Q.      What did Lydia tell you?

14       A.      She told me that Kim had

15 injured her ankle or the back of her

16 ankle.  She said that she had her foot

17 propped up on a stool.  And we had

18 spoken, and I said we need to send her

19 down to employee health.

20       Q.      Did Lydia say how Kim

21 injured her ankle?

22       A.      She said they were coming

23 around a corner and a portable bumped

24 into her, portable x-ray machine.

-DAWN C. SHUTAK

1        Q.      Did Lydia say how the
2   portable x-ray machine bumped into her?
3        A.      Just that the front of it
4   just kind of bumped.  I don't know the
5   specifics.
6        Q.      Did Lydia say whether she
7   was holding the machine when it bumped
8   into her?
9        A.      She said she was pushing the
10  machine.
11       Q.      And when she told you she
12  said Kim's leg was propped up?
13       A.      We have a little core area
14  upstairs, and she had sat her down when
15  it happened and then put her foot up and
16  then called me.  I don't know the time
17  frames of all that.
18       Q.      What did you do in response
19  to that call if anything?
20       A.      That we needed to send her
21  to employee health to have her checked
22  out.
23       Q.      If God forbid I walked out
24  of here and slipped and fell -- strike

-DAWN C. SHUTAK

1    that.  You told her to send her to

2    employee health, did that happen?

3            A.      Yes.

4            Q.      As far as you know?

5            A.      Uh-huh.

6            Q.      Did you see Kim there after

7    the accident?

8            A.      I can't remember if I saw --

9    I'm almost sure I saw her after she came

10   back from employee health.  I can't

11   remember the exact timing I saw her.

12   Because she required an x-ray.

13           Q.      What is employee health?

14           A.      Employee health is where if

15   an employee gets injured or they are sick

16   or they are involved in some kind of

17   lifting a patient and hurt their back,

18   they could go down to employee health and

19   be looked at by somebody.

20           Q.      Do you know what happened

21   after that?

22           A.      I know she required an x-ray

23   and I know -- I don't know how long

24   after, it might have been a week or

-DAWN C. SHUTAK

1  longer, that she needed an MRI.  Because

2  she stopped in.  I can't remember for

3  sure, she had stopped in to say hello,

4  and that is all I remember.  I think it

5  was an MRI, I'm not a hundred percent

6  sure.

7       Q.    Do you know if anyone else

8  witnessed this accident besides Lydia and

9  Kim?

10      A.    Not to my knowledge, I don't

11 know.

12      Q.    In your experience, do you

13 consider Aurius a good source of

14 qualified x-ray techs?

15      A.    Yes.  You had good and bad.

16      Q.    Like anything else.

17      A.    Yeah, it was pot luck I

18 guess.

19      Q.    Would you consider Kim one

20 of the good x-ray techs?

21      A.    I consider Kim in the

22 middle.  She wasn't bad, she wasn't

23 stellar.

24      Q.    After the date of her

-DAWN C. SHUTAK

1    accident, did you ever see her again?

2            A.      Yes.

3            Q.      You said she came back.

4            A.      Uh-huh.

5            Q.      She came back here for an

6    MRI?

7            A.      I remember her coming in to

8    say hello and I remember her boyfriend

9    standing back.  I think she had said she

10   was having an MRI.  But I can't be a

11   hundred percent sure.

12           Q.      After that interaction, did

13   you ever see her again?

14           A.      Not that I remember.

15           Q.      Do you remember the name of

16   any other Aurius techs that were there at

17   that time, maybe not that day but around

18   May?

19           A.      No.

20           Q.      Besides x-ray techs, did

21   Aurius supply any other health care

22   personnel to Christiana?

23           A.      I don't know.

24           Q.      These portable x-ray

-DAWN C. SHUTAK

1    machines, they are pretty big?

2            A.      Yes.

3            Q.      If I was assigned to take an

4    x-ray in Room 303, would the x-ray

5    machine be on that floor?  How would that

6    work?

7            A.      Not necessarily.  They are

8    strategically placed next to ICUs and in

9    the operating room.  If you are in a room

10   that is not close to an ICU, you may have

11   to take the portable one to the elevator

12   down to the room.

13           Q.      And that would be the x-ray

14   tech's job to do?

15           A.      Yes.

16           Q.      The type of machine involved

17   in Kim's incident, would this -- do you

18   need one or two people to move it?

19           A.      One.  They are motorized.

20           Q.      When the x-ray tech takes

21   the x-ray, who is in charge of developing

22   the film?

23           A.      The x-ray tech.

24           Q.      And that would apply to Kim

-DAWN C. SHUTAK

1    as well?

2            A.        Yeah.

3            Q.        None of us are technicians

4    here, but there is a broken bone in room

5    303, x-ray tech takes the x-ray, correct?

6            A.        Yes.

7            Q.        And then what does the x-ray

8    tech do with the film?

9            A.        They take it back to our

10   processing area, develop the film, and

11   then if it is of good quality, then

12   depending where it was, they could take

13   it back to -- if it was in the operating

14   room, usually the doctor likes to see the

15   films right then, and you would show them

16   the films.

17           Q.        And the x-ray tech

18   determines if it is good quality?

19           A.        Yes, and the doctor.  When

20   you show it to him, he will tell you.

21           Q.        But it is the x-ray tech's

22   job to develop the film?

23           A.        Correct.

24           Q.        The x-ray tech's interaction

-DAWN C. SHUTAK

1   with the machine is to move the machine,

2   correct?

3           A.      Correct.

4           Q.      Take the x-ray?

5           A.      Correct.

6           Q.      Develop the x-ray?

7           A.      Correct.

8           Q.      Speak to the patient?

9           A.      Correct.    The biggest part.

10          Q.      And probably the most

11  difficult?

12          A.      No.

13          Q.      And the x-ray tech does this

14  on her own or his own?

15          A.      Yes.

16          Q.      Does the x-ray tech also

17  give you that lead bib thing?

