Kimbra Criswell

38

1    A.    It was irritated when I played soccer, because

2 it was on the inside of my foot.

3    Q.    Was that on the left or right foot?

4    A.    Left foot.

5    Q.    And how did you recover from that surgery?

6    A.    I was on crutches for about 10 days.

7    Q.    And did you have any other problems with it?

8    A.    No.

9    Q.    Have you had any other work-related injuries?

10    A.    Yes.

11    Q.    And could you describe them for me?

12    A.    The back injury.

13            MR. LEVIN:  You described that one

14 already.

15            THE WITNESS:  Described that.

16    Q.    Anything else?

17    A.    No.

18    Q.    Did you have any other symptoms, other than

19 what you've described to me today, in terms of the

20 foot turning cold and purple and the pain that you

21 experienced immediately thereafter, any other

22 symptoms?

23    A.    Yes, sometimes it's hot and red.

24    Q.    And is that the same area?



WILCOX & FETZER LTD.
Registered Professional Reporters

1    A.    Yes.

2    Q.    Anything else?

3          MR. LEVIN:  You're asking --

4    A.    Numbness.

5          MR. LEVIN:  Go ahead.

6    A.    Tingling, burning.

7    Q.    And how often does any of that occur?

8    A.    It feels like that all the time.

9    Q.    So you have the pain, the numbness, the

10   tingling and the burning all at the same time?

11   A.    Um-hum.

12         MR. LEVIN:  I believe somewhere in the

13   records there's a hypersensitivity to touch.  Is that

14   correct?

15         THE WITNESS:  Yeah.  It hurts to put a

16   sock on.

17         MS. MASSARO:  Yeah, let's let her, though,

18   her memory.

19         MR. LEVIN:  It's all in the record.

20         MS. MASSARO:  I know you're trying to

21   help, I understand totally.

22         MR. LEVIN:  It's all in the records.

23   BY MS. MASSARO:

24   Q.    Did you experience anything else related to the



1    foot or heel as a result of this incident?

2    A.    I don't understand.

3             MR. LEVIN:  What, yeah, what --

4    Q.    Any other symptoms, any other problems related

5    to this incident?

6             MR. LEVIN:  That she experiences now?

7    Q.    That you've experienced since the incident.

8    A.    Well, yeah, I couldn't walk for a long time,

9    and it's affected my life.  I couldn't work.

10    Q.    I understand that.  But I'm talking about in

11    terms of physical, anything else, other than the

12    things that you've described?

13    A.    You mean other than the symptoms that I just

14    listed?

15    Q.    Yes, yes.

16    A.    There's the sensitivity to touch too; the

17    nerves twitch; my toes jump by themselves.

18    Q.    Anything else?

19    A.    Ongoing pain.

20    Q.    So today is your treatment for this then the

21    medication and the physical therapy a few times a

22    week; is that correct?

23    A.    Yes.  There's nothing else that can be done for

24    the RSD.



1    Q.    Do you wear special shoes?

2    A.    Yes.

3    Q.    And what are they?

4    A.    I have orthotics and I have to wear extra-wide

5    shoes.

6    Q.    And how often do you wear the orthotics?

7    A.    I was wearing them every day, and now I get the

8    new ones when I go back to Phoenix.

9    Q.    So do you typically, like, for example, today,

10   you don't have orthotics on.  Do you typically have

11   orthotics on every day?

12   A.    Until the doctor told me to stop wearing them,

13   yes.

14   Q.    When did the doctor tell you to stop wearing

15   orthotics?

16   A.    In May.  And I get the new ones when I go back,

17   a different type.

18   Q.    And how long have you worn orthotics for?

19   A.    I got them in July of '03.

20   Q.    And who ordered them?

21   A.    Dr. Bellis.

22   Q.    And do you do any home exercises, aside from

23   your physical therapy?

24   A.    I do sit-ups.



1    Q.    And you mentioned earlier that you had some

2    breaks throughout.  Did you do home exercises during

3    any of those breaks from physical therapy?

4    A.    I am supposed to stretch.  I stretch.

5    Q.    Is that stretch the Achilles, the tendo

6    Achillis?

7    A.    Um-hum.

8    Q.    And do you do that?

9    A.    Yes.

10    Q.    And how often do you do that?

11    A.    Once a day.

12    Q.    And again, in relationship to physically any

13    other, any other complaints as a result of this

14    incident?  Do you have any other --

15    A.    You mean symptom-wise, life-wise?  I don't

16    understand the question.

17    Q.    In terms of physically, do you have any other

18    complaints as a result, any other physical complaints

19    as a result of this incident?

20         MR. LEVIN:  You can talk about life-wise.

21    Q.    Well, that's not what I'm asking.  I'm asking,

22    what I'm trying to ascertain, you filed a complaint

23    against Christiana Care for injuries.  I'm trying to

24    ascertain what injuries, what your injuries are.

Kimbra Criswell

43

1    A.    Well, I'm stuck with the RSD for the rest of my

2    life.

3    Q.    Anything else?

4    A.    The pain, and all the symptoms that go with the

5    RSD that I previously listed.

6    Q.    Right, and I have all that.  And what I'm

7    asking, is there anything else, any other injuries

8    that you attribute to this incident?

9    A.    Yeah, my left knee, I have IT band syndrome.

10    Q.    Okay, and when were you first diagnosed with

11    that?

12    A.    A little over a year ago.

13    Q.    And who diagnosed you with that?

14    A.    Dr. Duwanjee.

15    Q.    When did you first report to him with pain in

16    your knee?

17    A.    When I moved to Phoenix, transferred my care

18    there.

19    Q.    So that was then in January --

20    A.    I had said my knee hurt all along.  Worker's

21    comp finally agreed to pay for him to evaluate my

22    knee.

