# EXHIBIT A

Dewanjee

1

1      IN THE UNITED STATES DISTRICT COURT

2       FOR THE DISTRICT OF DELAWARE

3

4  KIMBRA CRISWELL,          )
                         )
5     Plaintiff,     )
                         )
6     vs.             )  CA NO.
                         )  05-CV-00321 GMS
7  LYDIA ADAIR McFADDEN and   )
  CHRISTIANA CARE HEALTH SERVICES, )
8  INC.,               )
                         )
9     Defendants.    )
    —————————————————————— )
10

11

12

13

14       DEPOSITION OF SUMIT DEWANJEE, M.D.

15     Taken on Thursday, March 29, 2007

16           At 1:10 p.m.

17   At 2929 North Central Avenue, Suite 1680

18          Phoenix, Arizona

19

20

21

22

23

24  REPORTED BY:  MICHAEL H. DIPPEL, RPR
                 Arizona CR No. 50716
25              Nevada CCR No. 701
                 California CSR No. 9409

2

1  APPEARANCES:

2  For Plaintiff:

3       WHITE AND WILLIAMS, LLP
        BY:  DEBORAH J. MASSARO, ESQ.

                                Dewanjee
     4          824 Market Street
                Suite 902
     5          Wilmington, Delaware  19801
                302-654-0424
     6          (Appearing via video teleconference.)

     7
       For Defendants:
     8
                KATS, JAMISON, Van der VEEN & ASSOCIATES
     9          BY:  NELSON LEVIN, ESQ.
                25 Bustleton Pike
    10          Feasterville, Pennsylvania  19053
                215-396-8388
    11          (Appearing via video teleconference.)

    12

    13

    14

    15

    16

    17

    18              DEPOSITION OF SUMIT DEWANJEE, M.D.,

    19    taken at 2929 North Central Avenue, Suite 1680,

    20    Phoenix, Arizona, on Thursday, March 29, 2007, at

    21    1:10 p.m., before Michael H. Dippel, Registered

    22    Professional Reporter and Certified Reporter No. 50716

    23    in and for the State of Arizona.

    24

    25


                                                            3
     1                      I N D E X

     2

     3   WITNESS:

     4   SUMIT DEWANJEE, M.D.

     5

     6   EXAMINATION                                PAGE

     7   By Ms. Massaro                             4, 91

     8   By Mr. Levin                              82, 102

                        Page 2

Dewanjee

9

10                    INDEX TO EXHIBITS

11   EXHIBITS                                              PAGE

12   1   Curriculum Vitae                                  75

13   2   Sumit Dewanjee, M.D. Legal Fee Schedule           17

14   3   Report dated January 19, 2007                     48

15   4   Report dated March 26, 2007                        *

16   5   Medical records                                   92

17   6   Medical records                                   93

18   7   Medical records                                   84

19   8   Christiana Care Health Services discharge         51
         summary dated August 15th, 2002
20
     9   Advanced Foot and Ankle Center progress            *
21       note

22   10  Radiology Report                                  95

23   11  Medical records                                    *

24

25

⧠

                                                          4

1                 SUMIT DEWANJEE, M.D.,

2          was called as a witness and, having been

3          first duly sworn, testified as follows:

4                      EXAMINATION

5    BY MS. MASSARO:

6        Q.   Good afternoon, again, Dr. Dewanjee.  My name

7    is Debbie Massaro for the record.  I represent

8    Christiana Care and Lydia Adair McFadden.  Again,

9    that's the hospital and the X-ray technician who

10   Ms. Criswell has sued in this case.  And I have a few

11   questions for you today regarding Ms. Criswell's

12   medical care and your opinions.

13               Before I start the deposition, I want to
                          Page 3

Dewanjee

14  reserve on the record Defendants' right to oppose any
15  deposition testimony today that is based upon a late
16  submission or a supplemental report and/or that the
17  subject matter was not raised in Plaintiff's initial
18  Rule 26 disclosure, which was submitted in the form of
19  Dr. Dewanjee's written report dated January 19th, 2007.
20          Okay.  Dr. Dewanjee, now that we've gotten
21  that on the record --
22          MR. LEVIN:  May I respond briefly?
23          MS. MASSARO:  Sure.
24          MR. LEVIN:  To respond, Dr. Dewanjee's
25  supplemental report contained opinions that were

5

1  contained in his records, his office notes.  His
2  supplemental report does not put forth any new theories
3  of injury that have not been contained in his office
4  notes and his initial report.  Accordingly, there is no
5  prejudice to the defense in this case.
6          All the medical conditions caused by the
7  incident of May 23rd, 2002, have been well-documented
8  by Dr. Dewanjee's notes as well as the notes of other
9  medical providers.  There is no new medical condition
10  contained in Dr. Dewanjee's supplemental -- no new
11  medical condition contained in Dr. Dewanjee's
12  supplemental report.  Accordingly, there's no prejudice
13  to the defense.
14          And, additionally, the defense will be
15  offering a report of an expert neurologist, which has
16  not been received as per this date, which we anticipate
17  will rebut any opinions that Dr. Dewanjee may have
18  today.

Dewanjee

19    Q.    (By Ms. Massaro)  Okay.  And now that we're
20  both on the record -- that's for the judge to decide,
21  not for you to worry about -- we'll begin the
22  deposition.
23        First, Dr. Dewanjee, have you given a
24  deposition before?
25    A.    No.  Well, what do you mean by deposition?

6

1     Q.    Have you been in a situation where a court
2  reporter was taking your testimony where you were sworn
3  in --
4     A.    Yes.
5     Q.    -- and you were answering -- okay.
6        And what situation was that in?
7     A.    I think three of them -- I did two or three
8  in the last three years, and they were patients of
9  mine, and, I think, state compensation of Arizona
10  wanted some information about the patient and their
11  future prognosis and their injuries sustained at work.
12    Q.    Okay.  So were you a defendant in any of
13  those cases?
14    A.    No.
15    Q.    So you were, more or less, a fact witness in
16  those cases?
17    A.    Treating physician and fact witness, yes.
18    Q.    How long ago was that?
19    A.    One may have been approximately six months to
20  a year ago.
21    Q.    Okay.  Well, just as a reminder, I'm going to
22  go over just a couple of quick things.  I'm sure you'll
23  remember them, but just to save the court reporter.

Dewanjee

24         First, it's not a natural way to talk, so
25   please let me finish my question before you answer the

7

1   question, and I, in turn, will do my best to then let
2   you answer before I start my next question.
3         Also, be careful.  We tend to nod when we're
4   saying "yes" or "no," so please make sure to say "yes"
5   or "no" so that the court reporter can get that down.
6         Also, I'm going to -- as I ask you questions,
7   I will assume that you understood my question unless
8   you tell me otherwise.  Okay?
9      A.   Okay.
10     Q.   First, could you state and spell your name
11  for the record.
12     A.   My name is Sumit, S-u-m-i-t; last name
13  Dewanjee, D-e-w-a-n-j-e-e.
14     Q.   Okay.  And what is your business address?
15     A.   The business address of my company is
16  7301 East 3rd Avenue, No. 413, Scottsdale, Arizona
17  85251.
18     Q.   Okay.  And what company is that?
19     A.   FX RX, Incorporated.
20     Q.   And how do you spell that?
21     A.   Capital F, capital X, space, capital R,
22  capital X, space, Incorporated.
23     Q.   Okay.  What type of company is that?
24     A.   Arizona C corporation.
25     Q.   And what does that corporation as an

8

1   entity -- what does it do?

Dewanjee

2      A.    Medical consulting for orthopedics.

3      Q.    Would that be in Arizona or all over the

4  country?

5      A.    Arizona.

6      Q.    And is that something different than -- on

7  your curriculum vitae, Maricopa Health System is listed

8  as your employer.  Is that something different?

9      A.    I'm not -- they are not my employer because

10  it's an independent contractor that I serve as for that

11  hospital system.