18          A.      At times, yes.

19          Q.      Does Christiana still

20  contract with Aurius to provide techs?

21          A.      I don't know.  Because I'm

22  not in there anymore.

23  EXAMINATION

24  BY MS. MASSARO:

-DAWN C. SHUTAK-

1        Q.      In the beginning of the
2    deposition Mr. Levin asked you if you
3    understood or if you understood that you
4    were here due to issues of control or
5    whether Ms. Criswell was an independent
6    contractor.  Do you understand the legal
7    ramifications of the term independent
8    contractor?
9        A.      No.
10       Q.      Did you have anything to do
11   with negotiating the terms of the
12   contract between Aurius and Christiana
13   Care?
14       A.      No.
15       Q.      Have you ever seen the
16   contract?
17       A.      No.
18       Q.      With regard to Ms. Criswell,
19   when she was here, did she have to comply
20   with Christiana Care rules, regulations
21   and policies?
22       A.      Yes.
23       Q.      Were you her only site
24   supervisor?

47

-DAWN C. SHUTAK

```
 1        A.      Yes.
 2        Q.      Did Ms. Criswell go to
 3   employee health on May 23 of '02 --
 4        A.      Yes.
 5        Q.      -- after this incident?
 6   Going with the line of questioning
 7   earlier, if I walked out this door and
 8   fell on the floor, God forbid, would you
 9   send me to employee health or would you
10   send me to the emergency department?
11        A.      I would send you to the
12   emergency department.
13        Q.      Why is that --
14        A.      Do you work for Christiana
15   Care?
16        Q.      No.
17        A.      Then I would send you to the
18   emergency department.
19        Q.      Would you consider
20   Ms. Criswell and Lydia McFadden
21   co-employees?
22        A.      Yes.
23            MR. LEVIN:  I'm going to
24        object.
```

-DAWN C. SHUTAK

1    BY MS. MASSARO:

2           Q.    The equipment that

3    Ms. Criswell used, Mr. Levin was

4    describing x-ray equipment, that

5    equipment, does that belong to Christiana

6    Care?

7           A.    Yes.

8           Q.    The films that she would use

9    when she would work here and look at

10   films and develop them, would those films

11   and that developing equipment, did that

12   belong to Christiana Care?

13          A.    Yes.

14          Q.    And also the lead bib that

15   she might use in the radiology department

16   to protect herself, would that belong to

17   Christiana Care?

18          A.    Yes.

19          Q.    So would all of the

20   equipment that she used here to perform

21   her job duties, would all of that

22   equipment belong to Christiana Care?

23          A.    Yes.

24          Q.    You mentioned that you

49

-DAWN C. SHUTAK

1    prepared her schedule and that if you

2    were short staffed, you would call in

3    someone?

4            A.    Yes.

5            Q.    Would that be from a pool of

6    employees, Christiana Care people, people

7    from Aurius, would that be the same pool

8    you would call in people from that pool?

9            A.    Yes.

10           Q.    Do you know who hired

11   Ms. Criswell?

12           A.    I believe it was Maryellen

13   Hoffman.

14           Q.    If you were unhappy with her

15   performance, would you have had the

16   authority to discharge her through

17   Maryellen Hoffman?

18           A.    Yes.

19           MS. MASSARO:  No further

20           questions.

21   FURTHER EXAMINATION

22   BY MR. LEVIN:

23           Q.    Do you understand the legal

24   ramifications of the term co-employee?

-DAWN C. SHUTAK

1          A.      No.

2          Q.      You said in response to
3    counsel's questions, Maryellen Hoffman
4    hired Kim Criswell, but when she -- that
5    hiring process, that was an interview?

6          A.      I wasn't there, so I don't
7    know.

8          Q.      Well, when she hired her,
9    you are using the term hired, Kim
10   Criswell was in contract with Aurius,
11   isn't that right?

12         A.      To my understanding, yes.

13         Q.      She was under contract to
14   Aurius when Kim Criswell met her --

15         MS. MASSARO:  Objection to
16         the form of the question.

17   BY MR. LEVIN:

18         Q.   Kim Criswell was under
19   contract with Aurius when Maryellen
20   Hoffman met her, correct?

21         A.      To my understanding, yes.

22         Q.      And when she spoke to the
23   patient -- Kim would speak to a patient
24   before taking an x-ray, you would not

-DAWN C. SHUTAK

```
1   tell her what to say?

2          A.     No.

3          Q.     And when she put that

4   leather bib on, you would not tell her

5   how to do it?

6          A.     No.

7          Q.     And when she developed her

8   radiographs, you would not tell her how

9   to do that?

10         A.     Not once she was oriented to

11  our system.

12         Q.     Did your radiographs develop

13  differently than other hospitals?

14         A.     They can.  Some are

15  computer, all on a computer, others they

16  have to manually run them in a darkroom.

17  Ours was at the time a daylight system.

18         Q.     Are there daylight systems

19  in other hospitals?

20         A.     Yes.

21         Q.     Are there computerized in

22  other hospitals?

23         A.     Yes.

24         Q.     So if she knew that from
```

Exhibit B

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

KIMBRA CRISWELL,                    )
                                    )
            Plaintiff,              )
                                    )
      v.                            ) Civil Action
                                    ) No. 05-CV-00321 GMS
LYDIA ADAIR MCFADDEN and            )
CHRISTIANA CARE HEALTH              ) JURY TRIAL DEMANDED
SERVICES, INC.,                     )
                                    )
            Defendants.             )

            Deposition of KIMBRA CRISWELL, taken
pursuant to notice at the law offices of White and
Williams, LLP, 824 North Market Street, Suite 902,
Wilmington, Delaware, beginning at 11:01 a.m., on
Friday, July 14, 2006, before Julie H. Parrack,
Registered Merit Reporter, Certified Realtime Reporter
and Notary Public.