23    Q.    Who did you tell that your knee hurt?

24    A.    Dr. Bellis.



Kimbra Criswell

44

1    Q.    And where is Dr. Bellis again?  I forgot.

2    A.    Cape Coral, Florida.

3    Q.    I know you told me that.  Okay.  Is that the

4    first time that you reported it to a doctor is in

5    Florida?

6    A.    No.

7    Q.    When was the first time you reported the left

8    knee pain to a doctor?

9    A.    That was doctor, Dr. Reynolds.

10   Q.    And when was that?  What year?

11   A.    Beginning of '03.

12   Q.    And did Dr. Reynolds relate it back to this

13   incident?

14   A.    Yes.

15   Q.    And what did he suggest that you do for it?

16   A.    I needed to get it evaluated, which he said

17   he'd be more than happy to do, but worker's comp would

18   not agree to, wouldn't agree to have it paid for.

19   Q.    So worker's comp sent you to who?

20   A.    They drug their feet for over a year until

21   Dr. Duwanjee evaluated my knee.

22   Q.    And what did Dr. Duwanjee suggest?

23   A.    An MRI.

24   Q.    And what did that show or what did he tell you



WILCOX & FETZER LTD.
Registered Professional Reporters

1    that that showed?

2    A.    The MRI, as far as I know, was negative.  But

3    symptom-wise it was obvious that I had the IT band

4    syndrome.  It doesn't always show in the MRI.

5    Q.    And who diagnosed you with the IT band syndrome

6    then?

7    A.    Dr. Duwanjee.

8    Q.    And what did he suggest that you do for that?

9    A.    Physical therapy.  He also suggested surgery,

10   which I denied.

11   Q.    And why did you deny surgery?

12   A.    Because of the chance of it really flaring up

13   the RSD and making my leg a lot worse than it already

14   is.

15   Q.    And the physical therapy that you're having two

16   days a week, is that for the knee then?

17   A.    It's for the entire leg, to keep the entire leg

18   strong, get it stronger.

19   Q.    Any other complaints, physical complaints

20   regarding the incident, other than now your left knee

21   and the RSD, anything else?

22   A.    No.

23   Q.    Who is your general practitioner or your GP

24   doctor now?



Kimbra Criswell

46

1    A.    I just use my GYN.

2    Q.    And who is that?

3    A.    Dr. Trachtenberg.

4    Q.    And how do you spell that?

5    A.    T-r-a-c-h-t-e-n-b-e-r-g.

6    Q.    And where is Dr. Trachtenberg, what city?

7    A.    Phoenix.

8    Q.    Phoenix, okay.  Other than Dr. Trachtenberg and

9  Dr. Duwanjee, who are you seeing now?  Is there anyone

10  else that you're seeing now?

11    A.    No.

12    Q.    And the doctors that you named earlier, the

13  several doctors that we discussed a few moments ago,

14  has any other doctor treated you for this, for your

15  leg?

16    A.    Do I need to go over the list or --

17    Q.    No, not at all.  We've already got that on the

18  record, so don't worry.  Your memory is excellent, by

19  the way.

20         But anyway, other than those, anyone else?

21    A.    No.

22         MS. MASSARO:  Let me just go off the

23  record for a minute.

24  BY MS. MASSARO:



1      Q.   Now I'm just going to go over your responses to

2    interrogatories.  That's generated some questions, and

3    then we're pretty much done, okay?

4              MR. LEVIN:  Can I use the men's room for

5    one sec?

6              (A short recess was taken.)

7    BY MS. MASSARO:

8      Q.   We'll go back on the record.

9              First, I guess we'll just start with this.

10   This is going to jump around a bit.  I'm going to go

11   through your interrogatory responses and ask just a

12   few questions to fill in some gaps that I have.

13             First, with regard to your tax returns

14   that we received, we only received one year and that

15   was for the year 2001, and that was for $48,208.  That

16   was the total.  Now, that year, was that the year that

17   the incident occurred?

18     A.   No.

19     Q.   Okay, that was the year before then.

20     A.   Correct.

21     Q.   Okay.  Have you provided any other tax returns

22   to your attorney?

23     A.   Uh-uh.

24     Q.   Could you say no for the record?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Kimbra Criswell

48

1    A.    No.

2    Q.    Okay, thanks.  Could you provide your tax

3    returns to your attorney then for the five years prior

4    to and the years up until now as well?

5    A.    Yes.

6    Q.    Just for myself, for my understanding, I'm just

7    going to go back.  In 1997 you were 19 years old.

8    Where did you work during that time, or did you?

9    A.    I worked for PennDOT during the summer.

10    Q.    Is that the only income that you would have

11    that year?

12    A.    Yes.

13    Q.    And what did you make there, approximately, if

14    you remember?

15    A.    Not much.

16    Q.    Okay, I can imagine.  If you remember your

17    hourly rate.

18    A.    I don't remember the hourly rate.

19    Q.    Okay, if not, that's fine.  In '98 you were 20

20    years old.  Where did you work there?  When did you

21    work that year?

22    A.    I did not work that year.

23    Q.    Okay, how about '99 when you were 21?

24    A.    I worked for Geisinger Medical Center.



1    Q.    What did you do there?

2    A.    I was an x-ray tech.

3    Q.    And was that full time?

4    A.    No.

5    Q.    How much of the year did you work there?

6    A.    It was per diem.  I worked a day here and a day

7    there.

8    Q.    So do you know how much you worked total that

9    year?

10    A.    I worked -- I started in February and I worked

11    through December, but I filled in as needed.

12    Q.    How about the year 2000 when you were 22?

13    A.    I worked the first two months at Geisinger, and

14    then I moved to Naples, Florida.

15    Q.    And did you work there?

16    A.    Yes.

17    Q.    What did you do there?

18    A.    I was an x-ray tech.

19    Q.    And was it the same thing, per diem, as you did

20    at Geisinger?

21    A.    No, I signed a seasonal contract with the

22    hospital to work full time.