12      Q.    Okay.

13      A.    I'm actually employed by the company FX RX,

14  Incorporated.

15      Q.    And is that a group of --

16      A.    No.  It's owned by myself.

17      Q.    Okay.  You own it, but is it -- does it

18  encompass a group of physicians?

19      A.    No.  Just me.

20      Q.    And you serve as an independent contractor to

21  the hospital; is that correct?

22      A.    Yes.

23      Q.    Okay.  Are you an attending at that hospital?

24      A.    Yes.

25      Q.    All right.  I'll ask you a little bit more

9

1  about that later.

2            How long have you been doing legal work?

3      A.    The first deposition I was asked to do was

4  approximately two years ago.

5      Q.    And that was when you were the treating

6  physician?

Page 7

Dewanjee

7      A.    Correct.

8      Q.    And that was for the state compensation?

9      A.    Yes.

10     Q.    Have you ever done legal work where you were

11  with -- as in this case, where you were testifying on

12  behalf of the plaintiff?

13     A.    No.

14     Q.    Okay.  How did you come to know of this case?

15     A.    My patient told me about the extent of her

16  injuries and how she was injured, and, later, I

17  received information from the attorneys at Kats,

18  Jamison, Van der Veen & Associates that they needed

19  information regarding her injuries, her diagnosis,

20  prognosis, and expected outcomes, and that's when I

21  found out that she was most likely proceeding with a

22  suit.  I really, still, to this day, don't really know

23  the exact details of the suit but just was providing

24  background information about the items I just

25  discussed.

10

1      Q.    Okay.  Now, when you were reading that, you

2  were looking at a piece of paper in front of you.  Is

3  that a letter from the law firm that you just named?

4      A.    No.  That was just a supplemental report that

5  I sent out later that had their firm's name on it.

6  Because I'm not familiar with their firm.

7      Q.    Okay.  Have you received any correspondence

8  from the law firm?

9      A.    I received telephone correspondence from

10  Mr. Nelson Levin just asking me to provide the

11  information that I discussed in this report and a

Dewanjee

12  previous report.

13      Q.   Has he sent you anything in writing?

14      A.   He did send me something in writing, which I

15  don't have with me, just outlining, I think, the court

16  case and what -- what they needed regarding information

17  about her healthcare that I treated her for as well as

18  any opinions I might have had about her previous care.

19      Q.   All right.  That letter -- first of all, did

20  you get the -- I know, earlier in the week, we faxed to

21  you a copy of the subpoena duces tecum, which is a list

22  of things that I wanted you to bring to this deposition

23  today.  Did you get that list?

24      A.   Yes, I did.

25      Q.   Okay.  Did you not think that this letter

                                                    11

1   came under that category or . . .

2       A.   Yeah, I wasn't sure that it came under that

3   category since I've never done one of these before,

4   so . . .

5       Q.   Okay.  It does.  So what I'd ask is that you

6   send it to Mr. Levin so that he can forward it on to

7   me.

8       A.   Sure.

9       Q.   Thank you.

10          Anything else from him?  Anything else in

11  writing from --

12      A.   Most of that's handled by one of the

13  administrative secretaries at Med Pro, which is a --

14  it's a hospitalist group associated with the Maricopa

15  Health System, and our secretary handles most of that,

16  and when she needs something directly from me, then she

Dewanjee

17    asks me for it.  So I don't actually see a lot of the

18    paperwork from the attorney's office.

19        Q.    So would she have that file with all of the

20    correspondence from the attorneys?

21        A.    She may, yes.

22        Q.    Okay.  If I could have a copy of that, I

23    would appreciate that.

24            Also, you said you had telephone

25    correspondence with Mr. Levin.  When did he first

12

1    contact you?

2        A.    I would say within the last two months.

3        Q.    And what did he ask you?

4        A.    He asked me what my capacity was in terms --

5    in Ms. Criswell's treatment, what purpose I was

6    serving, if I was her treating physician or there for a

7    second opinion, and I think he asked me what injuries

8    she sustained and then what her prognosis was for these

9    injuries and how long these might last.

10        Q.    So when he first talked with you, these are

11    the questions that he asked you?

12        A.    Yes.

13        Q.    Okay.  And that's your first contact with

14    Mr. Levin?

15        A.    Yes.  I can't remember the exact details of

16    what we talked about because I didn't write them down.

17        Q.    Is that what you -- are those the questions

18    that you used to produce your first report dated

19    January 19th?

20        A.    Yes.

21        Q.    Okay.  How many conversations did you have

Dewanjee

22  with Mr. Levin?

23      A.    Approximately two.  And, today, I called him

24  about the address of this location to do the video

25  conference at.

                                                    13

1       Q.    Okay.  So the second time that he called you,

2   what was that conversation about?

3       A.    He wanted additional information, more

4   specific, regarding the chronicity of her injury and

5   previous work restrictions that I had talked about that

6   I didn't put into the first report.

7       Q.    Okay.  And is that what prompted your second

8   report?

9       A.    Yes.

10      Q.    How did you prepare for today's deposition?

11      A.    Just looking at her previous care, reading

12  the medical summary with Exhibit A through M, and then

13  looking at my previous notes.

14      Q.    Okay.  Do you have your notes there?

15      A.    Yes.

16      Q.    Could you set those aside in a pile for me?

17      A.    Sure.

18      Q.    Oh.  You're talking about your medical

19  record?  Or are you talking about notes that you made?

20      A.    No.  I didn't make any -- the only separate

21  notes I made was on the sheet, which is just a temporal

22  summary of the care that she received.

23      Q.    Okay.  You can set that aside.  I'll go over

24  your medical record in just a moment.

25          Am I correct -- is that your medical record

                                                    14

Dewanjee

1  that's right in front of you, the folder?

2      A.   The chart, yes.

3      Q.   Okay.  Does that include your notes?

4      A.   which notes?

5      Q.   Your notes regarding Ms. Criswell.

6      A.   Yes.

7      Q.   And the notes that you made in preparation

8  for this deposition?

9      A.   No.  Those notes are just on this piece of

10  paper.

11      Q.   Okay.  Okay.  With regard to the chart --

12  what was that that you just removed out of the chart?

13      A.   These are just the notes -- this chart is

14  from the office at 4524 North Maryvale Parkway.  That

15  office is closed.  Now, I work for FX RX.  So this

16  chart only includes the material from there.

17          And these are, I think, later notes dated

18  September 28th, October 19th, and then the two

19  supplementary reports, and a progress note from

20  January 29th.

21      Q.   Okay.  Super.  Let's go ahead and do the

22  documentation first, before we move on.

23          Let's take a look at your chart, then, for

24  the patient.  And I just want to make sure -- first,

25  how many actual papers are in that chart?  Is it enough

                                                      15

1  to where you could just count very quickly and tell me

2  how many papers you have in that chart?

3      A.   No.  There's quite a few papers.  I would say

4  about 40, 50 pages.

5      Q.   Okay.  Because I only have --

Dewanjee

6      A.    But these are not progress notes.  There's a
7  couple of fax transmissions of physical-therapy
8  requests, that sort of thing.
9      Q.    Okay.  Yeah, we want everything when we
10  request the chart.  So if you could set that aside, I'm
11  going to ask that that be faxed to me in a minute.
12          Am I correct in saying that Ms. Criswell has
13  seen you eight times?
14      A.    I would have to count the exact -- I don't
15  know the exact number of times.  That's approximately
16  accurate.
17      Q.    Okay.  Has anything been removed from that
18  file?
19      A.    No.
20      Q.    In forming your opinion, what records did you
21  review?
22      A.    I reviewed, first of all, her medical
23  summary, the Exhibits A through M, sent to me by my
24  secretary -- or our secretary at the hospital, and I
25  reviewed my chart and my progress notes later on at --

                                                        16
1  from Maricopa.
2      Q.    Okay.  Do you have that list, A through M, in
3  front of you?
4      A.    Yes.
5      Q.    Could you read that to me?  I want to make
6  sure that I have the same thing.
7      A.    You mean go through the exhibits?
8      Q.    Yes.  You can just list them.
9      A.    Exhibit A, Advanced Foot and Ankle Center,
10  Pro Physical Therapy, Vascular Consultants, Christiana
                        Page 13

Dewanjee

11  Care, Lawall Prosthetics and Orthotics, Johns Hopkins

12  Medicine, Orthopedic Specialists of Southwest Florida,

13  Foot and Ankle Center, LMR Imaging, Valley

14  Radiologists, my name, Endurance Rehab, and

15  prescriptions under Exhibit M.