APPEARANCES:

      NELSON LEVIN, ESQUIRE
      KATS, JAMISON, van der VEEN & ASSOCIATES
        25 Bustleton Pike
        Feasterville, Pennsylvania  19053
        On behalf of Plaintiff

      DEBORAH J. MASSARO, ESQUIRE
      WHITE AND WILLIAMS, LLP
        824 North Market Street, Suite 902
        Wilmington, Delaware  19899-0709
        On behalf of Defendants

            WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
            (302) 655-0477
            www.wilfet.com



**WILCOX & FETZER LTD.**
Registered Professional Reporters





2

1               KIMBRA CRISWELL,

2          the deponent herein, having first been duly

3          sworn on oath, was examined and testified as

4          follows:

5     BY MS. MASSARO:

6        Q.   Hi, Kimbra.

7        A.   Hi.

8        Q.   My name is Debbie Massaro, and I represent

9     Christiana Care in this lawsuit which you filed.  I

10    have a few just housekeeping things to go over before

11    we start the deposition.  Have you ever given a

12    deposition before?

13       A.   No.

14       Q.   Okay.  Before we start, you were just sworn in,

15    so do you understand that that means that's the same

16    as if you're in a court of law?

17       A.   Yes.

18       Q.   Okay, so for that reason, if you don't

19    understand a question that I ask you, let me know.  I

20    can rephrase it, I can repeat it.  If you have any

21    problems, just let me know with that.  Okay?

22       A.   (Nodded affirmatively.)

23       Q.   Also, you'll notice she's typing everything

24    that we say, and it's important -- because we tend to

1    nod -- it's important to say yes or no, rather than

2    nod.

3        A.    Okay.

4        Q.    And also, and I'm the most guilty of this, we

5    tend sometimes to talk over each other.  You know, let

6    me finish my question first, because sometimes you may

7    be thinking that I'm going in one direction, and I may

8    be going in the totally opposite direction.  So let me

9    finish my question completely before you answer.  And

10   again, I'll try not to do it, but if I do, just give

11   me a holler if I talk over you.  But let's just be

12   careful with that, not to talk over one another, okay?

13       A.    Okay.

14       Q.    And as I told you earlier, if you need a break,

15   just let me know.  Also, we're talking about a pretty

16   long history here.  If there's something you don't

17   remember, just feel free to say so, because we'll be

18   going back over your medical history.

19       A.    Okay.

20       Q.    To start, could you please state and spell your

21   name for the record?

22       A.    Kimbra, K-i-m-b-r-a, Criswell, C-r-i-s-w-e-l-l.

23              MR. LEVIN:  Kim, I'm going to give you one

24   additional instruction.  You're kind of soft spoken.

1    There is an air conditioner on today.  Could you just

2    speak up and pretend you're speaking towards the

3    window or the back of the courtroom, okay?

4              THE WITNESS:  Okay.

5              MR. LEVIN:  Great.

6        Q.    Thanks.  Are you on any medications today that

7    would affect your memory or judgment?

8        A.    No.

9        Q.    Okay.  Are you on any medications today?

10       A.    Yes.

11       Q.    What are they?

12       A.    Nortriptyline, Bextra, and I also take the

13   birth control pill.

14       Q.    What is the Nortriptyline for?

15       A.    It's for neurologic pain in my leg.

16       Q.    And the Bextra?

17       A.    Excuse me, I'm on Celebrex now.  They switched

18   it.

19       Q.    Okay, and what is that for?

20       A.    Inflammation.

21       Q.    Where?

22       A.    In my leg.

23       Q.    Did you review any documents today in

24   preparation for your deposition?



1      A.    No.

2      Q.    And where do you live currently?

3      A.    Phoenix, Arizona.

4      Q.    And the address?

5      A.    1814 East Bell, B-e-l-l, Road, No. 2120,

6    Phoenix, Arizona, 85022.

7      Q.    And how long have you lived there?

8      A.    Nineteen months.

9      Q.    And prior to that where did you live?

10     A.    Pennsylvania.

11     Q.    Okay, what brought you to Arizona?

12     A.    Better weather and hopes of obtaining a job

13   there.

14     Q.    And you say you lived in Pennsylvania prior to

15   that?

16     A.    Yes.

17     Q.    Immediately prior to Bell Road you lived in

18   Pennsylvania?

19     A.    No.

20     Q.    Where did you live immediately prior to Bell

21   Road?

22     A.    In Phoenix with my friends.

23     Q.    And what is that address?

24     A.    2109 East Wahalla, W-a-h-a-l-l-a, Road.



6

1     Q.    And how long did you live there?

2     A.    Eleven months.

3     Q.    And then when did you live in Pennsylvania?

4  Was it prior to that?

5     A.    Yes.

6     Q.    So you didn't go from Florida to Arizona, you

7  went from Pennsylvania to Arizona; is that correct?

8     A.    Correct.

9     Q.    When were you living in Pennsylvania?

10    A.    April of '04 till December of '04.

11    Q.    So just two months -- I mean just actually

12  eight months?

13    A.    Yes.

14    Q.    And where did you live in Pennsylvania?

15    A.    818 West 5th Street, Lewistown.

16    Q.    Were you working there?

17    A.    No.

18    Q.    And then where were you living prior to that?

19    A.    Fort Myers, Florida.

20    Q.    And the address there, if you know it?  If you

21  don't, that's fine.

22    A.    Corbel Circle.

23    Q.    Okay, and how long were you there?

24    A.    Sixteen months.



1    Q.    What brought you from Florida to Pennsylvania?

2    A.    I had gotten out of a relationship and moved

3  home with my family.

4    Q.    Is your family here in Pennsylvania?

5    A.    Yes.

6    Q.    Are they currently still here in Lewistown; is

7  that correct?

8    A.    Yes.

9    Q.    And then prior to that where did you live?

10    A.    Newark, Delaware.

11    Q.    And you don't need to give me the addresses,

12  but for approximately how long were you in Newark?