23    Q.    So when did you start working full time in the

24    year 2000?

1   A.   Third week of February.

2   Q.   And then did you work for the rest of that year

3   full time?

4   A.   I worked for that hospital until September, and

5   then I was off for two weeks, and then I started for

6   Aureus.  It was all full time.

7   Q.   And then that would have gone into the next

8   year, which we do have.

9   A.   Correct.

10   Q.   That one we have.  Then the year I guess, the

11   2002 tax return, which would be for the year of the

12   incident, did you work any time after May of '02?

13   A.   No.

14   Q.   And do you have any memory of what you earned

15   up until that point of that year?

16   A.   I have no idea.

17   Q.   We'll just look at your earnings, that's fine.

18        MR. LEVIN:  What were you earning per

19   hour --

20        THE WITNESS:  I was making 25 an hour.

21        MR. LEVIN:  -- for Aureus?

22        THE WITNESS:  For Aureus.

23   Q.   And did you work full time?

24   A.   Yes.

1      Q.    Now the next year, 2003, did you work at all?

2  You were 25 at that time, I think.

3      A.    I started as a nanny in September.  I was

4  unable to find a four-hour-a-day X-ray tech job.

5      Q.    And as a nanny, who did you work for?

6      A.    Can't think of her name.  I can't think of

7  their name.

8      Q.    Okay, did you work directly for the family?

9      A.    Yes.

10     Q.    Or did you go through an agency?

11     A.    For the family.

12     Q.    Could you provide your attorney with the name

13  of the family later?

14          MR. LEVIN:  Sure.

15     A.    I'll think of it.

16     Q.    Okay.  You have a good memory.  I'm going to

17  give you a minute.

18          MR. LEVIN:  Off the record.

19          (Discussion held off the record.)

20     A.    I got it.

21     Q.    Okay.  You should be a lawyer.

22     A.    Perry.

23     Q.    That's the last name of the family, P-e-r-r-y?

24     A.    Yeah, um-hum.



WILCOX & FETZER LTD.
Registered Professional Reporters

1    Q.    First name?

2    A.    Heather.

3    Q.    And do you know the husband's name?  How about

4    the children, how many children were there?

5    A.    Conner; she was pregnant with the second one.

6    Q.    Okay.  And how old was Conner?

7    A.    Sixteen months.

8    Q.    And was it a full-time nanny or --

9    A.    No, four hours a day.

10   Q.    And how long did you do that?

11   A.    Three months.

12   Q.    Any other work the year of 2003?

13   A.    No.

14   Q.    Did you do any work moving boxes, where you had

15   to move boxes as part of your job?

16   A.    I helped empty boxes.

17   Q.    And where was that at?

18   A.    With the Perrys.

19   Q.    Was that in terms of them moving or something?

20   A.    They had moved, yeah.

21   Q.    And no other employment then in 2003?

22   A.    I think I worked the last couple of weeks for

23   my ex, which then I did through March.

24   Q.    So when did you begin?  What type of work was



1      that, first of all?

2         A.    I was a receptionist.

3         Q.    Okay, at what type of company?

4         A.    He owned a flooring company.

5         Q.    What was the name of it?

6         A.    Floor Depot.

7         Q.    And when did you start?

8         A.    I think it was right before Christmas.

9         Q.    And then stayed through March; is that correct?

10        A.    Yes.

11        Q.    And what were some of the job duties there as a

12     receptionist?

13        A.    I answered the phone and greeted customers.

14        Q.    And were you paid there, actually?

15        A.    Yes.

16        Q.    Do you remember what you were paid?

17        A.    Six bucks an hour.

18        Q.    Going back to when you were a nanny, were you

19     paid there, and obviously you were?

20        A.    Yes.

21        Q.    How much were you paid there?

22        A.    Six bucks an hour.

23        Q.    Now, was that reported on your income tax or

24     was that unreported income?



Kimbra Criswell

54

1    A.    I filed that year, because I know that they

2    wrote off their --

3    Q.    Okay.  Now the next year, 2004, that's when you

4    started working at Floor Depot, I guess.  Is that

5    correct, or --

6    A.    That's incorrect.

7    Q.    When did you start working at Floor Depot?

8    A.    From December of '03 through March of '04.

9    Q.    All right, then the next tax year, 2004, which

10   would have been 2003 -- well, actually, we just went

11   over that.  What did you do the next year, which would

12   be --

13   A.    After March?

14   Q.    Yes.

15   A.    Nothing.

16   Q.    Through the end of the year?

17   A.    I moved back to Pennsylvania.  I was unable to

18   find an x-ray tech job.

19   Q.    And then when did you work again?  When is the

20   first time you worked again?

21   A.    April of '05.

22   Q.    And what were you doing then?

23   A.    Part-time x-ray tech.

24   Q.    Where at?

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    A.    Valley Radiologists.

2    Q.    And where is that?

3    A.    Phoenix, Arizona.

4    Q.    Is that where you're at to this day?

5    A.    Yes.

6    Q.    And how often do you work?

7    A.    I now work three days a week as a trial.

8    Q.    How long have you been doing that for?

9    A.    Five weeks, six weeks.

10   Q.    And how is that going?

11   A.    Okay.

12   Q.    And what were you working prior to that?

13   A.    Five days a week, four hours a day.

14   Q.    And now you're working three days a week?

15   A.    Yes.

16   Q.    Are you working longer days?

17   A.    Yes.

18   Q.    So that's the trial part is that you're working

19   longer days?

20   A.    Yes.

21   Q.    And so you've gradually worked up to this three

22   days a week.  How long are you working each day?

23   A.    Eight hours, Monday, Wednesdays and Fridays, so

24   I have a day in between.

Kimbra Criswell

56

1   Q.    And I think you said in your interrogatories,

2   what are you earning now?