16      Q.  Okay.  Good.  So let the record reflect these

17  are the records that Plaintiff has produced in

18  discovery.

19          Have you sent a bill to Mr. Levin for your

20  work so far in this case?

21      A.  I think my secretary did send a bill.

22      Q.  Okay.  Do you have a copy of that with you,

23  as well, that was on the list that I sent to you?

24      A.  I don't think so.

25      Q.  Okay.  Could you look and see if you have

                                                            17

1  that?

2      A.  I'm a hundred-percent sure I do not.

3      Q.  Okay.  Are you?  Okay.  All right.

4          Again, with regard to that, could you send a

5  copy of that to Mr. Levin --

6      A.  Sure.

7      Q.  -- for forwarding to me?

8          With relationship to that -- let me ask you

9  to take a look at Exhibit No. 2 -- what has been marked

10  as Exhibit No. 2.

11      A.  2 or B?

12      Q.  That would be the fee schedule.

13          And, actually, the court reporter will give

14  you that.

15      A.  Okay.

                        Page 14

Dewanjee

16    Q.    Is that the most up-to-date fee schedule?

17    A.    I'm not sure.  These are set arbitrarily by

18  what the other physicians in the office who do more of

19  these frequently charge.

20    Q.    And what office is that?

21    A.    The Med Pro Orthopedic office at Maricopa

22  Medical Center.

23    Q.    Okay.  Now, did I understand you to say

24  earlier that you're no longer with them?

25    A.    No.  I am with them, but I'm an independent

18

1  contractor.  They let me use their administrative

2  office.

3    Q.    Okay.  Then I wasn't really clear.  You said

4  that you had two charts for the patient, and you said

5  that you had one chart with a group that you were no

6  longer with, and I guess I'm not --

7    A.    That's the blue chart.

8    Q.    Can you explain that to me a little bit?

9    A.    That's the blue chart.  And now I'm with

10  Maricopa Medical Center.  They have e-files, so

11  everything is on the computer there.

12    Q.    Okay.  And the blue chart is from where?

13    A.    That's from the West Valley Orthopedics when

14  I was initially seeing Ms. Criswell.

15    Q.    Got it.  Okay.  And is that in Phoenix?

16    A.    Both of those are in Phoenix, yes.

17    Q.    And what hospital is West Valley Orthopedics

18  associated with?

19    A.    It's not associated with any particular

20  hospital.  The hospital across the street is Maryvale

Page 15

Dewanjee

21   Hospital, but it's not -- it's associated with the
22   Abrazo Healthcare System, which includes about five or
23   six hospitals in greater Phoenix.
24       Q.   And when did you leave West Valley?
25       A.   2006, August.  I had a two-year contract.  I

                                                          19

1    completed that and then started my own practice, which
2    is what I wanted to do.
3        Q.   So the reason that you left them was to start
4    your own practice?
5        A.   Yes.
6        Q.   Okay.  And I didn't catch the year.  We've
7    got a little static.  I don't know if you can hear the
8    static, but we've got a little static here.  I didn't
9    catch it.  What year was it that you left there?
10       A.   August 2006.
11            MR. LEVIN:  Doctor, maybe if you -- where is
12   your mike?
13            THE REPORTER:  The mike is pretty close to
14   him.  It's about as close as I can get it.
15            MR. LEVIN:  Okay.  Are there papers that are
16   obscuring the mike?
17            THE REPORTER:  No.
18            MS. MASSARO:  Something's really giving us
19   static from that mike.  I don't know -- do you have any
20   static with us.
21            THE REPORTER:  No.  We can hear you clearly.
22            MS. MASSARO:  Okay.  So it is your mike,
23   then.  Maybe take it a little further away from him and
24   let's see if that helps.
25            THE WITNESS:  Is that better?
                        Page 16

Dewanjee

20

1          MS. MASSARO:  No.  You might as well move it
2     closer to him.  I don't know what the static is.
3     Nelson's right.  It's usually papers.
4          THE REPORTER:  Do you have your cell phone
5     on?  Sometimes that will cause interference.
6          Is that any better?  We thought maybe it was
7     the cell phone.
8          MS. MASSARO:  I think maybe it was the cell
9     phone.
10     Q.   (By Ms. Massaro)  The last question before we
11     take a break to fax things:  Did you prepare any
12     drawings or charts?
13     A.   No.
14     Q.   Did you prepare a time line?
15     A.   Time line, yes.  That's the handwritten note
16     that I brought with me today for the deposition.
17     Q.   Okay.  Super.  And is that the only
18     handwritten note, then?
19     A.   Yes.
20     Q.   Okay.  We'll take a five-minute break.  If we
21     could have the 40-page chart in the blue folder and
22     then that handwritten note faxed to (302)467-4546.  It
23     should take five minutes, and then we'll come back on
24     the record.
25          (Pause in proceedings.

21

1     Q.   (By Ms. Massaro)  Dr. Dewanjee, did you read
2     any medical literature in forming your opinion?
3     A.   Yes.

Dewanjee

4    Q.    What did you read?

5    A.    I just read a quick -- we call it the

6  Orthopedic Knowledge Update 7.  It's just a brief

7  synopsis on RSD with a little flow chart.

8    Q.    Do you have a copy of that in your file?

9    A.    Not in the file, but I have it with me if you

10  want it faxed.

11    Q.    Yes.  If you could give that to them -- we

12  may as well save some time, and you can give that to

13  Kris while we're continuing on with the deposition.

14        Do you need that for the rest of the

15  deposition?

16    A.    It depends what you ask me.

17    Q.    Okay.  Then why don't you hold on to it.  I

18  do want a copy of that, though.

19        Why don't you go ahead and tell me what

20  injuries you allege are related to the incident that

21  occurred at Christiana Hospital on May 23rd, 2002.

22    A.    No. 1 is Achilles tendon partial tear; No. 2,

23  Achilles tenosynovitis; No. 3, RSD, reflex sympathetic

24  dystrophy, or causalgia in this case; and No. 4 is

25  proximal tibiofibular instability of the left knee.

                                                  22

1    Q.    So am I safe to say, then, there are four

2  areas:  Achilles tendon partial tear --

3    A.    Correct.

4    Q.    Then what was the second word you said?

5    A.    Teno -- t-e-n-o -- synovitis.

6    Q.    Okay.  RSD, and then proximal tibiofibular

7  instability?

8    A.    Correct.

Dewanjee

9  Q.  Anything else?

10  A.  No.

11  Q.  When did you first see Ms. Criswell?

12  A.  I would have to refer to my chart.

13  May 2nd, 2005.

14  Q.  Okay.  And at that time, what did she present

15  with?

16  A.  I'm trying to find my note.  I think it's in

17  the exhibits; correct?

18  Q.  Yes, it is.  It's Exhibit No. 5, I believe.

19  A.  At that time, I found that she did have the

20  RSD.  I didn't find anything that was contrary to the

21  diagnosis of RSD.  She also appeared to continue to

22  have Achilles tendinitis.  And I noted that I thought

23  she may have torn her meniscus in her knee, and she did

24  demonstrate the finding of the instability of the

25  proximal tibiofibular joint.

23

1  Q.  Okay.  First you said nothing contrary to

2  RSD.  Did you find any of the RSD symptoms?  For

3  example, was her left foot swollen?

4  A.  She had a stiffness of her ankle and a

5  tenderness over her Achilles tendon.

6  When she saw me, she was mainly complaining

7  of her knee, so I focused on that rather than her ankle

8  where most of the RSD findings were previously.

9  Q.  Okay.  But you said you saw nothing contrary

10  to RSD.  Did you find anything -- again, did you notice

11  if there was any swelling?