13    A.    Seven months, April till November, seven or

14  eight months.

15            MR. LEVIN:   Of what year?

16            THE WITNESS:   '02.

17    Q.    And during that seven-month period, did you

18  work that whole time for Aureus?

19    A.    No.

20    Q.    Okay, who else did you work for?

21    A.    I worked the first six weeks for Aureus, and

22  then I was there for my medical care after the injury.

23    Q.    We'll talk a little more about that later.

24  Okay, prior to Delaware, where did you live?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

8

1    A.    Fort Myers, Florida.

2    Q.    And when did you live in Fort Myers, if you

3    remember?

4              MR. LEVIN:   She said prior to Delaware.

5    Before Delaware, did you live in Fort Myers?

6              THE WITNESS:   Yes.

7    A.    From January till April of '02.

8    Q.    And what brought you from Florida to Delaware?

9    A.    My job.

10    Q.    Was that Aureus?

11    A.    Yes, ma'am.

12    Q.    Then prior to Florida, where did you live?

13    A.    Cambridge, Massachusetts.

14    Q.    For how long?

15    A.    Fifteen weeks.  I was there 15 weeks.

16    Q.    And what did you do there?

17    A.    I worked for Aureus.

18    Q.    And prior to that where did you live?

19    A.    Las Vegas, Nevada.

20    Q.    And what did you do there?

21    A.    Worked for Aureus.

22    Q.    And for how long were you there?

23    A.    Sixteen weeks.

24    Q.    And prior to that?

Kimbra Criswell

9

1    A.    Phoenix, Arizona.

2    Q.    How long?

3    A.    Five months.

4    Q.    Is that Scottsdale, Arizona?  Was it near

5  Scottsdale?

6    A.    Yeah, my address was Scottsdale, yeah.

7    Q.    And what were you doing there?

8    A.    Worked for Aureus.

9    Q.    And prior to that?

10    A.    Charlottesville, Virginia.

11    Q.    What was the year?

12    A.    September through December 2001.

13    Q.    And what brought you from Charlottesville to

14  Arizona?

15    A.    My job with Aureus.

16    Q.    Same company.  How long had you been working

17  with Aureus at the date of this incident?

18    A.    I started September 17th, 2001; about 19

19  months.

20    Q.    And could you explain to me what you did with

21  Aureus, what exactly your job title was and job

22  responsibilities were?

23    A.    I was a full-time traveling x-ray tech and

24  filled in at hospitals that were short-staffed.

1    Q.    And what education did you have for that?

2    A.    I have my associate's degree in radiography.

3    Q.    And where did you get that?

4    A.    Pennsylvania College of Technology,

5    Williamsport, Pennsylvania.

6    Q.    When did you graduate?

7    A.    August 13th, 1999.

8    Q.    Is that the highest degree that you have?

9    A.    Yes.

10   Q.    And how old are you today?

11   A.    Twenty-seven.

12   Q.    How young are you, is what I should say.  Okay.

13        You said that you live in Arizona.  Who

14   lives with you, your immediate family?

15   A.    I live by myself now.

16   Q.    Okay.  So you live in Arizona by yourself.  And

17   you said you had moved to, I believe it was Florida in

18   a relationship.  Have you ever been married?

19   A.    No.

20   Q.    Back to your employment, at the time of the

21   incident, you said you had been working with Aureus

22   for six weeks.  Is that correct?

23   A.    Six weeks at that hospital at the time of the

24   accident.

Kimbra Criswell                                11

1    Q.    That's what I meant.  And what type of duties

2    did you perform at Christiana Hospital then?

3    A.    I took x-rays.

4    Q.    And who did you report to at Christiana

5    Hospital?  Did you work, first of all, only at

6    Christiana Hospital, or did you also work at

7    Wilmington Hospital?

8    A.    Just Christiana.

9    Q.    Who did you report to at Christiana Hospital?

10   A.    Dawn.

11   Q.    Do you remember Don's last name?

12   A.    "Spitnik" or something.  It was something odd.

13   Q.    And do you remember what his title was?

14   A.    It's a her.  She's a supervisor.

15   Q.    Okay, Dawn, D-a-w-n?

16   A.    Yes.

17   Q.    Okay.  And do you remember her title?

18   A.    She was lead tech.

19   Q.    Did you have any other supervisor there at

20   Christiana Hospital?

21   A.    No.

22   Q.    And what were your hours?

23   A.    7 to 3:30 or 7:30 to 4.

24   Q.    And was this full time?



WILCOX & FETZER LTD.
Registered Professional Reporters

Kimbra Criswell

12

1      A.    Yes.

2      Q.    So was this Monday through Friday typically or

3    did the days vary?

4      A.    Typically it was Monday through Friday, but I

5    was required to cover weekends at times.

6      Q.    When you were there, did Christiana Care or

7    Christiana Hospital provide you the supplies that you

8    needed to do your job?

9      A.    Supplies, as in?

10     Q.    What you needed to take x-rays?

11     A.    The x-ray machine, yes.

12     Q.    And if you had to do any patient care when you

13   were there, did they supply you with bandages, that

14   type of thing, if you needed them?

15     A.    Yes.

16     Q.    When you were there were you ever disciplined?

17     A.    No.

18     Q.    And were you ever evaluated?

19     A.    No.

20     Q.    Let's talk a little bit about the incident that

21   occurred on May 23rd of 2002.  First, before we get

22   into that, do you know Lydia McFadden?

23     A.    Know of her.

24     Q.    She's the defendant in this case?



WILCOX & FETZER LTD.
Registered Professional Reporters

1      A.    Yes.

2      Q.    One of the defendants.  And I represent her as

3 well as the hospital.  Did you speak with her on the

4 day of the incident?

5      A.    Yes.

6      Q.    Have you spoken with her since the day of the

7 incident?

8      A.    No.

9      Q.    Have you ever seen her since the day of the

10 incident?