3   A.    Twenty-three something.

4   Q.    I think that covers it.

5         And we're going back to your interrogatory

6   responses.  No. 2, you indicate that 10 minutes

7   following the accident you spoke with Fred.  Who is

8   Fred?  I know it looks like you don't know Fred's last

9   name.  But who is he?  What is his title?

10   A.    As far as I know, he is a nurse.

11   Q.    In what area?

12   A.    In the operating room.

13   Q.    So had you made it all the way to the operating

14   room then that day with the machine?

15   A.    No.

16   Q.    Where exactly in the hospital were you when the

17   incident occurred?

18   A.    In the hallway outside of an operating room.

19   Q.    So you had gone from -- where did you begin

20   your journey when you went, you were going to the

21   operating room, where did you start in the hospital

22   with the x-ray machine?

23   A.    There's a room where the processor is, the

24   x-ray processor is with --

Kimbra Criswell

57

1    Q.    What floor?

2    A.    Second floor within the operating room suite.

3    The machine is kept around the corner from there.

4    Q.    I see.  So you were actually in the operating

5    room suite then when this occurred?

6    A.    Yes.

7    Q.    And Fred is an OR nurse?

8    A.    Yes.

9    Q.    Do you know whether he was a circulating nurse?

10   A.    I would say yes.

11   Q.    And what was the substance of your conversation

12   with him?

13   A.    He had asked why I was walking the way I was,

14   limping, you know, because I wasn't, you know, that

15   morning.  And I told him that I had hurt my leg, and

16   he said that I should probably go to PACU and get some

17   ice.

18   Q.    And did he say anything else?

19   A.    No.

20   Q.    Did you have any other conversation with him or

21   anyone else at Christiana about the incident, other

22   than your Employee Health, obviously?

23   A.    A lady named Cindy got me the ice in PACU.

24   Q.    Anyone else?



Kimbra Criswell

58

1    A.    No.

2    Q.    And since this event occurred, other than the

3    medical care, have you spoken with anyone at

4    Christiana Care regarding this event, regarding the

5    incident?

6    A.    No.

7    Q.    Did you speak with Dawn Spitnik about it?

8    A.    Yes.

9    Q.    When was that?

10    A.    When I went downstairs for lunch.

11    Q.    On the day of the incident?

12    A.    Um-hum.

13    Q.    And what was the substance of that

14    conversation?

15    A.    Lydia had already explained to her what had

16    happened, and she suggested I go to Employee Health.

17    Q.    And did you ever talk to Dawn about it again?

18    A.    When I came back upstairs from Employee Health

19    and got my x-rays.  That was -- she knew that I had

20    the x-rays, but that was it.

21    Q.    And any other phone conversations or anything

22    like that?  I realize --

23    A.    No.

24    Q.    -- you didn't go back.  I know you didn't go



WILCOX & FETZER LTD.
Registered Professional Reporters

1    back, but did you ever talk with her on the phone

2    after this incident?

3        A.    No.

4        Q.    Anyone else from Christiana Care, did you speak

5    with anyone else from Christiana Care after this

6    incident?

7        A.    The nurses that were caring for me in August.

8        Q.    Sure.

9        A.    The doctors.

10        Q.    But anyone else in any type of an official

11    capacity regarding this incident?

12        A.    No.

13        Q.    These photographs that I showed you earlier and

14    that have been marked as an exhibit, I have copies and

15    I know we'll get the actual photos.  Are there any

16    other photographs that you have relating to this

17    incident?

18        A.    Yes.

19        Q.    What are they of?

20        A.    My foot.

21        Q.    And when were they taken?

22        A.    On different dates throughout a year and a

23    half, almost two years.

24        Q.    Beginning immediately after the incident or



WILCOX & FETZER LTD.
Registered Professional Reporters

1    recently?

2        A.    They were beginning in July of '02.

3        Q.    Do you have those photographs in your

4    possession?  Not today, but in general.

5        A.    Yes.

6        Q.    And are they color photographs?

7        A.    Yes.

8        Q.    Approximately how many photographs are there?

9        A.    Seventy-five to 100.

10       Q.    And --

11       A.    I have an album.

12       Q.    What are they of?  I know they're of your foot,

13    but what exactly?

14       A.    Showing the color changes --

15       Q.    And are they dated?

16       A.    -- and the swelling.  Yes.

17       Q.    And do they have times?

18       A.    No times.

19       Q.    Have you provided a copy of those to your

20    attorney?

21       A.    Most of them, yeah, he got them.

22             MS. MASSARO:  I would like a copy of those

23    as well.

24             MR. LEVIN:  Sure, sure.

Kimbra Criswell                                    61

1     Q.    Any other photographs aside from these then,

2  the ones that you've mentioned and then these that

3  we're looking at here, any other photographs?

4     A.    No.

5     Q.    Do you have any photographs of the equipment,

6  other than those that were provided by your attorney

7  in your document production?

8     A.    No.

9     Q.    And have you seen those pictures that were

10 provided, that would be -- I'm not actually going to

11 mark this as an exhibit, but that's these pictures.

12 You can take a look at them.  These were provided by

13 your attorney.  I just want to make sure you don't

14 have anything else other than these.

15    A.    These are the accurate pictures.  This is an

16 older model.

17    Q.    Okay, thank you.  So I'll go ahead and mark

18 those then.  What, these two are accurate pictures of

19 the machine?

20    A.    Yes.

21    Q.    Wonderful.

22         MS. MASSARO:  We'll go ahead and have

23 these marked then as 4 and 5.

24         MR. LEVIN:  Let me just see them.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Kimbra Criswell

62

1      MS. MASSARO:  Sure.  I believe I got those

2  from you.

3      MR. LEVIN:  Yeah.

4      (Criswell Exhibits No. 4 and 5 were marked

5  for identification.)

6    Q.   Now, I'm going to ask you a few questions about

7  some of your doctors in terms of where they are and

8  that type of thing, who you've seen.  In your

9  responses to interrogatories you name a Dr. Robert,

10 this is in No. 10, Robert Guadagno.