12  A.  I did not note any swelling.

13  Q.  Did you notice that there was any

Page 19

Dewanjee

14    discoloration of the left foot as compared to the

15    right?

16        A.    No.

17        Q.    Did you observe any temperature change of the

18    left foot as opposed to the right?

19        A.    I did not check for a temperature change.

20        Q.    So when you say there was nothing contrary to

21    RSD, what made you say that?

22        A.    She had stiffness of the ankle without any --

23        Q.    Okay.  But that's something --

24        A.    -- without any recent injury.  And, mainly, I

25    was going by her history.

                                                        24

1         Q.    Okay.  And what did she tell you?

2         A.    She told me, basically, the whole history of

3    her injury starting out on May 23rd, 2002, when she was

4    struck by the X-ray machine at work, followed by a

5    short history of her care.  She didn't go into detail

6    regarding her care, but she did mention that she had an

7    MRI, the treatment with the serial casting.

8              But then she -- at that time, the knee was

9    bothering her more, and nobody had apparently addressed

10    that before because I think her initial physicians were

11    podiatrists, and they typically do not do any treatment

12    above the ankle.

13        Q.    Okay.  So you first saw her, then, am I

14    correct, three years after the incident?  Is that

15    correct?

16        A.    Correct.

17        Q.    Okay.  And this is the first time that the

18    knee was addressed, three years after the incident?

Dewanjee

19    A.    Yes.

20    Q.    Is that correct?

21    A.    Correct.

22    Q.    Okay.  Back to the RSD.  I just want to ask

23  you a few more symptoms to find out if you noted them

24  on this first visit when you saw her.

25        Was the left foot warmer than the right?

25

1    A.    I did not check for any difference in

2  temperature.

3    Q.    Did you notice any limited range of motion of

4  the left --

5    A.    She did have limited range of motion.

6    Q.    And how was that limited?

7    A.    She could only dorsiflex to about 10 degrees.

8  And that is abnormal.

9    Q.    Okay.  Did you notice any changes in the

10  toenails in the comparison of the left to the right?

11    A.    No.  I did not check her toenails.

12    Q.    Did you examine her foot at all?  Did you see

13  her foot without socks on?

14    A.    Yes, I did.

15    Q.    Okay.  Would you have noticed if there was a

16  difference in her toenails from the left to the right?

17    A.    Not if I was focusing on her knee mostly, and

18  her Achilles tendon.

19    Q.    You said that you noted that she had limited

20  range of motion.  Did you look at her foot when you did

21  that?

22    A.    Yeah, I did have to look at it, and I had to

23  watch her move it up maximally and down maximally to

Page 21

Dewanjee

24    see what her range of motion was, and I also had to

25    palpate her ankle to check what was tender, and, at

26

1    that time, the area that what was tender in her foot

2    was her Achilles insertion.

3        Q.    Would you have noted if you had noticed any

4    difference in the right to the left foot?

5        A.    I would have if I had checked the right foot,

6    but I only checked her left ankle.

7        Q.    Okay.  Did you notice any moisture of the

8    left foot?

9        A.    I did not check her skin moisture on that

10   visit.  These are things I'd most likely check if I was

11   trying to determine whether someone had a new onset of

12   RSD, but she had a previously established diagnosis,

13   and that was not her -- yes.

14       Q.    And at that time -- you say she had a

15   previously established diagnosis.  Did you actually see

16   a medical record, or was this a verbal relaying of the

17   diagnosis of RSD to you?

18       A.    At the first visit, I think that was a verbal

19   relaying.

20       Q.    Okay.  Now, with regard to the knee, you

21   indicated that you thought, initially, she had a torn

22   meniscus?

23       A.    Correct.

24       Q.    Why was that?

25       A.    She was tender over the medial joint line,

27

1    and she did have some --

2        Q.    How long had that been going on?

Page 22

Dewanjee

3      A.    She stated since her initial injury in

4    May 2002.

5      Q.    So you thought perhaps she had a torn

6    meniscus for three years?

7      A.    Possibly.

8      Q.    Is that very common?

9      A.    Yes.

10     Q.    Okay.  And what else made you think she had a

11    torn meniscus?

12     A.    She had a -- something called a McMurray's

13    test that was positive that usually indicates a

14    meniscal injury.

15     Q.    Okay.  And you said you also thought she

16    might have instability of the proximal tib-fib joint at

17    that time?

18     A.    She did have that.  That was a palpable

19    finding with squatting.

20     Q.    Okay.  How did Ms. Criswell describe the

21    incident to you of May 23rd, 2002?

22     A.    On that day, she said she was at Christiana

23    Hospital in Newark, Delaware, and she said her left

24    ankle was, quote, "run over by an X-ray machine,"

25    unquote.  She said she also fell onto the left knee at

28

1    the time of injury.

2      Q.    Is that the time that you believe the

3    instability occurred?

4      A.    The instability could have occurred --

5    started when she sprained her ankle and then been

6    completed when she fell on her knee.  It's hard to

7    determine without being there at the time of injury and

Page 23

Dewanjee

8  watching it happen.

9     Q.   Okay.  In relationship to that, to the time

10  of injury, that is correct.  If you -- for example, do

11  you think that it's important how fast the portable

12  X-ray machine was going?

13         MR. LEVIN:  Objection.

14     Q.   (By Ms. Massaro)  You can answer.

15     A.   No, because they typically run at the same

16  speed.

17     Q.   Okay.  So you don't think it's important how

18  fast the X-ray machine was going at the time of impact?

19     A.   It depends upon -- I think more important

20  would be the mass of the X-ray machine rather than the

21  velocity.

22     Q.   Okay.  Again, so are you saying, then, it's

23  not important to you, in your determination, how fast

24  the X-ray machine was going at the time of this

25  incident?

29

1         MR. LEVIN:  Objection.

2         THE WITNESS:  Correct.  In terms of

3  determining what's wrong with her, I don't need to know

4  how fast the X-ray machine was going when it hit her.

5     Q.   (By Ms. Massaro)  That's not what I asked.

6  I'm asking in terms of her diagnosis after this.

7         Would your opinion change if you knew, for

8  example, the speed --

9     A.   No.

10     Q.   -- of the portable X-ray machine?

11         Okay.  Let me ask you this:  Would your

12  opinion change if you knew that it had not run over her

Page 24

Dewanjee

13  left foot but tapped the back of the ankle?

14          MR. LEVIN:  Objection.

15      Q.  (By Ms. Massaro)  You can answer.

16      A.  I would have to know what amount of force a

17  tap meant in terms of kinetic energy.

18      Q.  So when you're talking force and kinetic

19  energy, does the speed of the machine matter to you at

20  that point?

21      A.  Yes.

22          MR. LEVIN:  Objection.

23      Q.  (By Ms. Massaro)  You can answer.

24      A.  Yes.  That's one of the determinants of

25  kinetic energy.

                                                    30

1       Q.  Okay.  If Ms. Criswell did not fall on her

2   knee -- again, this is a hypothetical.  If she did not

3   fall on her knee, would that affect your opinion in

4   terms of relating the knee injury to this incident?

5       A.  No.

6       Q.  And why not?

7       A.  Because a common mechanism for injuring the

8   proximal tibiofibular ligament is a bad ankle sprain

9   that travels up through the ankle, into the proximal

10  connection.  Because the leg bones, the tibia and

11  fibula, are connected at the ankle and they're

12  connected at the knee, and they're also connected in

13  between, and, often, with a bad ankle sprain, the tear

14  can exit up through the knee.

15      Q.  So are you saying, then, that the ankle

16  sprain -- are you saying that you believe an ankle

17  sprain occurred when the machine tapped her heel?

Dewanjee

18          MR. LEVIN:  Objection.

19          THE WITNESS:  She was diagnosed previously

20   with an ankle sprain.

21          Q.   (By Ms. Massaro)  "Previously" when?

22          A.   I think when she saw her physician,

23   initially, after the injury.