11     A.    No.

12     Q.    Had you worked with her every day?

13     A.    No.

14     Q.    How often had you worked with her?

15     A.    Two to three days a week.

16     Q.    And had you known her pretty much since you'd

17 been there, the six weeks that you had been there?

18     A.    Just as a fellow employee.

19     Q.    And --

20            MR. LEVIN:  Well, that's incorrect.

21            THE WITNESS:  Fellow worker.

22            MR. LEVIN:  You were not an employee of

23 Christiana Hospital, correct?

24            THE WITNESS:  Right, correct.



Kimbra Criswell

14

1    MR. LEVIN:  You were always employed at
2  Aureus, correct?
3    THE WITNESS:  Correct.
4    MS. MASSARO:  Okay, let her testify, okay?
5  It's her testimony.
6  BY MS. MASSARO:
7    Q.   What was your relationship with her in terms of
8  was she a supervisor or anything like that?
9    A.   No.
10    Q.   Could you describe the incident that occurred
11  that day?
12    A.   We were, Lydia and I were walking down the hall
13  side by side having a conversation.  And we approached
14  the portable x-ray machine which was parked in the
15  hallway.  She went to the control part of the machine.
16  I went to the front of the machine and unplugged it
17  from the wall.  We continued our conversation
18  face-to-face.  Once the conversation was finished, I
19  turned 180 degrees with my back towards her, took one
20  step with my right foot, and she ran the machine over
21  the back of my left leg.
22    Q.   And then what did you do?  What did your body,
23  physically what did your body do?
24    A.   Pain immediately.  I was down to my knees.



**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    Q.    And then what did you do?

2    A.    I sat there for a while.

3    Q.    Was Lydia there with you?

4    A.    Yes, then she went to do the x-ray that we were

5    going to go do together.

6    Q.    Is that where you were on the way to, to

7    perform an x-ray together?

8    A.    Yes.

9    Q.    Was this a patient there in the hospital?

10   A.    In the operating room.

11   Q.    Was it a stat order?

12   A.    Everything in the OR is stat.

13   Q.    And did you then report to Employee Health at

14   Christiana Hospital?

15   A.    Not immediately.

16   Q.    When did you report to Employee Health?

17   A.    Right after lunch, about --

18   Q.    Okay, can you show me --

19   A.    It was about an hour after that.

20   Q.    About an hour after the incident.

21   A.    Um-hum.

22   Q.    Okay.  And what did you feel?

23   A.    Immediate pain.

24   Q.    Where?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Kimbra Criswell

16

1    A.    The back of my leg, back of my heel.

2    Q.    Could you first, if you can on these pictures,

3    these are pictures that your attorney has provided for

4    us.  Can you show me what part of the machine struck

5    your --

6    A.    That's not an accurate picture.

7    Q.    Okay.

8         MR. LEVIN:  This is a picture of a

9    different machine, off the record.  It's that.

10        MS. MASSARO:  Okay.  That's why I brought

11   both, because I wasn't really sure.

12   Q.    Is this the picture that you're looking at,

13   which I will have marked as an exhibit, does this

14   reflect the machine that was involved in the incident?

15   A.    Yes.

16   Q.    Can you maybe use my pen and draw an arrow as

17   to which part of the machine you believe struck the

18   back of your heel?

19   A.    It's on the other side of this wheel, the

20   bracket on the other side of the wheel.  This same

21   bracket on the other side.

22        MR. LEVIN:  Could you then draw and say

23   "bracket."

24        MS. MASSARO:  "On other side."

1              (Criswell Exhibit No. 1 was marked for

2     identification.)

3       Q.    Now, just for my understanding, because I have

4     a pea brain and I don't really understand, was this

5     wheel -- so you're saying that this wheel, there's a

6     bracket on the other side and this wheel was like

7     turned out?

8       A.    The wheel pivots 360 degrees.

9       Q.    So the wheel was this part, would you say then

10    that that was like inside and then this was on the

11    outside and that struck you?  I guess I'm trying to

12    figure out how the underside of that struck you.

13      A.    I don't understand the question.

14              MR. LEVIN:  Kim, what she's trying to ask

15    is you said there is a wheel here, correct?

16              THE WITNESS:  Yes.

17              MR. LEVIN:  There is a bracket that we see

18    in this picture, right?

19              THE WITNESS:  Yes.

20              MR. LEVIN:  On the other side of the wheel

21    there is a bracket, correct?

22              THE WITNESS:  Yes.

23              MR. LEVIN:  The wheel then was turned, not

24    in the same way it's depicted here, correct?

1          THE WITNESS:  Correct.

2          MR. LEVIN:  And when that wheel is turned,

3     it would be parallel to the front of the machine,

4     correct?

5          THE WITNESS:  When you push the machine

6     forward, the wheel is perpendicular to the front of

7     the machine.

8          MR. LEVIN:  There you go.

9     BY MS. MASSARO:

10     Q.    Okay.  So although this is not the right

11    machine, was the wheel in this fashion?  For example,

12    was the wheel aligned like this as it was going down

13    the hall?

14     A.    These are two different machines.

15     Q.    Right, I understand that.  But I'm trying to

16    get the principle down here in terms of the machine.

17    The wheels are still the same, aren't they, even

18    though the machines obviously are different, they're

19    made like --

20     A.    They're similar but they're not identical, no.

21     Q.    So in terms of the how they go down the hall,

22    you were standing in front here?

23     A.    No.

24     Q.    Okay, were you standing --



1    A.    I was standing in front here.

2    Q.    In front here, okay.  So the person was behind

3    pushing it here and the wheel was there.

4    A.    Lydia was here, I was here.

5    Q.    Got it, okay.  Now my pea brain is a little

6    clearer.

7              MR. LEVIN:  You want to mark that?

8              MS. MASSARO:  Sure.  I'm going to write

9    "front" and "back" on this and I'll show it to you.  I

10   probably shouldn't be writing on this, but just so you

11   know that that's what I'm doing, Nelson.  We'll mark

12   that as Exhibit 2.