11   A.   Guadagno?

12   Q.   Yeah.

13   A.   That's incorrectly spelled.

14   Q.   How do you spell that?

15   A.   G-u-a-d-a-g-n-o.  Guadagno.

16   Q.   And his first name is Robert?

17   A.   Yes.

18   Q.   And where does he practice?

19   A.   At the time I saw him he was in Geisinger

20 Medical Group.  He was there.

21   Q.   Do you know where he is today?

22   A.   He was a per diem doctor.  I don't know where

23 he's at today.

24   Q.   But he was with the Geisinger Medical Group?



1      A.    Correct.

2      Q.    Then in 2003, 2004 you provided the name of

3    Dr. William Garafolo.  Is that spelled correctly,

4    G-a-r-a-f-o-l-o?

5      A.    Yes.

6      Q.    And where did you see him, in Fort Myers,

7    Florida?

8      A.    Yes.

9      Q.    Then later you saw a chiropractor Christine

10   Guiswhite?

11     A.    That's incorrectly spelled.

12     Q.    How do you spell that?

13     A.    G-u-i-s-w-h-i-t-e, Guiswhite.

14     Q.    And where was she?

15     A.    Lewistown, Pennsylvania.

16     Q.    Who is your general practitioner in Lewistown?

17     A.    I just used my GYN there as well.

18     Q.    Okay, and who is your GYN?

19     A.    Dr. Solomon.

20     Q.    And the first name?

21     A.    Stephen.

22     Q.    S-t-e, do you know if it's p-h?

23     A.    P-H.

24     Q.    Okay.  Do you see any other type of doctor in



1    Lewistown, OB-GYN, and these that have been named

2    here, any other doctors?

3        A.    I don't live there now.

4        Q.    Have you seen any other doctors there for any

5    condition?

6        A.    Dr. West.

7        Q.    And what type of physician is that?

8        A.    Orthopedic surgeon.

9        Q.    And what did you see him for?

10       A.    I broke my right wrist.

11       Q.    When was that?

12       A.    August of 1996.

13       Q.    And how did you break your right wrist?

14       A.    I was racing.

15       Q.    Running racing?

16       A.    No.

17       Q.    What type of racing?

18       A.    Car racing.

19       Q.    And it was a motor vehicle accident then?

20       A.    It was a racing accident.

21       Q.    How did it occur?

22       A.    I hit the guy in front of me.  Our -- his right

23   wheel, right rear wheel hit my right front wheel and

24   it turned the steering wheel.



Kimbra Criswell                                65

1    Q.   And what type of a car were you driving?

2    A.   Sprint car.

3    Q.   What is that?

4    A.   A type of race car.

5    Q.   And you said Sprint, S-p-r-i-n-t?

6    A.   Correct.

7    Q.   Was this on a track?

8    A.   Yes.

9    Q.   And did you have any other injuries --

10   A.   No.

11   Q.   -- as a result?  Okay.  How long did you do

12   that for?

13   A.   Two seasons.

14   Q.   It's actually a sport that you --

15   A.   It's a family thing.

16   Q.   Anyone else, other than Dr. West?

17   A.   Nope.

18   Q.   And we've already talked about who you're

19   seeing now.  No. 18 indicates that an IME doctor and

20   treating physicians told you that you are permanently

21   disabled.  And would that be the physicians that you

22   named earlier?

23   A.   No.

24   Q.   Who, first of all, who is the IME doctor who



WILCOX & FETZER LTD.
Registered Professional Reporters

Kimbra Criswell

66

1    told you that you were permanently disabled?

2    A.    Well, I've been to five or six of them.

3                MR. LEVIN:  For the record, this is the

4    worker's comp IME?

5                THE WITNESS:  Yeah, it was all for

6    worker's comp.

7    Q.    Okay.  Could you tell me who those five or six

8    are and where they are located?

9    A.    They don't have to be in order, do they?

10   Q.    No, not at all.

11   A.    Dr. Kagen in Fort Myers, Florida.  Dr. Gelman

12   here, that's a guy, guy Gelman.

13   Q.    Do you know Gelman's first name?

14   A.    No.

15   Q.    And that was in Delaware?

16   A.    Um-hum.  And I saw another guy here, I don't

17   remember his last name.  His first name was Peter.

18   And Dr. Green in Phoenix.

19   Q.    First name?

20   A.    Lawrence.

21   Q.    And this Dr. Kagen in Fort Myers, Florida, what

22   was the first name?

23   A.    It's Kagen, K-a-g-e-n, first name is John.

24                MR. LEVIN:  Is this an IME doctor?

1          THE WITNESS:  Um-hum.

2      Q.    Okay.  So you said John Kagen, Dr. Gelman,

3  Dr. Peter something here?

4      A.    Yeah.

5      Q.    You don't remember the last name?

6      A.    I don't remember his name.

7      Q.    So that's one, two, three.  And then I have

8  Dr. Lawrence Green in Phoenix.  Anyone else?  That's

9  four.

10     A.    That's all I remember.

11            MR. LEVIN:  That's fine.

12     Q.    Yeah, that's fine.  Okay.  Do you have the

13  medical records from any of these physicians?

14     A.    Do I have them?

15     Q.    Yes.

16     A.    No.

17     Q.    Does your attorney?

18     A.    Yes.

19            MS. MASSARO:  I don't have any of those.

20            MR. LEVIN:  I think, I think I have one

21  report.

22            MS. MASSARO:  If I could have that, I

23  would appreciate it.

24            MR. LEVIN:  Sure.



1         MS. MASSARO:  We'll work on getting

2   copies.

3         MR. LEVIN:  Yeah.

4    Q.    Which ones of those told you that you were

5   permanently disabled?

6    A.    Gelman and the Peter guy.

7    Q.    If you remember his name before the end of the

8   deposition, if you want we'll just wait a second and

9   let you think, that would be helpful.