24          Q.   Okay.  Is that Dr. DiPretoro?

25          A.   Yes.

                                                        31

1           Q.   Okay.  Do you want to show me where he

2    diagnosed her with an ankle sprain?  And just let me

3    know where you're looking in the record.

4           A.   Well, for us, it's Exhibit A.

5           Q.   I have that.

6           A.   It's the second page, dated May 28, 2002.

7    Under "assessment," he wrote, "Achilles tenosynovitis,

8    peroneus brevis tenosynovitis likely due to ankle

9    sprain."

10          Q.   Now, are you saying, then, that, as a result

11   of this ankle sprain, she experienced instability in

12   the knee?

13          A.   It's not really a result of.  It's part of.

14          Q.   Part of.  Okay.

15               Would she have experienced knee pain at this

16   time?

17          A.   She may have not.  She may have, but since

18   she wasn't weight-bearing on the leg, she really

19   wouldn't have noticed the instability.

20          Q.   Did she tell you, when she saw you, that she

21   had had pain since the date of the incident?

22          A.   In her ankle, yes.

Page 26

Dewanjee

23    Q.   Did she tell you that she had had pain in her

24  knee since the date of the incident?

25    A.   I think the main complaint with her knee was

32

1  instability, and pain only when doing certain

2  activities.  The knee pain didn't bother her at rest or

3  with just walking regular -- just regular ambulation.

4    Q.   Okay.  But my question was:  Did she tell you

5  that she had left knee pain since May of 2002?

6    A.   I would have to look at my note again

7  briefly.

8         She didn't tell me that she specifically had

9  the pain since -- at the time of that injury in the

10  knee.

11    Q.   Okay.  Could you look at your note from

12  May 11th, 2005.

13    A.   Yes.

14    Q.   Okay.  Do you see where it says, "Left knee

15  pain since May 23rd, 2002"?

16    A.   Yes.

17    Q.   So at some point, did she then tell you that

18  she had the knee pain since the incident?

19    A.   She did.  She must have told me at the second

20  visit.

21    Q.   Okay.  Did you see in her -- in any of her

22  records that you reviewed, did you see any complaints

23  of knee pain?

24    A.   No.

25    Q.   Okay.  So you're the first person that she

33

Dewanjee

1    complained to of knee pain and had an actual diagnostic

2    study of her left knee after this incident?

3         A.    Correct.

4         Q.    Okay.  So it wasn't until three years after

5    the incident that she actually had an MRI done on the

6    left knee or an X-ray even done of the left knee; is

7    that right?

8         A.    Correct.

9         Q.    I want to go back through your records in a

10   minute, but I want to go backwards a little bit.

11              In terms of your time -- this is just a

12   general question -- how much time do you spend in your

13   practice in clinical versus administrative versus

14   surgical?

15        A.    Administrative, 5 percent, and the remainder

16   between surgery and clinic, I would have to say about

17   60 percent clinic, 40 percent surgery.  So divide up

18   the 95 percent, and it's a 60/40 split with the

19   majority of time being clinic.

20        Q.    Got it.

21              How many of your patients -- or, let's say,

22   what percentage of your patients do you see with a

23   diagnosis of RSD?

24        A.    I would have to say five or less.

25        Q.    And how long have you been in practice?

                                                          34

1         A.    Three years.

2         Q.    What type of surgeries do you typically

3    perform?

4         A.    Knee, shoulder, trauma, joint replacement.

5         Q.    Okay.  Do you have a specialty?

                        Page 28

Dewanjee

6       A.    Sports.

7            MR. LEVIN:  Doctor, if you could speak up

8  just a little.

9            THE WITNESS:  Sure.  Sports orthopedics.

10      Q.    (By Ms. Massaro)  Okay.  Thanks.

11            When you perform surgeries, do you ever do an

12  intraoperative X-ray?

13      A.    Yes.

14      Q.    Okay.  When you page the X-ray technician

15  because the patient is under anesthesia and you need an

16  X-ray done, do you expect the X-ray technician to get

17  there quickly?

18            MR. LEVIN:  Objection.

19      Q.    (By Ms. Massaro)  You can answer.

20      A.    No, not always.

21      Q.    Okay.  And why wouldn't you expect the X-ray

22  technician to get there quickly when you have a patient

23  under anesthesia and you've paged them to come?

24            MR. LEVIN:  Objection.  What is the relevance

25  of this?

                                                         35

1            MS. MASSARO:  It's very relevant.  I'm just

2  asking him what his surgical -- I'm not here to argue

3  with you.

4      Q.    (By Ms. Massaro)  You can answer the

5  question.

6      A.    Well, I work in a busy trauma center, so

7  there's, sometimes, ongoing trauma and they're unable

8  to get there immediately.

9      Q.    Okay.  When you page someone when you're in

10  the OR and you need them to come and take an X-ray --

Page 29

Dewanjee

11  an X-ray technician to take an X-ray -- is the

12  expectation that they will get there quickly?

13          MR. LEVIN:  Objection.

14          THE WITNESS:  Not always.  It just depends on

15  time of day and where it is and . . .

16      Q.   (By Ms. Massaro)  And what do you mean "where

17  it is"?

18      A.   We often wait 20, 30 minutes for an X-ray

19  tech.

20      Q.   And why would you often -- why do you wait

21  20, 30 minutes for an X-ray tech?

22          MR. LEVIN:  Objection.

23          THE WITNESS:  Because they might have

24  concurrent traumas where they're taking X-rays.

25      Q.   (By Ms. Massaro)  How often do you request

                                                    36

 1  intraoperative X-rays?

 2          MR. LEVIN:  Objection.

 3          THE WITNESS:  We request them for trauma

 4  patients where we -- anytime we need to see the bone.

 5      Q.   (By Ms. Massaro)  Okay.  Would you say that

 6  that's a stat order?

 7          MR. LEVIN:  Objection.

 8      Q.   (By Ms. Massaro)  You can answer.

 9      A.   Sure.

10      Q.   Of those 5 percent of patients that you have

11  with RSD, how do you treat those patients?

12      A.   I usually refer them to someone else.

13      Q.   And what type of physician do you usually

14  refer them to?

15      A.   A hand surgeon who's familiar with RSD, or a

Dewanjee

16  neurologist, or a pain-management specialist.

17       Q.    Did you refer Ms. Criswell to one of those

18  doctors?

19       A.    No.

20       Q.    Why not?

21       A.    She had already had a treatment regimen for

22  her RSD that seemed to be controlling her symptoms.

23       Q.    Okay.  So her treatment regimen is

24  controlling her symptoms?

25             MR. LEVIN:  Objection.

                                                        37

1              THE WITNESS:  Was controlling her symptoms as

2   best they could with -- I think they tried various

3   things, and that was as good as it gets for her.

4        Q.    (By Ms. Massaro)  Okay.  And what --

5        A.    She was at a baseline at that point.

6        Q.    And what is her treatment regimen?

7        A.    She was receiving nortriptyline and Mobic.

8        Q.    Is she still on nortriptyline and Mobic?

9        A.    I think she's still on nortriptyline.  She

10  might have switched to a different nonsteroidal,

11  anti-inflammatory medication.

12       Q.    So the Mobic might be out and something else

13  in?

14       A.    Yeah, a different anti-inflammatory.

15       Q.    Okay.  Anything different for the RSD?

16       A.    I think we were continuing with her physical

17  therapy intermittently.

18       Q.    Okay.  So when you say, "intermittently," how

19  often -- let me ask you this.  Let me rephrase that

20  question.  Do you prescribe her physical therapy for

                           Page 31

Dewanjee

21  her now?

22      A.   Yes.

23      Q.   How often do you do that?

24      A.   Typically, whenever she comes into the office

25  or her therapy sends a note, I review the note and

                                                        38

1   determine how she's doing and whether she would benefit

2   from additional therapy or not.

3       Q.   Okay.  And do you have her on physical

4   therapy, for example, now?