13             (Criswell Exhibit No. 2 was marked for

14   identification.)

15   Q.    Okay, now what did Lydia say immediately after

16   the incident to you?

17   A.    There weren't words.  It was more of a "huh,"

18   gasp.

19   Q.    Okay, and you didn't discuss it with her at

20   all?

21   A.    All she said was she would go do the x-ray

22   herself and I should go sit down.

23   Q.    And then you sat down for an hour and then you

24   went to Employee Health; is that correct?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    A.    I got some ice from the PACU first, and I sat

2    with it elevated.

3    Q.    And then, well, before we get to the Employee

4    Health, you have also provided some photographs,

5    actually not photographs, but copies of photographs.

6    And as I understand it --

7              MS. MASSARO:  I really do need color

8    photographs, and I will just put in a request for

9    that.

10              MR. LEVIN:  No problem.

11              MS. MASSARO:  Thank you.

12    Q.    Could you show me on these photographs, I would

13    also like to see your foot, but if you could show me

14    on these photographs where the machine hit your heel.

15    Okay, I'll give you my pen, if you could just mark

16    that for me.

17    A.    (The witness complied with counsel's request.)

18              MR. LEVIN:  And maybe make an arrow on the

19    border saying --

20              MS. MASSARO:  To the more specific area.

21              MR. LEVIN:  -- saying "where machine hit

22    heel."

23    Q.    And that's a pretty wide range.  Can you be any

24    more specific?



21

1      A.    Well it hit and it -- when it hit it knocked me

2    to my knee and then it ran, you know, because she was

3    still in the forward motion.  So it hit and --

4      Q.    Okay, so the range would be from there to there

5    is what you're saying.  The first impact was here and

6    then the range was up that high?

7      A.    Yes.

8            MS. MASSARO:  If I could have this marked

9    as an exhibit.

10     Q.    And I'd like to see on your heel.

11           (Criswell Exhibit No. 3 was marked for

12    identification.)

13     A.    Okay.  (Indicating).  This is where she hit

14    originally.

15     Q.    All right.

16           MR. LEVIN:  Indicating, for the record,

17    the witness is demonstrating on her left heel in the

18    Achilles tendon region the impact point of the metal

19    bracket of the machine.

20           Is that correct, Kim?

21           THE WITNESS:  Yes.

22     Q.    Which is reflected as well in the photographs

23    which we've marked.

24           And is there a scar on your ankle or no?



Kimbra Criswell

22

1    Okay, all right.  Thanks.

2              You have little feet.  What size feet do

3    you have?

4        A.    Six, six and a half.

5        Q.    Tiny.  Now, when you went to Employee Health an

6    hour later, who did you see?

7        A.    It was a P.A. that works there.  I don't recall

8    her name.

9        Q.    And what did she do?

10       A.    Examined my leg and ordered x-rays and put me

11   on crutches.

12       Q.    And what type of shoes were you wearing at the

13   time of the incident?

14       A.    Medical clogs.

15       Q.    Did they have a back?

16       A.    No.

17       Q.    Did they have a heel?

18       A.    I don't understand.

19       Q.    Did the medical clogs have a heel?

20       A.    You mean like for height?

21       Q.    Yes.

22       A.    No.

23       Q.    So they were flat medical clogs?

24       A.    Yes.



Kimbra Criswell                                23

1      Q.    And did she send you for an x-ray?

2      A.    Yes.

3      Q.    And do you remember what the results of the

4    x-ray were?

5      A.    Negative.

6      Q.    And then what happened after that?

7      A.    She told me to come back in two business days

8    and she would re-evaluate me, to stay non-weight

9    bearing.

10      Q.    Did you return to work then at all the next two

11    days?

12      A.    No.

13      Q.    And then did you report back to Employee Health

14    in a couple of days?

15      A.    Yes.

16      Q.    And what happened at that time?

17      A.    A lady by the name of Candace reexamined me and

18    decided there wasn't anything else they could do for

19    me and referred me to Dr. DiPretoro, who is a

20    podiatrist.

21      Q.    Okay.  And before we get to Dr. DiPretoro,

22    prior to this incident had you been to Employee Health

23    at all?

24      A.    No.



Kimbra Criswell

24

1    Q.    And did you ever have any other problems with

2    an x-ray machine prior to this incident?

3    A.    I had hurt my back the week before.

4    Q.    Do you remember reporting to Employee Health

5    for that?

6    A.    I did, because they gave me pain pills for my

7    back.

8    Q.    Do you remember what they gave you?

9    A.    A pain pill and a muscle relaxer.  I don't

10    recall names.

11    Q.    And what happened in that incident?

12    A.    I was wheeling a fluoro screen into the room,

13    and the nurse had taped down the doctor's headlight

14    cord to the floor with cushy medical tape versus the

15    plastic.  And when I went to push it over, the machine

16    didn't go.

17    Q.    And then what happened?

18    A.    I had pain in my back.

19    Q.    In your upper back or your lower back?

20    A.    Mid.

21    Q.    And what was the treatment?  I know you said

22    the medicine.

23    A.    They gave me muscle relaxers and pain pills.

24    Q.    Anything else?



1        A.      No.

2        Q.      Was an x-ray done?

3        A.      It was fluoro, it's continuous x-ray.  At that

4    point somebody helped me get the machine in.

5        Q.      I'm sorry.  Was an x-ray done of your back that

6    day --

7        A.      No.

8        Q.      -- when you went to Employee Health?  Now,

9    Dr. DiPretoro, what was his treatment when you went to

10   see him?

11       A.      He ordered an MRI.

12       Q.      And did he tell you what that showed?

13       A.      Yes.

14       Q.      And what was that?

15       A.      A tear of the Achilles tendon.

16       Q.      And what was his treatment?

17       A.      I was casted three separate times.

18       Q.      And then what?

19       A.      Physical therapy.

20       Q.      Did you attend physical therapy?

21       A.      Oh, yeah.

22       Q.      And where did you go for physical therapy?

23       A.      Pro Physical Therapy.

24       Q.      And how long did you undergo physical therapy?



Kimbra Criswell

26

1      A.    With Pro, three hours a day, three days a week

2   for, I was there for four or five months with them.