10   A.    Also Dr. Green.

11   Q.    So Dr. Gelman, Peter something and Dr. Green.

12   A.    Dr. Kagen.  They all said pretty much the same

13   thing.

14   Q.    It's not Peter Townsend, is it?

15   A.    No.

16   Q.    I don't know if he does that.  If you do, let

17   me know.

18         MR. LEVIN:  That's okay.

19   Q.    Now, another response, you indicate that you

20   were in Lewistown Hospital in mid 2004 regarding

21   something called an adjustment disorder.  Who was the

22   doctor that you saw there?

23   A.    That was a psychiatrist.  Dr. Bellis had

24   referred me to see a psychiatrist.



1    Q.    And who was that?

2    A.    I don't recall his name off the top of my head.

3    Q.    But Dr. Bellis referred you?

4    A.    He referred me to see somebody in Florida, but

5    I had relocated back to Pennsylvania so I saw somebody

6    there.

7    Q.    And why did he refer you to a psychiatrist?

8    A.    I was having a very hard time dealing with

9    everything that was going on.  My life was basically

10   turned upside down.  I couldn't work, I couldn't

11   support myself.  I had excruciating pain every day.

12   Q.    And what happened when you were in the

13   hospital?

14   A.    I wasn't in the hospital.  I saw the doctor in

15   his office in the hospital.

16   Q.    I see.  So you were never actually hospitalized

17   then?

18   A.    No.

19   Q.    So how long did you see this doctor?

20   A.    I was there less than an hour, once.

21   Q.    And how many times -- one time?

22   A.    Um-hum.

23   Q.    So this was a one-time visit.  And what was --

24        MR. LEVIN:  You've got to answer verbally.



Kimbra Criswell

70

1      A.    I'm sorry.

2      Q.    My fault too.  Okay.  Was he with a practice

3  group?

4      A.    Not that I know of.

5      Q.    I'm going to need you to narrow that down a

6  little bit more in terms of who you saw there.

7      A.    Okay.

8      Q.    So if you can think about that, look in the

9  Yellow Pages, whatever, or look in your records and

10  let your attorney know, we need to know who that is.

11     A.    Sure.

12     Q.    And you're saying that this was a psychiatrist

13  that had an office in the hospital?

14     A.    Yes.

15     Q.    And did he prescribe any medications?

16     A.    No.

17     Q.    What was the treatment plan, anything?

18     A.    He said there really wasn't anything that he

19  could do, that I was not a threat to myself.

20     Q.    Did he make any recommendations?

21     A.    No.

22     Q.    And did you ever see a psychiatrist again --

23     A.    No.

24     Q.    -- before or since that time?  Sorry.

Kimbra Criswell                              71

```
1       A.    No.

2       Q.    And that was Lewistown Hospital in

3    Pennsylvania, correct?

4       A.    Yes.

5       Q.    You indicate in question No. 24 that you're

6    receiving, or that you receive worker's compensation

7    checks in the amount of $1,876 per month.  Is that

8    still continuing?

9       A.    Yes.

10      Q.    And when did that begin?

11      A.    The week after the accident.

12      Q.    So that's been consistent since the week after

13   the accident through till today?

14      A.    Yes.

15      Q.    And on the 26th you indicate that a claim has

16   been made for $20,448?

17      A.    That was a permanency settlement through

18   worker's comp.

19      Q.    And you received that in November of '04; is

20   that correct?

21      A.    Yes.

22      Q.    Have you had any other settlement --

23      A.    No.

24      Q.    -- in this case?  And do you know of any other
```



Kimbra Criswell

72

1    liens?

2        A.    I don't know what that word means.

3        Q.    Do you have any outstanding debt to anyone else

4    regarding -- do you have any outstanding debt

5    regarding this incident, any medical bills, anything

6    like that?

7        A.    No.

8              MR. LEVIN:  Well --

9        Q.    Does worker's comp, does your worker's comp

10   carrier, that you know of?

11             MR. LEVIN:  Well, I would believe that

12   there would be a lien by Wausau in connection with

13   this case.

14             MS. MASSARO:  Okay.

15       Q.    But you have not talked with anyone at Wausau

16   about that or anything?

17       A.    They pay for the stuff directly.

18       Q.    So they pay for it directly, and in the

19   beginning did you fill out paperwork for them?

20       A.    Yes.

21       Q.    And who did you deal with at Wausau?

22       A.    Currently it's Tabitha May.  They seem to have

23   a bunch of people there.

24       Q.    And that's her last name, Tabitha May, or May

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    is her last name?

2      A.    Yeah.

3      Q.    Okay, and who did you deal with before that in

4    the beginning, initially, at the beginning of the

5    incident?

6      A.    Yolanda Heart and Kevin Babb.

7      Q.    Almost done.

8            MR. LEVIN:  I might have a few questions.

9            MS. MASSARO:  Okay, can you hold on?

10           MR. LEVIN:  Yes.

11           THE WITNESS:  Take a break.

12           (A brief recess was taken.)

13   BY MS. MASSARO:

14     Q.    Okay, I just have one or two questions.  Have

15   you ever been diagnosed with arthritis?

16     A.    I was told posttraumatic stress arthritis.

17     Q.    And who told you that?

18     A.    Dr. Bellis.

19     Q.    And what is your treatment for that?

20     A.    I take Celebrex.

21     Q.    So that's the inflammation that you were

22   talking about earlier that you take the Celebrex for?

23     A.    Yes.

24     Q.    And what were your symptoms that led him to



1    diagnose you with that?

2        A.    The pain and the swelling.

3        Q.    Where?

4        A.    In my foot.

5        Q.    So you have arthritis in your foot?

6        A.    I was told I have posttraumatic stress

7    arthritis.