5       A.   I'd have to look at my most recent note.  She

6   was on physical therapy as last I saw her on

7   January 29th, 2007.

8       Q.   Okay.  Is she still to this day?

9       A.   I'm not sure if she's actually doing it right

10  now.  She may have completed a month or two from

11  January 29th, which would take her to February 28th.

12  So she may have finished it two weeks ago or three

13  weeks ago.

14      Q.   Have you seen her since January 29th?

15      A.   No, I have not.

16      Q.   And how often -- when you prescribe physical

17  therapy, how often do you prescribe it for?  For

18  example, once a week or --

19      A.   When she does therapy, it's typically two to

20  three times a week depending on her schedule, the

21  therapist's schedule.

22      Q.   Okay.  Getting back to your records, it looks

23  like you -- after you saw her, you requested an MRI of

24  the left knee without contrast; is that correct?

25      A.   Correct.

Dewanjee

39

1    Q.    And do you have a copy of that in front of

2  you?  In my exhibit, it's the third page back if you

3  want to look at mine.  Or you probably have it in your

4  record.

5          Under "findings," does it say there's no

6  previous study for comparison?  Is that correct?

7    A.    Correct.

8    Q.    So this, again, was the first diagnostic of

9  her left knee; is that correct?

10   A.    Correct.

11   Q.    Okay.  Did you yourself actually look at the

12 MRI films?

13   A.    I think I did, but it was quite a long time

14 ago, and I don't actually remember if I did or did not.

15   Q.    Okay.  So if I ask you did you actually see

16 the effusion on the MRI, would you be able to answer me

17 that question?

18   A.    No.  I can't recall.

19   Q.    Okay.  So you don't know whether you actually

20 saw that effusion or not?

21   A.    No.

22   Q.    Are they hard to visualize on an MRI?

23   A.    No.

24   Q.    Okay.  Have you seen effusions on MRIs in the

25 past, yourself, say, for other patients that you

40

1  recall?

2    A.    Yes.

3    Q.    Okay.  And how does an effusion occur?

4    A.    An effusion usually -- what an effusion means

Page 33

Dewanjee

5  is that there's fluid -- extra fluid somewhere.

6       Q.   Okay.  And what do you call that fluid?

7       A.   Extra fluid in the body usually occurs as

8  it's filtered through the bloodstream.  The capillaries

9  dilate and the water that's typically in the blood

10 comes out filtered through the capillaries and enters

11 the tissues.

12      Q.   Does trauma cause that?

13      A.   Trauma can cause it, or chronic inflammation.

14      Q.   Okay.  And in this instance, what did you

15 suspect that tiny effusion to mean?

16      A.   Since this is a place that you almost never

17 see an effusion -- I've never seen an effusion there --

18 I thought it was consistent with her finding of the

19 instability on physical examination.

20      Q.   Okay.  I notice, later, on September 26 of

21 '05, it refers to some X-rays of the left knee.  Do you

22 have those reports in the file that's being faxed to

23 me, the reports of the X-rays?

24      A.   Those X-rays, we did in our facility, and I

25 just read them.  And the reading is on -- the knee

                                                     41

1  X-ray?

2       Q.   Yes.

3       A.   That's -- the interpretation is in my clinic

4  note on May 2nd, 2005, at the bottom of the --

5       Q.   Okay.  So there is no actual report, then?

6       A.   No, because I read it.

7       Q.   I see.  Okay.

8       A.   These are for our clinic.

9       Q.   Is that for the MRI, as well?

Page 34

Dewanjee

10    A.    No.  The MRI is read by an accredited
11  radiologist at their --
12    Q.    Sure.  I'm sorry.  Let me rephrase.
13        Is the MRI also at Maricopa as well as the
14  X-rays?  Are the films all at the same place?
15    A.    No.  The MRI was done at a separate facility
16  not related to me or the clinic or the hospital.
17    Q.    Got it.
18        Now, sorry to make you flip back, but back to
19  that date that I was at, September 26 of 2005, at the
20  last part, the prognosis part, it says, "Possible
21  tibiofibular subluxation with IT band friction
22  syndrome.  Doesn't want further intervention at that
23  time" -- "at present."
24    A.    Correct.
25    Q.    Well, first of all, what were you

                                          42
1  recommending at that time as far as treatment?
2    A.    I was recommending that she had the option of
3  trying a second injection.  I can't remember if I had
4  already given her the injection or not.  But I gave her
5  an injection there.  It didn't really help too much.
6  She didn't want another one.
7        The other option was, I was going to send her
8  for a second opinion as to methods of reconstructing
9  the ligaments in between her tibia and fibula.  And it
10  was kind of a complicated surgery.  It's very rare, so
11  the success rate is kind of unknown.  And she really
12  wasn't interested in pursuing that at that time.
13    Q.    Did you recommend that surgery?
14    A.    I just gave her the risks, the benefits, and
                        Page 35

Dewanjee

15   provided it as an option to her in the future if it

16   became too much of a problem depending on her

17   activities.

18        Q.    Would you recommend that surgery to her?

19        A.    It would only -- it would depend on her

20   activity level.  At that time, her ankle was causing --

21   limiting her activity more than the knee, and she felt

22   that doing something with the knee wouldn't really help

23   because she couldn't walk on her ankle anyway.

24        Q.    Okay.

25        A.    She couldn't do what she wanted in terms of

                                                          43

1    sports and things anyway.

2         Q.    Back to my question.  Would you or do you

3    recommend that surgery for her?  Let me ask you that

4    today.  Do you recommend that surgery for her?

5         A.    With her current activity level, no.  But in

6    the future, she may need it.

7         Q.    And what would cause her to need it in the

8    future?

9         A.    If she became more active.

10        Q.    And how do you mean "more active"?

11        A.    Skiing, going to the gym.

12        Q.    Do you think that's a possibility for her?

13        A.    I don't think so.

14        Q.    Does she go to the gym today?

15        A.    I'm not sure.

16        Q.    Well, if you'll look in your notes on -- how

17   about the next note, March 15th of '06?  Does it refer

18   to her using an elliptical machine at the gym?

19        A.    Yes.  She's doing the elliptical.

                    Page 36

Dewanjee

20      Q.   So she does go to the gym today; is that

21   correct?

22      A.   Yes.  But she was only doing -- I think she

23   was concentrating on upper-body weight training, and

24   the only thing she could do at the gym was the

25   elliptical.

44

1      Q.   Okay.  Skipping up a few more pages at least

2   in my records -- I don't know what you're looking at,

3   but I'm looking at a work/school-release form that says

4   that she can work up to 30 hours per week --

5   approximately 30 hours per week as tolerated.

6      A.   Yes.  I see it.

7      Q.   It's dated May 16.  Is there -- actually,

8   it's dated May 10th of '06, and then it says, "May

9   return to light duty on May 16th."  So that's where I'm

10   getting that date.

11           When did that order expire?  There's no

12   expiration date on that order.

13      A.   I think that's pretty much all she could do,

14   and unless she notified me otherwise, we weren't going

15   to change that.

16      Q.   Okay.  So is that still in effect today,

17   then?

18      A.   She's at, I think, eight hours per day, three

19   days a week, so she's actually at 24.

20      Q.   Has this order changed any though?

21      A.   No.

22      Q.   The next date is September 28th of 2006, and

23   under the history, the first sentence discusses a

24   recent injury that happened on September 25th of '06.

Page 37

Dewanjee

25  Do you see that?

45

1       A.   Yes.

2       Q.   Okay.  And how did she describe that injury

3  to you?

4       A.   She said she was at Valley Radiology working

5  as a radiology technician.  She stepped backward onto

6  someone's foot and rolled her ankle in.

7       Q.   Okay.  And -- sounds familiar.  What were her

8  symptoms after that?

9       A.   She developed a limp, and she had some

10  swelling, actually, in the outside part of the ankle,

11  and she had some tenderness, a small amount of fluid in

12  the joint, and some weakness of the ankle.  X-rays were

13  negative.

14      Q.   Okay.  And you recommended that she continue

15  to work her eight hours per day three days per week; is

16  that correct?