3      Q.    So that was even after you had gone to the

4   hospital in August, or was that all before you went to

5   the hospital in August?

6      A.    I had been there twice before I was admitted.

7      Q.    Now, what brought you to the hospital August

8   5th?

9      A.    My leg was cold and purple.

10      Q.    So when you reported to the E.D. on August 5th

11   of '02, was your foot cold and purple at that time or

12   had it been previous to?

13      A.    It had been previous.  It was worse, and it was

14   not getting better so I went to the E.R.

15      Q.    And who did you see in the E.D., do you

16   remember?

17      A.    No.

18      Q.    Was it a doctor?

19      A.    Yes.

20      Q.    And did the doctor admit you to the hospital?

21      A.    Yes.

22      Q.    And who was your doctor while you were in the

23   hospital?

24      A.    Dr. Rao.

Kimbra Criswell

27

1    Q.    And what did he do?

2    A.    Ran more tests.

3    Q.    What type of tests did you have, do you

4    remember?

5    A.    Vascular tests, an ultrasound, and they tested

6    my veins and arteries from my waist down, and an MRI.

7    Q.    And what did the doctor ultimately tell you was

8    causing the cold and purple?

9    A.    They ruled out a blood clot.  They didn't know

10   what was causing the cold and purple since there

11   wasn't a clot.

12   Q.    So did they give you a diagnosis before you

13   left the hospital?

14   A.    Yes, but not that doctor.

15   Q.    Who gave you the diagnosis?

16   A.    Dr. Leschek-Gelman.

17   Q.    And what was the diagnosis?

18   A.    RSD.

19   Q.    And what did she use to determine that, do you

20   know?

21   A.    Based on the symptoms.

22   Q.    And you reported to the E.D. with -- what was

23   cold and purple, the whole foot or the toes?

24   A.    My left leg from just below the knee, clear to



1    the toes.

2    Q.    And how long did that last?

3    A.    I still have it today.

4    Q.    Well, I'm talking about in August 5th of '02

5    when you went to the emergency department, was it nine

6    hours?

7    A.    It had been cold and purple five hours before I

8    went to the E.R.

9    Q.    And then how long after you went to the E.R.

10   did it last after that?

11   A.    Twenty-four hours.

12   Q.    And then when you were in the hospital for that

13   time frame, did it ever turn cold and purple again

14   while you were in the hospital?

15   A.    Yes.

16   Q.    How often?

17   A.    Two to three times a day.

18   Q.    Every day?

19   A.    Yeah.

20   Q.    And you just said that it's still cold and

21   purple today.  Now I just looked at it and it wasn't

22   purple, so how often does it occur?  Is it a

23   continuous thing or an intermittent thing?

24   A.    It's an intermittent thing.



Kimbra Criswell

29

1    Q.    Okay, and how often does it occur today?

2    A.    Two to three times a week.

3    Q.    And who are you seeing for that now?

4    A.    Dr. Duwanjee.

5    Q.    And what is the treatment now?

6    A.    All I can do is take my meds for the pain and

7    physical therapy.

8    Q.    And how often do you go to physical therapy?

9    A.    Twice a week.

10    Q.    And that's in Arizona?

11    A.    Yes.

12    Q.    And where is that?  What is the name of the

13    physical therapy place?

14    A.    Endurance Rehabilitation.

15    Q.    What city?

16    A.    Scottsdale.

17    Q.    And Dr. Duwanjee is the one who has prescribed

18    that physical therapy for you?

19    A.    Yes.

20    Q.    And the cold and purple, is it the same -- you

21    say it happens now two to three times weekly, and

22    before initially it was two to three times daily.  Is

23    that correct?

24    A.    Yes.



Kimbra Criswell

30

1    Q.    Is it the same today as it was initially?

2         MR. LEVIN:    Could you rephrase --

3    Q.    Sure.    In terms of, you said to me earlier that

4    it was cold and purple from about the knee down

5    initially.    And you went to the hospital for that

6    because it was cold and purple.    What I'm asking is --

7    and you said that happened two to three times a day

8    when you were in the hospital, and then you said it

9    happens now two to three times a week.    What I want to

10   know is, the cold and purple, is it the same thing

11   from the knee down, is it cold and purple the same as

12   it was initially?

13   A.    Yes.

14   Q.    And do you see any other physicians other than

15   Dr. Duwanjee for that?

16   A.    Not at this time.

17   Q.    Have you had any other hospitalizations

18   regarding this incident, other than the one in August

19   of '02?

20   A.    No.

21   Q.    Have you had any surgery regarding this

22   incident?

23   A.    No.

24   Q.    Now, there came a time when you had a fracture



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    in November of '02.  And the complaint indicates that

2    sometime in November you stepped off a curb, a normal

3    size curb.  Where did that occur?

4        A.    Parking lot of Applebee's.

5        Q.    And what were you doing?

6        A.    Going to get in the car.

7        Q.    And when was this?  What time of day?

8        A.    9:00 at night.

9        Q.    And had you had any pain in your toes in that

10   area prior to this incident?

11       A.    It hurt all the time.

12       Q.    And had you had any x-rays for a potential

13   break prior to this incident?

14       A.    Yes.

15       Q.    And who ordered those x-rays?

16       A.    Dr. DiPretoro.

17       Q.    And what were the results --

18       A.    Negative.

19       Q.    -- if you remember.  Okay.  And after this

20   incident, what did you do?

21       A.    Called --

22       Q.    Well, actually, what happened?  Could you

23   describe what happened first?

24       A.    Came out of the restaurant and went to get in



Kimbra Criswell

32

1    the car and stepped left foot first off the curb, and

2    felt a crack immediately and pain.