8        Q.    Do you have arthritis anywhere else?

9        A.    No.

10        Q.    Okay, only in your foot?

11        A.    Yes.

12        Q.    And Dr. Bellis diagnosed you with that?

13        A.    Yes.

14        Q.    Do you have any other joint pain?

15        A.    Not other than my leg.

16        Q.    Just quickly, in response to No. 40, you

17    indicate that you had a vehicle allowance and a per

18    diem allowance and that housing was furnished.  Who

19    was all that arranged with through Aureus, do you

20    know?  Who did you speak with there to arrange?

21        A.    My supervisor was Ray Petty.

22        Q.    And how do you spell that last name?

23        A.    P-e-t-t-y.

24        Q.    And his title was?



75

1    A.    I don't know.

2    Q.    Did you arrange it through anyone else at all?

3    A.    No.

4              MR. LEVIN:   You said it was your

5    supervisor at Aureus?

6              THE WITNESS:   Um-hum.

7              MR. LEVIN:   Ray Petty?

8              THE WITNESS:   Um-hum, yes.

9    Q.    Last but not least, No. 10, and you can take a

10   look at that response, this lists your doctors and

11   treatment.  Any other conditions that you're being

12   treated for other than these listed here in No. 10 and

13   what we've discussed today at this deposition?

14   A.    I'm not being treated for any of these

15   conditions at this time.

16   Q.    Okay, have you seen anyone else for any other

17   condition, these are your past conditions, any other

18   past conditions that are not listed here?

19   A.    No.

20   Q.    Anything since the incident that is not listed

21   here, other than what we've discussed today?

22   A.    No.

23             MS. MASSARO:   I have no further questions.

24



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Kimbra Criswell

76

1    BY MR. LEVIN:

2       Q.    A couple questions.  Kim, to clarify a few

3    things, at the time of this incident, you were

4    employed by Aureus?

5       A.    Yes.

6       Q.    You received a paycheck from Aureus?

7       A.    Yes.

8       Q.    And you were an independent contractor?

9       A.    Yes.

10      Q.    Did anyone at Christiana Hospital supervise

11   your activities as an x-ray technician?

12      A.    No.

13      Q.    Did anyone at Christiana Hospital train you how

14   to operate an x-ray machine?

15      A.    No.

16      Q.    Did anyone at Christiana Hospital train you in

17   how to deal with patients in administering x-rays?

18      A.    No.

19      Q.    Were you given any protocols or procedures in

20   the administration of x-rays by Christiana Hospital?

21      A.    No.

22      Q.    This individual, Dawn Spitnik, did she

23   supervise your x-ray technician activities at

24   Christiana Hospital?

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Kimbra Criswell

77

1      A.    No, she was just a dispatcher and told me where

2    I was needed that day.

3      Q.    And that's all that she did in connection with

4    your activities in Christiana Hospital; is that

5    correct?

6      A.    Yes.

7      Q.    And you had been working as an independent

8    contractor with Aureus prior to Christiana Hospital.

9    Is that correct?

10     A.    Yes.

11     Q.    And the worker's compensation that you were

12   receiving, that is through Aureus?

13     A.    Yes.

14     Q.    And Wausau Insurance Company, the comp

15   provider, is Aureus's comp carrier.  Is that correct?

16     A.    Yes.

17     Q.    And to be clear, Lydia Adair, to your

18   knowledge, is an employee of Christiana Hospital,

19   correct?

20     A.    Yes.

21     Q.    You indicated that now you're working three

22   days a week, and there is a day in between during the

23   week that you are resting.  Is that correct?

24     A.    Yes.



Kimbra Criswell

78

1    Q.    And why do you require that day in between of

2  rest?

3    A.    The pain and swelling.  There's no way I can do

4  two long days back to back.

5    Q.    I see.  Now, prior to this accident, you were

6  working 40 hours a week?

7    A.    Yes.

8    Q.    Are you able to work 40 hours a week now as an

9  x-ray technician?

10    A.    No.

11    Q.    Why is that?

12    A.    Because I'm required to be on my feet, and the

13  pain and swelling is too much.

14    Q.    I see.  And is your understanding that this

15  will be a permanent part of your life?

16    A.    Yes.

17    Q.    Did you receive a paycheck directly from Aureus

18  or was it direct deposit?

19    A.    It was direct deposit.  I received a stub in

20  the mail.

21    Q.    And you never signed any contracts with

22  Christiana Hospital.  Is that correct?

23    A.    No.

24    Q.    Yes, that is correct?



1      A.    Yes, that is correct.

2      Q.    And since this accident, am I correct that you

3   have not returned to full-time employment as an x-ray

4   technician?

5      A.    Correct.

6      Q.    At some part of your testimony you indicated

7   that you were looking for a job in one of the

8   locations you were living but could not find

9   employment.  Do you recall that?

10     A.    Yes.

11     Q.    And is that because you could not find

12  employment part time?

13     A.    Yes, with the hour stipulations, the four hours

14  a day part time.

15     Q.    And those four hours a day, was that limitation

16  prescribed to you by a physician?

17     A.    Yes.

18     Q.    And which physician said to you you could only

19  work four hours a day as an x-ray technician?

20     A.    Dr. Bellis.

21     Q.    And in connection with what injury you

22  sustained in this accident limits you from working

23  four hours a day?

24     A.    The pain and the swelling from the RSD that



1    I'll have for the rest of my life.

2        Q.    Incidentally, prior to this incident, had you

3    ever injured your left leg before?

4        A.    No.

5        Q.    During your testimony there was a discussion

6    that after the incident you had stepped off a curb and

7    fractured your fourth metatarsal.

8        A.    Yes.

9        Q.    That's your toe next to your pinky toe; is that

10   right?

11       A.    Yes.

12       Q.    And what is your understanding of how that

13   metatarsal was fractured?

14       A.    From the osteopenia, it's a form of

15   osteoporosis where the bones are weak.    The RSD causes

16   that.