17      A.   Yes.

18      Q.   I just have a quick question about the next

19  note, which was October 19th of '06.  It looks like

20  there was no dictation done.  At least that's what I

21  thought.  And then I received a dictation yesterday, I

22  think.

23           When was this dictation done?

24      A.   October 19th.

25      Q.   Is there any reason why initially it came out

46

1  as no dictation?

2       A.   Probably it wasn't in the right drive or it

Page 38

Dewanjee

3  wasn't printed out into the system.

4      Q.   Okay.  And now I'm looking at January 29th,

5  which, as I understand it, is the last time that you've

6  seen her; is that correct?

7      A.   Yes.

8      Q.   Okay.  Again, am I correct in saying that she

9  has returned to the gym?

10     A.   Yes.

11     Q.   And you mentioned something about a popping

12 in the left knee?

13     A.   Yeah.  Those were the same symptoms she was

14 having related to that tibiofibular instability, and

15 she still didn't want anything done for it.

16     Q.   Okay.  That's the first time I read about the

17 popping.  Are you saying that there was popping but it

18 just wasn't mentioned in the note?

19     A.   Yeah, there was popping.  We just didn't -- I

20 neglected to put it into the note.

21     Q.   So the popping was since day one, since

22 May 2nd of '05, when you saw her?

23     A.   Probably not, because to get the popping, she

24 would have to weight-bear on the ankle.  Otherwise, if

25 she was just using crutches and not putting weight on

47

1  her ankle after the first injury, she probably wouldn't

2  have noticed any popping.

3      Q.   I'm sorry.  I'm asking from the first time

4  after she saw you on May 2nd of '05.

5      A.   Yes.  That's the same popping.

6      Q.   Okay.  But what I'm saying is, there's no

7  note of popping in your note.  And are you saying,

Page 39

Dewanjee

8   then, that, when she saw you, she did have a popping?

9       A.   Yes, she did.  I probably did not put it in

10  there.

11      Q.   Actually, there is a note.  There is a note.

12  I'm wrong.  "Unable to kneel, deep squatting, and

13  causes left knee pain and popping."  It is there.

14           And that popping is related to the

15  instability; correct?

16      A.   Between the two bones at her knee.

17      Q.   Yeah, the tib-fib.  Okay.

18           Now, I notice on this one you recommended

19  discontinuing the Celebrex.  Why is that?

20      A.   I think she probably told me that it wasn't

21  working that well, and she elected to proceed with the

22  Tramadol and nortriptyline.

23      Q.   And with regard to the three eight-hour days,

24  is this what she has expressed to you that she can

25  tolerate?

                                                        48

1       A.   Yes.

2       Q.   Is that why you recommended the three

3   eight-hour days?

4       A.   Yes.

5            MR. LEVIN:  What were you referring to?

6            MS. MASSARO:  I'm referring to the last

7   sentence.

8            MR. LEVIN:  January 29th, '07.

9       Q.   (By Ms. Massaro)  Okay.  Now, I'd like to --

10  I believe the next thing I'd like to do is go over your

11  reports.  Let's do that.  Let's take a look at your

12  reports.  We'll start with your first report,

Dewanjee

13  January 19th, 2007 -- dated January 19th.  Do you have

14  that in front of you?

15      A.   Yes.

16           You also have a copy in your exhibits?

17      Q.   Yes, I do.  It's Exhibit No. -- if it's

18  helpful to you, it's Exhibit No. 3.

19           Okay.  I'm on the first page.  The first

20  thing I want to ask you about is, you said, "She was,

21  according to history and provided documentation,

22  injured at Christiana Hospital," and then it goes on.

23           What documents were you provided?

24      A.   It's the medical summary with Exhibits A

25  through M.

49

1      Q.   Okay.  What medical summary is that?

2      A.   Just the various medical records from

3  Advanced Foot and Ankle Center, Pro Physical Therapy,

4  Vascular Consultants, et cetera.

5      Q.   Okay.  And that's what you looked at to form

6  the basis of your opinion; is that correct?

7      A.   That and my notes.

8      Q.   And when you say, "history," is that the

9  history that she expressed to you in the way she

10  described the incident occurring?

11      A.   Part of it is that and part of it is the

12  other doctors' account of that.

13      Q.   Which, again, likely was from her explaining

14  the way it happened to the doctors?

15      A.   Yes.

16      Q.   Now, with regard to Dr. DiPretoro, he

17  diagnosed her with Achilles tenosynovitis, which is

Page 41

Dewanjee

18 what you've just said, peroneus brevis tenosynovitis

19 "likely due to ankle sprain, left ankle." This is from

20 the MRI.

21          Where do you form the opinion that she had an

22 Achilles rupture?

23     A.   According to Dr. DiPretoro's note after he

24 ordered the MRI.

25     Q.   Okay. And what date is that?

                                                    50

1     A.   That, I think, was his second visit with her.

2 It's under our Exhibit A, the June 4th . . .

3     Q.   Okay.

4     A.   Under "assessment," at the bottom, above

5 "plan."

6     Q.   Got it.

7          I'm going to ask you, then --

8          MR. LEVIN:  Which exhibit is it under for us?

9          MS. MASSARO:  I think it's 11, but for some

10 reason, my 11 isn't here.

11          Hold on one second.  We're just having

12 exhibit issues here.

13          MR. LEVIN:  Off the record.

14          MS. MASSARO:  Off the record for a minute.

15              (Pause in proceedings.)

16     Q.   (By Ms. Massaro)  I just want the record to

17 reflect that we did receive a 58-page document of the

18 medical record of Dr. Dewanjee.  Prior to this, I had

19 about a 10-, 15-page document, so I haven't had the

20 opportunity to review everything in this 58-page

21 document.  But I will review it.  If I have any further

22 questions, I'll let you know.

Dewanjee

23          I do have the handwritten note, and we'll go

24   over that in a minute.  Let's go ahead and continue

25   with your report where we were.

51

1           You mentioned that she was treated with

2    serial casting?

3           A.   Correct.

4           Q.   And that she was diagnosed with reflex

5    sympathetic dystrophy of the left lower extremity;

6    correct?

7           A.   Correct.

8           Q.   Can I ask you to take a look at my exhibits,

9    Exhibit No. 8?  Are you there?

10          A.   Yes.

11          Q.   Okay.  Is that the discharge summary from

12   Christiana Care dated August 15th, 2002?

13          A.   Yes.

14          Q.   Okay.  And what is the primary diagnosis upon

15   discharge?

16          A.   Peroneal nerve neuropathy and possible reflex

17   sympathetic dystrophy secondary to left foot injury.

18          Q.   So when she was discharged, it was possible

19   reflex sympathetic dystrophy; is that correct?

20          A.   Correct.

21          Q.   Now, next, you mention that she saw

22   Dr. Grabow at Johns Hopkins and that he indicated she

23   had classic signs of Class 1 complex regional pain

24   syndrome.  What does that mean, "Class 1"?

25          A.   I don't know what that means, actually.  I

52

1    was trying to find that out myself.  I think there's
                      Page 43

Dewanjee

2  different classes, and some of it depends on the

3  temporal sequence.  There's three phases -- that's the

4  way I usually do it -- early, middle, late.  Other

5  people use different numbers.

6      Q.   So you don't really know what that Class 1 is

7  actually associated with?

8      A.   No.

9      Q.   Okay.  Then never mind.  I'm not going to go

10  there.

11      A.   Basically, complex regional pain syndrome is

12  almost a synonym for RSD.  All causalgia means is it's

13  RSD with a defined nerve injury.  And I think this

14  complex regional pain syndrome encompasses both RSD and

15  causalgia.  So it's kind of like semantics of the

16  terminology and all that.  But it's all basically RSD,

17  same stuff.

18      Q.   Sure.  Okay.  I just wanted to know what the

19  Class 1 -- if you had an idea of what that meant.

20          Now, I'm looking at the last page of your

21  report, I have a few questions about that.  Then we'll

22  go to your supplemental report.

23          On the last page of your report, you indicate

24  that, on March 15th, she had a new complaint of left

25  foot pain.