3       Q.    So this was additional pain to what you were

4    already experiencing?

5       A.    The RSD makes it that way.

6       Q.    Like, for example, like right now, are you in

7    pain?

8       A.    Yes.

9       Q.    Is it a constant pain?

10      A.    Yes.

11      Q.    And has a doctor told you that that's

12   attributable to the RSD?

13      A.    Yes.

14      Q.    What doctor told you that?

15      A.    Dr. Gelman, Dr. Daitch, Dr. Bellis,

16   Dr. Reynolds, Dr. Duwanjee.

17      Q.    Wait, okay.  I got "Ronji," who was after

18   "Ronji"?

19      A.    Dr. Duwanjee.

20      Q.    Duwanjee, okay.  Anyone else?

21            MR. LEVIN:  You want to read back the

22   recitation of doctors?

23            (The requested portion was read.)

24      A.    Dr. Grabow.

1    Q.    Okay, let's go back over that list, because I

2    want to know where each of these doctors, where

3    they're located, okay?

4    A.    Okay.

5    Q.    You seem to have it in your head, so let's

6    start with the first doctor.  If you could just name

7    the doctor and name where they're at.

8    A.    Dr. DiPretoro, Newark, Delaware.

9    Q.    And I know Dr. Gelman.  But who else?  And I

10    know Dr. Duwanjee, the last one that you named.  But

11    Gray --

12    A.    Dr. Grabow is at Johns Hopkins.

13    Q.    Okay, how long, how many times did you see

14    Dr. Grabow?

15    A.    Just once.

16    Q.    And who else?

17    A.    Dr. Reynolds and Dr. Daitch are both in Fort

18    Myers, Florida.  Dr. Bellis is in Cape Coral, Florida.

19    Q.    And the other doctor in Fort Myers, Reynolds

20    and what was the other doctor, how do you spell that

21    name?

22    A.    Which name?

23    Q.    Reynolds and whoever else it was in --

24    A.    Daitch, D-a-i-t-c-h.



1    Q.    What type of doctor is Dr. Grabow?

2    A.    He is an anesthesiologist pain specialist.

3    Q.    Okay, how about Reynolds?

4    A.    Orthopedic surgeon.

5    Q.    Daitch?

6    A.    Pain management specialist.

7    Q.    And Bellis?

8    A.    Podiatrist.

9    Q.    Now, when you went to Johns Hopkins, what did

10   they tell you there?

11   A.    They told me that I eventually would get to the

12   point where I could walk without the brace, and then I

13   would have to wean myself off the crutches, but that I

14   needed to continue taking the medicines.  He

15   prescribed a new medicine, and said that I would never

16   run again.  I would get to the point where I could

17   walk unaided but never run.

18   Q.    And how long did you wear the brace?

19   A.    Which brace?

20   Q.    The first one that you had I believe was called

21   a MAFO.

22   A.    Um-hum.

23   Q.    How long did you wear that?

24   A.    Three to four months.



Kimbra Criswell

35

1    MR. LEVIN:  And to be clear, the MAFO

2  brace is the type of brace that we would see at the

3  beginning of "Forest Gump" or one of Jerry's Kids,

4  that type of brace?  Is that right?

5    THE WITNESS:  Yeah, it's a hard plastic

6  Forest Gump-like brace.

7    Q.   All right.  Now, during that time you were

8  non-weight bearing or weight bearing?

9    A.   I was non-weight bearing at the beginning, and

10  then through physical therapy I started to be able to

11  weight bear a little bit.

12    Q.   And then you said other braces.  What other

13  braces did you use?

14    A.   I had a big walking boot.

15    Q.   When was that?

16    A.   After the MAFO brace.

17    Q.   Immediately after?

18    A.   I had it prior to and then after, and then when

19  I fractured my foot I wore it also.

20    Q.   And how long did you wear that?

21    A.   At which time?

22    Q.   Well, first, immediately after the MAFO.

23    A.   I wore it for about three months.

24    Q.   And then you said when you fractured your foot

Kimbra Criswell

36

1    you wore it as well.  That wasn't the same time as
2    this?

3        A.    That's what I was answering there, because that
4    was after the MAFO.

5        Q.    Okay.  Then did you wear it again?

6        A.    After I fractured my foot?

7        Q.    No, I understand that that's what this is.  You
8    said which time, so what other time did you wear it?

9        A.    I wore it after the first cast was off, before
10   I got the MAFO.

11       Q.    Okay, got it.  So did you wear it any time
12   after the foot fracture and after you wore it for
13   that, the three months there, did you wear a brace
14   ever again after that?

15       A.    No.

16       Q.    And did you have physical therapy after that?

17       A.    Yes.

18       Q.    And when was that?

19       A.    In January of '03.

20       Q.    And why was that?

21       A.    It's part of the treatment for RSD.

22       Q.    Was there a break in between?

23       A.    I was not in physical therapy while the
24   fracture was healing.

**W&F**
**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    Q.    So that's what represents that break.

2    A.    Yes.

3    Q.    Have you been in physical therapy since January

4    then, or since the time of this incident, have you

5    been in physical therapy in some form or fashion?

6    A.    Yeah.    There's been, there's been some breaks.

7    Q.    In physical therapy?

8    A.    Yes.

9    Q.    And when would those be?

10   A.    Well, the past two months I haven't been in,

11   waiting for clearance for it to be paid for.    When I

12   go back to Phoenix I have eight more weeks of physical

13   therapy.

14   Q.    And is that through worker's comp?

15   A.    Yes.

16   Q.    In 1993 you had surgery for an accessory

17   navicular coalition.    Who did that surgery?

18   A.    Dr. DeThomas.

19   Q.    And where was that at?

20   A.    Lewistown, Pennsylvania.

21   Q.    Was that at Lewistown Hospital?

22   A.    Yes.

23   Q.    And what were your symptoms before that, before

24   the surgery?