17       Q.    While you were working on behalf of Aureus, in

18   connection with your answer to interrogatories, it

19   says that your housing was fully furnished and paid

20   for by Aureus?

21       A.    Yes.

22       Q.    Your phone and cable were paid for by Aureus?

23       A.    I was reimbursed for that through Aureus.

24       Q.    I see.    And 12 percent of your earnings went

1    into a 401(k)?

2      A.    Yes.

3      Q.    And that was offered to you by your employer,

4    Aureus?

5      A.    Yes, and they matched it.

6      Q.    And they matched it.  And also you got a dental

7    plan with Aureus?

8      A.    Yes.

9      Q.    And health insurance as well?

10     A.    Correct.

11     Q.    Currently in the radiology facility you work at

12   in Arizona, are you receiving these benefits?

13     A.    No.

14     Q.    Is it your understanding that you'll ever be

15   able to return to full-time employment as an x-ray

16   technician?

17     A.    Can you repeat that, please?

18     Q.    Certainly.  It was poorly phrased.

19            As far as you know, will you ever be able

20   to return to full-time employment as an x-ray

21   technician?

22     A.    No.

23     Q.    What's that?

24     A.    No.



Kimbra Criswell

82

1          MR. LEVIN:   No further questions.

2     BY MS. MASSARO:

3     Q.    I just have one quick follow-up.  Has a doctor

4     ever told you that you will not be able to return full

5     time as an x-ray technician --

6     A.    Yes.

7     Q.    -- to work?  And who was that?

8     A.    Dr. Bellis.

9     Q.    Okay.

10    A.    Dr. Duwanjee.

11    Q.    Duwanjee.

12    A.    Um-hum.

13          MS. MASSARO:   Okay, I have no other

14    questions.   Thank you.

15          MR. LEVIN:   No follow-up questions.

16          I'll ask you.  You have an opportunity to

17    read and sign the deposition, would you like to do

18    that?  This is off the record.

19          (Discussion held off the record.)

20          (Reading and signature were waived.)

21

22

23

24



WILCOX & FETZER LTD.
Registered Professional Reporters

1                    I N D E X

2  Deponent:  KIMBRA CRISWELL                    Page

3  By Ms. Massaro....................................  2

4  By Mr. Levin......................................  76

5  By Ms. Massaro....................................  82

6                  E X H I B I T S

7  Criswell:                                        Page

8  1      Photocopy of Two Photographs              17

9  2      Photocopy of Photograph                   19

10 3      Photocopy of Five Photographs             21

11 4      Photocopy of Photograph                   62

12 5      "Pg. 2 of 3, New Model - GE - CT Portable 62

13        X-rays AMS-4+"

14                    - - - - -

15

16

17

18

19

20

21

22

23

24

84

1                          CERTIFICATE

2       STATE OF DELAWARE)
                         )
3       NEW CASTLE COUNTY)

4                   CERTIFICATE OF REPORTER

5            I, Julie H. Parrack, Registered Professional
        Reporter and Notary Public, do hereby certify that
6       there came before me on the 14th day of July, 2006,
        the deponent herein, KIMBRA CRISWELL, who was duly
7       sworn by me and thereafter examined by counsel for the
        respective parties; that the questions asked of said
8       deponent and the answers given were taken down by me
        in Stenotype notes and thereafter transcribed by use
9       of computer-aided transcription and computer printer
        under my direction.

10
             I further certify that the foregoing is a true
11      and correct transcript of the testimony given at said
        examination of said witness.
12
             I further certify that I am not counsel,
13      attorney, or relative of either party, or otherwise
        interested in the event of this suit.
14

15

16                          Julie H. Parrack, RMR, CRR
                            Certification No. 102-RPR
17                          (Expires January 31, 2008)

18
        DATED:  July 24, 2006
19

20

21

22

23

24







bracket
on other side
of wheel





B
A
C
K



DEPOSITION
EXHIBIT

where machine hit
heel





DEPOSITION
EXHIBIT

Criswell 4
7/14/06    JP





## The image quality of a stationary system

With the **AMX**-4+, there's no need to choose between patient comfort and quality of exam results. Capabilities such as these deliver the same level of image quality typically only achievable with stationary systems:



- Its wide range facilitates even difficult lateral-hip and spine studies.
- Digital microprocessor control delivers extremely accurate and consistent technique output from exposure to exposure, regardless of battery charge.
- Excellent generator-output accuracy and reproducibility translate into excellent results the first time.
- Closed-loop feedback regulates kVp throughout exposures, eliminating the voltage fluctuations traditionally associated with mobile units.

## Extraordinary reliability and durability

The **AMX**-4+ is designed for nonstop performance in even the most taxing "bump and run" environments. Features include:

- Maintenance-free, rechargeable lead/acid battery produces up to 50 exposures on a single charge.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

KIMBRA CRISWELL             :
       **Plaintiff,**         :
                                   :
        **v.**                :        **C.A. No. 05-00321 GMS**

**LYDIA ADAIR MCFADDEN**  :        **JURY TRIAL DEMANDED**
      **and**               :
**CHRISTIANA CARE HEALTH**  :
**SERVICES, INC.,**           :
       **Defendants.**       :

## CERTIFICATE OF SERVICE

I, Richard R. Wier, Jr., Esquire, do hereby certify that on this _11th_ day of December, 2006, two copies of Appendix to Plaintiff's Answering Brief to Defendants' Opening Brief in Support of their Motion for Summary Judgment were served via electronic filing and delivered first class, postage-prepaid United States mail upon the following:

Deborah J. Massaro, Esquire
**White and Williams LLP**
824 No. Market Street, Suite 902
P.O. Box 709
Wilmington, DE  19899-0709

                                       _Richard R. Wier, Jr._
Richard R. Wier, Jr., (#716)
Two Mill Road, Suite 200
Wilmington, DE 19806
(302)-888-3222
rwier@wierlaw.com