53

1          Now, is that an unrelated left foot pain?

2      A.   I think that's unrelated.

3      Q.   Okay.  And you say, "More recently, she

4  stepped off of a curb and reaggravated her left ankle."

5  Is that --

6      A.   That's pertaining to that -- the last couple

Page 44

Dewanjee

7   notes.

8       Q.    Where she had an injury at work?

9       A.    Yeah, September 25th at Valley Radiology.

10  That's what that's pertaining to.

11      Q.    So when you say she stepped off of a curb, is

12  that just -- is that incorrect?  Because, actually, she

13  was -- she alleges she stepped into a person in your

14  notes.  So I guess I'm asking which is correct.

15      A.    I'm not sure.  She would probably know.  I

16  just took that from whatever she told me.

17            I think she may have twisted it twice.  I

18  can't actually recall, but . . .

19      Q.    Okay.

20      A.    I think she may have -- so three times total

21  in our, I guess, long scenario, but two times within

22  maybe the last year.  But I'm not a hundred-percent

23  sure on that.  She would probably be able to tell you

24  exactly when she did that.

25      Q.    Would that have been reflected in your notes?

54

1       A.    It should have been.

2       Q.    Okay.  And you say, "Currently, the patient

3   is weight-bearing as tolerated, and RSD symptoms

4   controlled with PT and medication."

5             Is that still true?

6       A.    Yes.

7       Q.    And then you say, "In the future, she may

8   benefit from operative treatment of her left knee,

9   proximal tibiofibular subluxation, or operative

10  treatment of her Achilles tendinitis with synovectomy."

11            Would you -- does she need these surgeries,

Page 45

Dewanjee

12    in your opinion, to a reasonable degree of medical

13    probability?

14         A.    The need is completely dependent on her

15    symptoms and whether -- it's not a surgery that's a

16    hundred-percent guaranteed, so there's risks associated

17    with it, and it's up to her whether she believes the

18    risks are worth having the surgery.

19         Q.    Would you operate on her with RSD?

20         A.    I'm not -- I would most likely send her to a

21    foot and ankle subspecialist to have surgery, and, on

22    her knee, I would probably get a second opinion from

23    another sports surgeon with more experience than myself

24    who's maybe done that surgery before doing anything

25    with her knee.  Because that's a very rare surgery.

55

1    Most orthopedic surgeons have probably never even

2    attempted that reconstruction or even know anything

3    about it.

4         Q.    Okay.  And would you recommend that surgery?

5         A.    If she progressed her activities and it was

6    continuing to bother her, I would recommend it.  But at

7    this point, I think her ankle is the main problem

8    that's limiting her activity.  If her ankle --

9         Q.    Is that because she had the accident at the

10    hospital where she -- this recent accident where she

11    stepped into somebody?

12         A.    Well, I think it was the initial accident

13    that resulted in the RSD and the possible partial

14    Achilles tear.

15         Q.    Okay.  But did the second accident aggravate

16    that?

Page 46

Dewanjee

17    A.    The second accident aggravated her RSD.

18    Q.    Did you know that she had had left foot

19 surgery in the past?

20    A.    Yes.  I think she had an os resected or

21 something, which is an accessory bone that a lot of

22 people have.

23    Q.    Then you say, I believe, that her Achilles

24 and knee injuries are directly related to her initial

25 injury at Christiana Hospital because she denies any

56

1 prior injury to her left lower extremity, and findings

2 are consistent with mechanism of injury.

3        Did you review anything other than the

4 records that were provided to you?

5    A.    No.

6    Q.    And when you say, "findings are consistent

7 with the mechanism of injury," what do you mean by

8 that?

9    A.    Meaning, for example, if you twist your

10 ankle, you can get a sprain, but if you twist your

11 ankle and you say your shoulder hurts, that's not

12 consistent.  Or if something hits you in the foot and

13 you have a laceration over your ankle, that's

14 consistent, where if somebody hits your foot and you

15 say you got the laceration in your arm because of that,

16 that's not consistent.

17    Q.    So you're saying that because her ankle was

18 tapped --

19        MR. LEVIN:  Objection.

20    Q.    (By Ms. Massaro)  -- by a portable X-ray

21 machine, that that's consistent with the injuries that

Page 47

Dewanjee

22   she has?

23       A.   Well, I'm not saying anything about tapping

24   because I don't know exactly what happened to her, but

25   I'm saying that her injuries that she received at work

57

1   initially, way back in 2002, are consistent with later

2   findings and current diagnoses.

3       Q.   And is that based on the fact that because it

4   was --

5       A.   The main thing.

6       Q.   -- the alleged impact on the area where -- of

7   her ankle; is that correct?

8       A.   Correct, and the lack of prior problems in

9   that area.

10      Q.   Now, this report, you're saying her Achilles

11  and knee injuries are related.  Is there anything else

12  that you believe are related to the incident?

13      A.   She had previous related injuries that have

14  healed since they occurred.  She had a laceration.

15  That healed correctly.  She had stress factors, which

16  healed.

17      Q.   Okay.  And the stress fracture, what stress

18  fracture are you talking about there, the stress

19  fracture that healed.  Let me ask you specifically.

20  Are you talking about the one in November of '02?

21      A.   Yeah, I think so.  It's the metatarsal

22  fractures.

23      Q.   Are you saying that that was -- why are you

24  saying that that is related to the incident at the

25  hospital?

Dewanjee

58

1      A.    Because once you remain nonweight-bearing on

2  a bone for such a long period of time, the bone calcium

3  generally leaves the bone.  And on top of that, RSD is

4  associated with osteopenia, meaning the calcium leaches

5  out of the bone.  So she had two reasons to have weak

6  bone.  One was the RSD.  The second was the

7  immobilization, which was appropriate for her care, and

8  the RSD and nonweight-bearing period.

9      Q.    And are you saying that the osteopenia is

10 related to the RSD?

11     A.    Yes.  That's one of the cardinal findings of

12 RSD.

13     Q.    And how long does that take to develop when

14 you have the osteopenia related to the RSD?

15     A.    I'm not sure, but I'd say within six months.

16     Q.    Okay.  Can I ask you to take a look at my

17 Exhibit 8?

18     A.    Sure.

19     Q.    The second page.  We looked at it a moment

20 ago, but now the second page.

21     A.    Sure.

22     Q.    You'll notice that it's a progress record

23 from Christiana Care.

24     A.    Yes.

25     Q.    What is the date on that?

59

1      A.    August 14th, 2002.

2      Q.    Okay.  Could you look at -- could you read,

3  as best as you can, No. 3 and No. 4 for the record?

4      A.    "Lack of sympathetic block giving improvement

Dewanjee

5   makes RSD less likely."

6       Q.   And No. 4, as well?

7       A.   "As per patient, ortho has" -- I'm not sure

8   what the next word is -- "that old X-rays of metatarsal

9   fracture show osteopenia, not osteoporosis."

10      Q.   So would you agree, then, that, as of August

11  of '02, old X-rays showed osteopenia at least according

12  to the records that you reviewed?

13      A.   Sure.

14      Q.   Okay.  Let's take a look at your supplemental

15  report.  And, again, could you explain what prompted

16  this report?

17      A.   Mr. Levin reviewed my initial report, and he

18  felt he wanted some things addressed that I neglected

19  to put in there, which were specifically -- I didn't

20  mention anything about how much work she was able to

21  do, and there was one other thing.  Yeah, I think that

22  was mainly it.  And he just wanted me to discuss the

23  RSD more and what was the RSD a result of, what did he

24  think -- or what did I think caused the RSD.

25      Q.   And when did that phone call take place?

                                                        60

1       A.   Sometime before March 23rd or 26th.

2       Q.   Okay.  Was it a week before March 23rd --

3       A.   Honestly, I can't say.  I've been on the

4   phone so much with everybody that -- not him, but just

5   a lot of time on the phone.  But it was after that,

6   Friday, January 19th.

7       Q.   Okay.  That's a big stretch.  That's several

8   months.  So you're saying -- like that's the rest of

9   January, all of February, and almost all of March.

                        Page 50