Dewanjee

10 So -- because March 26th is the date of this report.

11 So that's a pretty big stretch.  Can you narrow it down

12 at all?  If you can't, fine, but if you can --

13     A.    No, I cannot.

14     Q.    So sometime between the first and the second

15 report, you were called and asked to do this second

16 supplemental report?

17     A.    Correct.

18     Q.    Let's go over it.  First, I want to ask you

19 something that is mentioned in your record that's not

20 mentioned in either report, "iliotibial band syndrome"?

21     A.    Yes.

22     Q.    Okay.  You definitely diagnosed her with that

23 in your record; is that correct?

24     A.    Yes.  Well, I think we had two working

25 diagnoses at that point.  I thought maybe she tore a

61

1 medial meniscus.  She was definitely tender over that

2 lateral part of her knee.

3          There's two things in the lateral part of

4 your knee that can cause popping and pain.  The more

5 common one is the illiotibial band friction syndrome.

6 The less common one is the proximal tibiofibular

7 instability.

8          So, usually, in the medical profession, you

9 always try to put the common things first, and,

10 occasionally, it can be something more unusual like a

11 proximal tibiofibular problem.  But after getting the

12 MRI, we found the only area where she had extra fluid

13 was actually the tibiofibular joint, so then I didn't

14 think that -- and then also I gave her an injection,

Dewanjee

15  and that really didn't help too much.  Usually, the

16  iliotibial friction band syndrome is at least

17  alleviated for some time with a shot.

18      Q.   So was it the MRI or the cortisone?  Which

19  one was it that made you determine that she didn't have

20  iliotibial band syndrome?

21      A.   Both of them together.

22      Q.   So would you say, shortly after you did the

23  MRI, then, you felt that she did not have iliotibial

24  band syndrome?

25      A.   I think after we gave her the injection and

                                                    62

1   the MRI.

2       Q.   So in your estimation, even though that's

3   mentioned in your record, then, that was just a

4   differential diagnosis?  She actually does have, then,

5   the instability is what your final diagnosis is?

6       A.   Yes.

7       Q.   So that's how you came to the diagnosis, is

8   through that testing.

9            What else can cause -- what can cause

10  instability -- this instability that you've diagnosed

11  her with?

12      A.   Congenital problems are possible.  But she

13  doesn't have any history of congenital problems.  The

14  only real thing is trauma, some type of trauma to that

15  knee.

16      Q.   So falling on the knee?

17      A.   Twisting the knee, falling on it.

18      Q.   Okay.  Can stepping off of a curb cause it?

19      A.   It's possible depending on how rapidly you

Dewanjee

20  step off it, your body weight, et cetera, the

21  strength -- you know, some people's ligaments are a

22  little bit looser than others.

23      Q.   And what other types of trauma have you seen

24  cause this instability?

25      A.   I think that's about it.

63

1       Q.   Okay.

2       A.   Just a blow to the knee or a bad ankle sprain

3   that's called -- an extremely high ankle sprain where

4   it goes -- a maisonneuve fracture is what they call it.

5       Q.   And in this instance, what trauma is it that

6   caused the instability?

7       A.   I can't say for sure, but it's something --

8   as per her history -- because the only trauma that she

9   related was that X-ray machine, I would say it is that.

10      Q.   But she also related she stepped off of a

11  curb not too long after that.  Could it have been

12  caused when she stepped off of the curb?

13      A.   No, because she had the knee problem prior to

14  that.

15      Q.   Did you see anything in the medical record

16  prior to that that she complained of knee pain?

17      A.   No.  I meant my record.

18      Q.   I'm talking about when she stepped off of a

19  curb in 2002, in November of 2002.  Could it have

20  occurred then?

21      A.   Could have.

22      Q.   So that could have been a cause, then, of the

23  instability in the knee; is that correct?

24      A.   Depending on the mechanism of what happened

Dewanjee

25  after she stepped off.  If she just stepped off and

64

1  twisted her ankle not as badly as before, then no.  It
2  just depends on the degree of twisting to the ankle.
3      Q.  So how did you decide that the instability
4  was caused by the incident at the hospital rather than
5  when she stepped off of the curb?
6      A.  Because I think, in my second note, she
7  mentioned that she had that knee problem since the
8  first injury.
9      Q.  Okay.  But did you see anything in the
10  medical record where she had complained of knee pain --
11      A.  No, I did not.
12      Q.  Okay.  Now, you talk about the RSD associated
13  with the nerve.  Then you discuss the peroneal nerve
14  palsy?
15      A.  Correct.
16      Q.  Are you relating that to the incident at the
17  hospital, the peroneal nerve palsy, the foot drop?
18      A.  Which incident?
19      Q.  The reason why we're here today, the portable
20  X-ray machine --
21      A.  Yes.  Well, I think the portable X-ray
22  machine didn't cause the nerve palsy.  That occurred
23  later on from swelling and subsequent treatment.  I'm
24  not sure exactly where that nerve palsy stemmed from,
25  but it was either -- occurred as a result of her course

65

1  of treatment.
2      Q.  Okay.  So do you know, for example, when she
3  was casted in November -- you remember she was

Dewanjee

4  casted --

5      A.   Yes.

6      Q.   Do you know whether the cast was padded

7  properly behind the fibula when she was casted in the

8  early stages?

9      A.   I don't know anything about that.

10     Q.   So you don't know if the cast, perhaps, was

11 too tight and could have caused the peroneal nerve

12 palsy?

13     A.   No, I do not.  Although Dr. -- those notes, I

14 think -- Dr. DiPretoro, I think, at each visit, he

15 mentioned how she was doing.  So I think, if we

16 reviewed those, you could figure out if she developed

17 something at that point or if he made any comment about

18 the cast being too tight or anything like that.

19     Q.   You've been practicing three years.  Have you

20 ever had a patient with a tight cast that didn't

21 complain about it?

22     A.   Tight cast?  I haven't had any patients that

23 I've had to recast in the last three years.

24     Q.   Okay.  But have you ever had a patient that

25 had a tight cast that maybe didn't complain about it?

66

1      A.   Didn't complain about it?  I would never know

2  because they didn't complain about it, I guess.

3      Q.   That's true.  But when they came in, you

4  would know that the cast was tight.  You've never had

5  anybody come in with a tight cast?

6      A.   No.  I always put them on a little bit loose.

7      Q.   How do you know that this one wasn't tight?

8      A.   I do not know that.

Page 55

Dewanjee

9    Q.   So do you know, then, that the serial casting
10   did not cause the peroneal nerve palsy?

11   A.   I do not know that.

12   Q.   So can you rule that out as a cause of the
13   peroneal nerve palsy?

14          MR. LEVIN:  Rule what out?  Objection.

15          MS. MASSARO:  The serial casting.

16          THE WITNESS:  I cannot rule it out.

17   Q.   (By Ms. Massaro)  Okay.  So could it possibly
18   have been a proximate cause of the peroneal nerve
19   palsy?

20          MR. LEVIN:  Objection.

21   Q.   (By Ms. Massaro)  You can answer.

22   A.   Could have been.

23   Q.   I need you to explain this sentence to me:
24   "RSD resulted from initial soft-tissue trauma" -- I got
25   that -- "later peroneal nerve palsy that caused

                                              67

1    sustained efferent sympathetic nerve activity
2    perpetuated in a reflex arc."  Could you explain the
3    last part of that sentence to me starting with the
4    "efferent sympathetic nerve activity"?

5    A.   Sure.  What RSD is, it's kind of a
6    dysfunction of the sympathetic nerves.  These are the
7    same sympathetic nerves responsible in a
8    fight-or-flight-type response when people get scared or
9    a predator type of thing, and what sympathetic nerves
10   do is, they cause vaso constriction peripherally, which
11   makes your skin cool, and it can also cause moisture
12   changes because they're also responsible -- the nerve
13   fibers are responsible for altering moisture

Dewanjee

14    production.

15        So what the reflex arc is, the patient's

16    ankle becomes painful.  Then they use it less.  And,

17    also, the initial pain response causes sympathetic

18    nerve activity to increase.  The nerves become

19    hypersensitive and then the patient basically keeps

20    getting in this cycle where they have pain, they don't

21    use their ankle, the sympathetic nerves keep firing.

22        So that's why one of the treatments is a

23    sympathetic nerve block.  But not all of -- when

24    someone does a block in the lumbar spine, that doesn't

25    hit all of the sympathetic fibers.  Sometimes, there's

68

1    other sympathetic fibers which will not be addressed by

2    the block.  That's why lack of response to a nerve

3    block doesn't mean that someone doesn't have RSD.

4        Q.    And then you talk about various signs and

5    symptoms of RSD.  Did you see any of those signs or

6    symptoms with Ms. Criswell?

7        A.    She had four of them:  Hypersensitivity to

8    pain; she perceived normal touch as pain; she had

9    skin-color changes -- I did not see that, but she had

10   that documented previously -- and she did have joint

11   stiffness.  She also was noted to have osteopenia.

12       Q.    Okay.  So let's go over that.

13            The hypersensitivity, is that what she

14   described to you when you saw her?

15       A.    It is, and it's also -- it's also something

16   you find on a physical exam.  If you were to move

17   somebody's ankle maximally, the normal person wouldn't

18   scream.  But if she screamed, that's hypersensitive.

                        Page 57

Dewanjee

19     Q.    Did you do that?

20     A.    Yeah.  When I examined her ankle, she didn't

21  scream, but she -- it appeared that she was quite

22  uncomfortable, more than a normal person would be if

23  you moved their ankle in that way.

24     Q.    And did you note that in your records?

25     A.    I don't think I did.

                                                         69

1     Q.    So you just -- how do you know that that

2  happened?  You just remember that?

3     A.    Yeah.

4     Q.    So you have an independent recollection of

5  her being hypersensitive when you moved her ankle?

6     A.    Correct.

7     Q.    Do you have an independent recollection as to

8  when that happened?

9     A.    Early in the visit and also later on when she

10  resprained her ankle and I was examining her.

11     Q.    So then when you first saw her three years

12  after the incident in May of 2005, you're saying you

13  noticed that --

14     A.    She was a little bit difficult to examine

15  because she was very sensitive about anybody touching

16  her ankle and foot.

17     Q.    Okay.  But you didn't note that in the chart?

18     A.    No, I did not.

19     Q.    Okay.  And now you're talking perception of

20  normal touch with pain.  Did you say she also had that,

21  as well?

22     A.    She had that, as well.

23     Q.    And how do you know that?

Dewanjee

24      A.   Well, normally, if you just, like, stroke

25   somebody's tendon, they shouldn't feel that that's

70

1   causing severe pain.

2      Q.   And did that occur with her?

3      A.   She -- yeah.  When I palpated her Achilles,

4   she -- or not even palpated it.  When I was just

5   putting my fingers next to that area, she found it very

6   uncomfortable.

7      Q.   Okay.  And, again, that's not noted in the

8   chart?

9      A.   No, it's not.

10      Q.   You just remembered that?

11      A.   Yes.  I didn't focus on that because it

12   wasn't something I was really -- I just considered it

13   part of -- it was consistent with her previous

14   diagnosis.

15      Q.   And you have an independent recollection,

16   back in May of '05, that that occurred?

17      A.   Yes.

18      Q.   And then changes in skin color, you're saying

19   you didn't notice that?

20      A.   I didn't notice any of that.  But I wasn't

21   looking either.

22      Q.   How about moisture?

23      A.   I did not check for that.

24      Q.   Okay.  Joint stiffness, you said you noticed

25   that?

71

1      A.   Yes, I did notice that.

Dewanjee

2    Q.    And then the osteopenia, as we noted already,

3    she had had that prior to August of '02; correct?

4    A.    Correct.

5    Q.    Okay.  Then --

6         MR. LEVIN:  Excuse me.  What did you say,

7    Doctor?

8         THE WITNESS:  Correct.

9    Q.    (By Ms. Massaro)  Next, you indicate that,

10   "Ms. Criswell cannot work on her feet for more than

11   eight hours per day for three days per week."

12        You indicated, "on her feet."  If she were

13   working in a more sedentary position, would she be able

14   to work longer hours?

15   A.    Possibly, yes.

16   Q.    And when you say, "possibly," what do you

17   mean?

18   A.    If it didn't aggravate something.  It's hard

19   to say because -- if we did something like what they

20   call work hardening where you put her in that situation

21   and see how she does -- because sometimes being in a

22   dependent position where you're seated like that, your

23   legs can swell, and that may aggravate RSD.  So it's

24   hard to say without initially putting her in that

25   situation with physical therapy or a work-hardening

72

1    program.

2    Q.    Okay.  If she were in a position where she

3    could keep her leg elevated, would that make a

4    difference?

5    A.    That would most likely help more than keeping

6    them in a dependent position.

Page 60

Dewanjee

7    Q.    And the eight hours per day for three days a
8  week, is that so that she can have a day of rest in
9  between each day?  Is that the reason for that?

10    A.    She basically said that, once she works three
11  eight-hour shifts sequentially, she can't work on the
12  next day because it's impossible for her to weight-bear
13  because of pain on that fourth day.

14    Q.    Okay.  You're saying she works three days in
15  a row?

16    A.    I'm not sure what her schedule is because I
17  never discussed that with her, but she told me she
18  can't tolerate any more than three eight-hour shifts
19  per week.

20    Q.    Okay.  But you just said, "sequentially," so
21  that's what got me confused.

22    A.    I think the worst -- yeah.  I think the worst
23  situation is, she told me she had to do that once and
24  it was impossible.  I'm not sure, if she spread it out,
25  if that would be okay for her or not.

73

1    Q.    Okay.  So your opinion is that she, then, as
2  far as -- if she was doing more sedentary work, she
3  would be able to work more hours; is that correct?

4    A.    Not necessarily.  Just depending on whether
5  that -- if it did not aggravate her RSD, if that solved
6  the problem, then it would be okay.

7    Q.    Okay.  Have you seen her improve since you've
8  been seeing her?

9    A.    I've seen her improve, and then I've seen her
10  get worse, and then slowly improve, recently.

11    Q.    Sure.  Did she get worse when she had the

Page 61

Dewanjee

12  accident again at another hospital the second time, the

13  second accident that she had?

14      A.    Yeah.  She had a small setback at that point

15  where she was decreased weight-bearing and

16  decreased . . .

17      Q.    So is that when she got worse, then?

18      A.    Yes.

19      Q.    After she experienced that trauma?  Okay.

20          And then, on the last page, you say that

21  the -- "Her injuries, as described above, are caused by

22  trauma to the left leg and ankle."

23          Where on the left leg did she experience

24  trauma other than the ankle?

25      A.    Well, she said her -- what she told me is

74

1   that the machine struck her ankle.  She had a

2   laceration from that that healed.  She also, at that

3   time, fell over onto her knee.

4       Q.    And is that what you based part of your

5   opinion on, is the fact that she indicates she fell on

6   her knee at the time of the incident?

7       A.    No.  I based it on the fact that, when I

8   checked her during motion exercises with her

9   weight-bearing, that she had palpable popping in

10  between the tibia and fibula in her knee.

11      Q.    Okay.  And that is not based on the trauma

12  that she alleges she had to the knee at the time of the

13  incident?

14      A.    Well, yeah, I believe it's from that, but,

15  regardless of mechanism, without any prior history of

16  trauma, that diagnosis makes sense to me.

Page 62

Dewanjee

17     Q.   Okay.

18     A.   That seems a sensible cause of her problem.

19     Q.   So I'm still not clear, then.  The trauma to

20  the left leg, are you talking about the trauma to the

21  knee?

22     A.   Correct.

23     Q.   Okay.  And then you say, "and are permanent."

24  And could you explain that to me?

25     A.   Yes.  Because of the instability of the knee,

75

1  the ligaments that are damaged, they're damaged.

2  They're not going to heal back on their own at this

3  point, and I think she'll just continue having that

4  instability.  The RSD has been going on now for the

5  last five years, and that's not going to change.  She

6  also continues to have Achilles tendinitis.  That's

7  been going on five years.  So I don't think any of

8  these, really, are going to change at this point, five

9  years from the initial injury.

10     Q.   And as you said before, her RSD symptoms are

11  controlled at this time with PT and medicine?

12     A.   Yeah.  They're managed, I think, is the

13  correct term.  They're not completely controlled

14  because she still has symptoms despite the treatment.

15     Q.   Okay.  I'm going to ask you a few more

16  questions, look at your curriculum vitae, and then I'm

17  going to take a five-minute break and come back and

18  complete everything.  Okay?

19     A.   Sure.

20     Q.   But right now, let's take a look at

21  Exhibit 1, which I believe is your curriculum vitae.

Page 63

Dewanjee

22  Take a look at that.

23          Do you have that in front of you?

24      A.    Yes.

25      Q.    Super.  Is that -- there must be a date on

76

1   it, actually, but is that -- can you tell by looking at

2   it is that the most recent?

3       A.    I think it's the most recent.  The only thing

4   I'm missing -- no.  I think I have everything.

5       Q.    So that does have everything.  Okay.

6             How long have you been with Maricopa?

7       A.    Well, I did my -- completed my residency

8   there, so from 2000 to present minus two years.

9       Q.    And where were you at those two years?

10      A.    One, I was working for -- that was where I

11  was when I did the initial blue chart for West Valley

12  Orthopedics, and then I started --

13      Q.    Okay.

14      A.    And then one year was when I was a fellow --

15  doing a sports fellowship in San Diego with the

16  Chargers.

17      Q.    Is that mostly your practice, sports --

18      A.    No.  My practice is about 40 percent trauma,

19  40 percent sports, and about 20 percent other.

20      Q.    And I take it, then -- have you ever been in

21  private practice?

22      A.    Yeah.  That's where I was from 2003 to

23  present.

24      Q.    Okay.  And the articles that you've written

25  here, are any of those -- are any of the articles that

Page 64

77

Dewanjee

1  are listed here, the six articles, or any articles that
2  you have pending, related to the issues in this case?
3      A.  No.
4      Q.  I'm just interested for myself.  You did some
5  carotid artery thrombosis?
6      A.  Sure.
7      Q.  Why?  Why did you do that?  I'm just curious.
8      A.  I was thinking of going into neurosurgery.
9      Q.  I see.  Okay.
10     A.  That was as a medical student.  And then I
11 decided didn't like it.
12     Q.  Okay.  I notice you're also -- you have a
13 license in California as well as Arizona?
14     A.  Correct.
15     Q.  Did you ever practice in California?
16     A.  That was for my fellowship.  It was required.
17     Q.  Now, I just have a few questions.
18         Do you have any articles pending aside from
19 what we have here?
20     A.  No.  Well, I do have one article pending, but
21 that's not related to this case either.
22     Q.  Okay.  Have you ever lectured on the issues
23 relevant to this case?
24     A.  No.
25     Q.  What society memberships do you have?  AAOS?

                                                        78
1  That type of thing?
2      A.  Yeah, American Academy of Orthopedic
3  Surgeons.  I think my induction is next January or
4  March at the San Francisco meeting.
5      Q.  Okay.  Well, actually, what I need to know

Dewanjee

6  is, what are you currently a member of?  What societies

7  are you currently a member of now?

8       A.   None other than that and, I guess, the

9  American Board of Orthopedic Surgery.  I don't think

10 that's a society though.

11      Q.   No.  And your specialties -- I think I asked

12 you this before, but would you say that that's -- what

13 would you say is your specialty?

14      A.   Trauma surgery and sports.  Sports is

15 probably the specialty, and then trauma is what I do.

16      Q.   Okay.  That's the sense I got.

17           Okay.  Are you board-certified?

18      A.   Yes.

19      Q.   When?

20      A.   July 28th, 2006.

21      Q.   And in orthopedics?

22      A.   Orthopedic surgery.

23      Q.   When you're in clinic -- you have clinic days

24 and surgery days.  How many patients do you see a day

25 in clinic?

                                                     79

1       A.   Clinic, 15 to 25.

2       Q.   And where do you have privileges?

3       A.   VA Hospital Phoenix, Maryvale Hospital,

4  Maricopa Medical Center, Phoenix Memorial Hospital,

5  West Valley Hospital, possibly Phoenix Baptist

6  Hospital.  I'm not sure.

7       Q.   Okay.  Can you tell me your week schedule?

8  For example, Monday, you have surgery?

9       A.   Monday is full-day clinic.  Tuesday is

10 usually elective surgery.  Wednesday is morning clinic,

Dewanjee

11  afternoon surgery.  Thursday is morning clinic.  Friday

12  is all-day surgery.

13      Q.  Have you ever had any staff privileges

14  revoked or curtailed at any hospital?

15      A.  No.

16      Q.  How often do you perform legal review of

17  cases?

18      A.  Extremely rarely.

19      Q.  Okay.  In the past year -- actually, since

20  you've been in practice, how many legal cases have you

21  had other than the three that you've told me about in

22  which you were the treating physician and it was, I

23  assume, sort of like workers' compensation -- is that

24  correct?

25      A.  Yes.

                                                    80

1       Q.  -- and, you said, state compensation.

2           Other than those three and this one, have you

3   had any others?

4       A.  I did one two weeks ago, and that's it.

5       Q.  And in that one two weeks ago, were you

6   deposed?

7       A.  No.  They wanted a summary of a patient's

8   care, but it was someone that was in our hospital

9   system.  But the surgeon who was treating that patient

10  is no longer with the hospital, so the attorneys asked

11  me if I would do that for them even though I had never

12  treated the patient before.

13      Q.  I see.  So you really weren't even a

14  treating.  You just did the summary, then, of what

15  someone at your hospital had done?

Page 67

Dewanjee

16      A.   Yes.

17      Q.   Okay.  So other than those three deps and

18 this one, you've been at just four depositions now that

19 you've participated in; is that correct?

20      A.   Yes.

21      Q.   And then --

22      A.   That one was a written summary.  I guess

23 that's a deposition.

24      Q.   No.  Actually, the deposition refers to when

25 you're actually under oath --

                                                        81

1      A.   No.  Then I didn't do that.  That was just a

2 written summary.

3      Q.   But you have been deposed in the past?

4      A.   Yes, for those workers'-comp-type hearings.

5      Q.   Have you ever been involved in any trials?

6      A.   No.

7      Q.   So in all the cases that you've done, have

8 you been representing the plaintiff or working with the

9 plaintiffs, with the patients, I guess?

10      A.   Yeah, with the patients.

11      Q.   Do you advertise or anything --

12      A.   No.

13      Q.   -- for legal work?

14      A.   No.

15      Q.   I didn't think so.

16          Have you ever been sued?

17      A.   No.

18      Q.   Other than Arizona and California, are you

19 licensed to practice in any other state?

20      A.   No.

Dewanjee

21    Q.   Have you ever had your medical license
22  suspended, revoked, or terminated --

23    A.   No.

24    Q.   -- in any state or any country?

25    A.   No.

82

1    Q.   I'm going to take a five-minute break and
2  come back and then probably ask a few more questions
3  and then we'll be done.  Okay?

4         MR. LEVIN:  I may have some questions.

5         MS. MASSARO:  Sure.  But I want to take five
6  minutes and review what I haven't seen yet.

7         We can go off the record now.

8         (Recess.)

9                   EXAMINATION

10  BY MR. LEVIN:

11    Q.   Dr. Dewanjee, how are you?

12    A.   Pretty good.  I have a trauma, probably, to
13  go to in about an hour or less.

14         MS. MASSARO:  We're almost done.

15    Q.   (By Mr. Levin)  We'll be done.

16         Dr. Dewanjee, two follow-up questions:
17  Getting back to your notes, you recommended her -- you
18  recommended that she work, as tolerated, part time
19  eight hours a day, three days a week as -- that was in
20  your September 28, 2006, note; is that correct?

21    A.   Correct.

22    Q.   And, Doctor, in your January 29, 2007, note,
23  she continued to follow your recommendation.  She was
24  working three eight-hour shifts; is that correct?

25    A.   Correct.
                   Page 69

Dewanjee

83

1      Q.   And, Doctor, as of May '06, you had her
2   restricted to the work she could do on her feet; is
3   that correct?

4      A.   Yes.

5      Q.   So, Doctor, when you write in your report
6   that she was unable to work full time, that was based
7   upon your review of your office notes; is that correct?

8      A.   Yes.

9      Q.   Doctor, when you saw her, you did note a few
10   signs of RSD.  Decreased touch, is that a sign of RSD
11   you noted?

12      A.   It can be depending on where it is.

13      Q.   Did you note that in your record over the
14   calf?

15      A.   Yes.

16      Q.   Is that consistent with the RSD that she --
17   is that consistent with the RSD which she's complaining
18   about?

19      A.   I can't make that conclusion.  I'm not sure
20   because it's in here medial calf.  I would probably
21   have to go back and exactly work out exactly which part
22   of her calf it was and then look back at the nerve
23   studies she had and all that.

24      Q.   Okay.  The stiffness of the ankle that you
25   found, is that consistent with the RSD?

84

1      A.   Yes.

2      Q.   Doctor, it's your opinion, to a reasonable
3   degree of medical certainty, that she developed RSD as

Page 70

Dewanjee

4  a result of the incident when she was run over by the

5  X-ray machine; is that correct?

6       A.   Correct.

7       Q.   And, Doctor, you had reviewed records that

8  indicated that she had RSD from other of her doctors;

9  is that correct?

10      A.   Correct.

11      Q.   And --

12      A.   Most notably the specialist from

13  Johns Hopkins.

14      Q.   And the specialist from Johns Hopkins made a

15  diagnosis of RSD; is that correct?

16      A.   Correct.

17      Q.   And what did the specialist at Johns Hopkins

18  base his diagnosis on?

19      A.   I don't have his notes.  I guess I'd have to

20  look under --

21           MS. MASSARO:  Exhibit 7.  That's my

22  Exhibit 7 if it's helpful.

23           THE WITNESS:  I got it.  Thank you.

24           So major findings, she had some tenderness,

25  calf atrophy, weakness of the muscles.  He noticed

                                                      85

1  hypersensitivity to touch, and dysesthesia, and

2  numbness.

3       Q.   (By Mr. Levin)  Okay.  Are those diagnostic

4  of RSD?

5       A.   They're part of the various findings in RSD.

6  The dysesthesia is probably the most important one, and

7  hypersensitivity.

8       Q.   And, Doctor, also, Dr. DiPretoro, the

                      Page 71

Dewanjee

9  podiatrist, noted color changes?

10      A.   That is another finding of RSD.  That is an

11  important one, as well, which was, I think, why she was

12  admitted to the hospital, because of the color changes

13  in her foot.  They were worried that there was

14  something else wrong with her, but they never found

15  anything else.

16      Q.   And, Doctor, bluish discoloration of the

17  right foot, which was noted by Dr. Grabow, is that

18  diagnostic of RSD?

19      A.   That, in and of itself, is not, but it's part

20  of the constellation of findings that is diagnostic of

21  RSD.  So when she was admitted to the hospital, they

22  were trying to find the different causes of the bluish

23  discoloration.  They did an MRA to look at the arteries

24  and veins, and they didn't find anything there.  So

25  after eliminating all their diagnoses in their

86

1  differential, the only thing they were left with was

2  the RSD.

3      Q.   And you agree with the diagnosis that she has

4  RSD today; correct?

5      A.   Yes.  Yeah.  There's nothing else I can find

6  in the differential that would explain that

7  constellation of findings.

8      Q.   And, Doctor, you gave an opinion, to a

9  reasonable degree of medical certainty, that the RSD is

10  permanent; is that correct?

11      A.   Yes.

12      Q.   And what do you base your opinion on that the

13  RSD is permanent?

Page 72

Dewanjee

14    A.    The time from which she's had it and the
15  natural history of RSD.

16    Q.    Meaning what, Doctor?

17    A.    Meaning that she's had this, now, for five
18  years, and her symptoms have changed very little over
19  the last couple of years.  I doubt that anything is
20  going to happen in the next couple of years or many
21  years to make those change.  I would have to defer to
22  an RSD -- okay.

23    Q.    And these symptoms, Doctor, have been
24  documented by her medical providers for almost the past
25  five years, have they not?

                                                        87

1    A.    Correct.

2    Q.    And the diagnosis of RSD, in fact, was made
3  soon after the incident of May 2000, was it not?

4    A.    Yes, within, I think, a month or two or
5  three, somewhere in there.  It doesn't develop
6  immediately.  It takes a little bit of time, typically.

7    Q.    Doctor, you gave four medical conditions that
8  she had as a result of this trauma:  Number one,
9  Achilles tendon partial tear; is that correct?

10    A.    Correct.  That's according to Dr. DiPretoro's
11  note.

12    Q.    And, Doctor, is it your opinion, to a
13  reasonable degree of medical certainty, that the
14  Achilles tendon partial tear was caused by the incident
15  at Christiana Hospital when she was run over by the
16  X-ray machine?

17    A.    Yes.

18    Q.    Doctor, the second injury that you believe is

                            Page 73

Dewanjee

19  caused by the incident at Christiana Hospital when she

20  was run over by the X-ray machine is Achilles

21  tenosynovitis; is that correct?

22      A.    Correct.

23      Q.    And, Doctor, it's your opinion, to a

24  reasonable degree of medical certainty, that the

25  Achilles tendinitis was caused by the trauma of being

                                                            88

1  run over by the X-ray machine; is that correct?

2      A.    Yes.

3      Q.    And, Doctor, you gave an opinion today that

4  the Achilles tendinitis is permanent; is that correct?

5      A.    Yes.

6      Q.    And, Doctor, what do you base your opinion on

7  that the Achilles tendinitis is permanent?

8      A.    She's had this for the last five years,

9  approximately.

10      Q.    And that has been recorded by her medical

11  providers in the last five years of treatment; is that

12  correct?

13      A.    Correct.

14      Q.    Now, Doctor, we talked about an injury to the

15  peroneal nerve.  Doctor, is it your opinion that that

16  injury was a result of the serial casting that she had?

17      A.    I'm not sure.  I can't determine what that

18  nerve injury is from.

19      Q.    Doctor, would she have needed the casting if

20  it wasn't for the ruptured tendon?

21      A.    No.

22      Q.    Doctor, to a reasonable degree of

23  probability, is she a candidate for future surgery?

                        Page 74

Dewanjee

24    A.    Yes.

25    Q.    And why do you say that?

89

1    A.    Because she has documented instability in her

2    knee, and it's also consistent with MRI.  She has a

3    persistent Achilles tendinitis that's interfering with

4    her ability to weight-bear on the foot.

5    Q.    And would the goal of the surgery be, then,

6    to resolve the Achilles tendinitis?

7    A.    Yes, to resolve the pain in her ankle

8    associated with weight-bearing activities.

9    Q.    And, Doctor, if you could, in the Phoenix

10    community, what would be the cost of the surgery?

11    A.    Including hospitalization, associated

12    therapy, surgical fees, medications, anywhere in the

13    neighborhood of five- to twenty thousand per each

14    surgery, of course.

15    Q.    Doctor, Ms. Criswell gave you a history of

16    the injury.  Did she tell you that she was just tapped

17    by the X-ray machine?

18    A.    No.

19    Q.    In fact, Doctor, the injury she sustained

20    caused a laceration to her ankle; correct?

21    A.    Correct.

22    Q.    In fact, the X-ray machine caused a partial

23    tear of the left Achilles tendon; is that correct?

24    A.    Correct.

25    Q.    And, Doctor, given that severity, would you

90

1    classify that as a tap?

2    A.    No.

Dewanjee

3    Q.    Doctor, what does the Achilles tendon do?

4    A.    The Achilles tendon's main job is to plantar

5   flex the foot in the push-off phase of gait.

6    Q.    And, Doctor, she has complained that she is

7   unable to stand on her feet for more than eight hours

8   at a time.  What is the mechanism -- or which injury is

9   causing that condition?

10    A.    The combination of RSD and chronic Achilles

11   tendinitis.

12    Q.    Doctor, your records indicate that she was

13   wearing a cam walker?

14    A.    She may have had that at some point.  I can't

15   recall when I made that statement.

16    Q.    It's on the September 28th, '06, note.

17          Doctor, my question to you is:  What is a cam

18   walker?

19    A.    A cam walker is a brace, essentially, for the

20   ankle.  It's a large, black boot that prevents someone

21   from moving their ankle, to hold it still to let the

22   swelling, inflammation, and pain slowly resolve as best

23   possible.

24    Q.    And for what condition would the cam walker

25   be used to stabilize the ankle?

91

1    A.    Ankle sprain.

2    Q.    I'm saying would it be used for the ankle

3   tendinitis or the RSD?

4    A.    It could be used for any of those.

5    Q.    I see.

6          Doctor, I think that's all the questions I

7   have for you right now.  I may have others after

Page 76

Dewanjee

8    Counsel.

9                        EXAMINATION

10   BY MS. MASSARO:

11        Q.   Okay.  I just have a few, not many.  I

12   promise that we will get you out of here in time.

13        A.   Okay.  Thank you.

14        Q.   Okay.  I just wanted you to take a quick look

15   at your -- well, actually, my exhibit.  And I

16   specifically do want you to look at my exhibit because

17   there's something I wanted to point out.  If you'll

18   look at my Exhibit No. -- the one that is -- are your

19   records, which would be --

20        A.   5?

21        Q.   Yes.

22             If you could look at -- Counsel just pointed

23   out to you that, on September 28, 2006, and on

24   January 29, 2007, it indicates that the patient could

25   work three eight-hour shifts per day.

                                                        92

1              If you could look at the top of those two, it

2    says -- you see a fax line?  What is the date on that

3    fax line?

4         A.   November 20th, 2006.

5         Q.   I'm talking about my exhibit.  Because this

6    is the date that I received these records.  Are you

7    looking at my exhibit?

8         A.   Yes.

9         Q.   Exhibit No. 5?  Because I did not receive

10   those until March 27th.  I'm looking at my Exhibit 5

11   with your records.

12        A.   You mean the note dated Monday, September 26,
                            Page 77

Dewanjee

13  2005?

14      Q.   No.  Thursday September 28th, 2006, and also

15  January 29th, 2007.  They're at the end of your

16  exhibits.  If you look at the fax line at the top . . .

17           MR. LEVIN:  Which note?

18           MS. MASSARO:  September 28, 2006, was the

19  date on the fax line, in the left-hand corner.

20      Q.   (By Ms. Massaro)  Are you at that page?

21      A.   Yes.

22      Q.   Do you see, on the top line, where it says --

23  the fax line?

24      A.   Uh-huh.

25      Q.   -- at the very top?

                                                      93

1            What is the date on that?

2       A.   I think it says March 27th, 2007.

3       Q.   How about the next page, Monday,

4   January 29th, 2007?  What does the fax line say?

5       A.   March 23rd, 2007.

6       Q.   Okay.  Great.

7            That's all on that.  Thank you.

8            My exhibit -- go ahead and keep that in front

9   of you.  I'm going to ask you a few more questions.

10           My Exhibit No. 6, this is -- go to the second

11  page of No. 6.  You'll see that this is the Employee

12  Health Record where Ms. Criswell reported to employee

13  health.

14           Let me just ask you.  Do you see any

15  complaints of knee pain?  I'm talking about dated --

16  there's two of them.  One's dated 5-28-02 and one is

17  dated 5-23-02.  You can look at both of those and let

                         Page 78

Dewanjee

18    me know if you see anything about knee pain.

19        A.    The only thing I see is, on the second page,

20    Employee Health Service Referral, under "A," I don't

21    know if it says, "Trauma, left knee/Achilles," or what

22    it says.

23        Q.    Where are you at?

24        A.    It's the --

25        Q.    What date?  Tell me what date.

94

1        A.    The date, 5-23-02.

2        Q.    Okay.  And then under "A"?

3        A.    Yes, in the handwritten part in the box at

4    the bottom.

5        Q.    What is the title in the box?

6        A.    Well, I guess it's called Section 2, "To be

7    completed by physician and/or nurse."

8        Q.    Okay.  Got it.  Got it.  I'm looking in the

9    wrong Section A, because I'm not looking where you're

10    looking at.  Okay.

11            It says, "Trauma, left heel, Achilles"?

12        A.    Yeah.  I don't know if it says heel or knee.

13    I really don't know.

14        Q.    Well, if you'll notice, in that same

15    question, in the upper left-hand corner, there's

16    pictures of two bodies.  What section is circled on

17    that?

18        A.    That's the chief complaint, and it's circled

19    the worst pain is a number seven, and she puts that in

20    the ankle.

21        Q.    Okay.  Do you see a knee circled at all

22    there?

Page 79

Dewanjee

23    A.    Well, it's the chief complaint, so they'd
24   only put one circle.
25    Q.    Okay.  Let me ask you to look at Section O.

95

1   And it says -- in the second line, it says, "posterior
2   heel."
3         Does that word look like the same "heel" in
4   "A," under "assessment"?
5    A.    It does to me, kind of.
6    Q.    Look at Exhibit No. 10, my Exhibit No. 10.
7   And this is an MRI of the left ankle that was done on
8   June 1st of '02.  Could you read the conclusion of that
9   MRI at the bottom of the page?
10    A.    "No evidence of Achilles tendon rupture or
11   complete tear.  Findings compatible with distal
12   Achilles tendinopathy.
13    Q.    Now, you believe that Ms. Criswell has RSD;
14   correct?
15    A.    Correct.
16    Q.    And how long have you been treating RSD
17   patients?
18    A.    I don't typically treat RSD patients.  I base
19   that conclusion upon a previous diagnose from Hopkins.
20    Q.    Okay.  And you say that you would do Achilles
21   tendinitis surgery on a patient with RSD; is that what
22   you're saying?
23    A.    No.  I would refer her to a foot and ankle
24   subspecialist to determine whether he thought -- he or
25   she thought that Ms. Criswell would benefit from that.

96

Page 80

Dewanjee

1    Q.  Well, then, how come, a moment ago, when

2  Plaintiff's counsel asked you if you believe, to a

3  reasonable degree of medical probability, that she

4  would need this surgery in the future, you said, "Yes"?

5    A.  Well, just because I think she needs the

6  surgery doesn't mean I'm going to do.

7    Q.  Okay.  But you think that she should have

8  this surgery even though she has RSD?  You would

9  recommend this surgery --

10    A.  Well, it depends on how much of the

11  proportion of her symptoms come from her Achilles

12  versus her RSD.  Sometimes, RSD can flare up.

13  Sometimes, it can remit.  It just depends on what

14  proportion of symptoms it's contributed to her ankle

15  problem.

16    Q.  But for purposes of this lawsuit, you were

17  specifically asked would you recommend -- do you

18  believe that this surgery is medically necessary to a

19  reasonable degree of medical probability.  That's the

20  question.

21    A.  That's impossible to answer in some ways

22  without additional information.

23    Q.  Okay.  And what additional information would

24  you need to make that assessment?

25    A.  I would need to know from her, the patient,

97

1  how bad her symptoms are now and whether she wants to

2  be willing -- she wants the risk of having other

3  additional problems versus an option to cure her ankle.

4  Because every surgery has complications associated with

5  it, and she may not be ready to accept those

Page 81

Dewanjee

6  complications.

7      Q.   Okay.  But as far as her symptoms now, then,
8  you know -- do you know her condition now, what her
9  condition is now?

10     A.   Yes.

11     Q.   Would you recommend the surgery now?

12     A.   Only if she's willing to accept the risk that
13  goes along with the surgery.

14     Q.   Has she indicated to you that she is?

15     A.   No, she is not ready at this point.  She's
16  apprehensive about having surgery.

17     Q.   Has she indicated to you that she does not
18  want the surgery?

19     A.   No.

20     Q.   Okay.

21     A.   She has indicated she doesn't want surgery on
22  her knee at this point.

23     Q.   Okay.  But she hasn't indicated to you that
24  she doesn't want surgery on the Achilles tendon?

25     A.   She hasn't indicated, to me, that one way or

98

1  the other at this point.

2      Q.   Have you ever discussed it with her?

3      A.   Yes.

4      Q.   And what date did you discuss that with her?

5      A.   I'm not sure.  It was -- I think, when she
6  first saw me, she was addressing her knee, so we worked
7  that up for quite a bit.  And then, later on, she
8  reinjured her ankle, so we were trying to get her
9  through the RSD flare-up from the ankle sprain.

10     Q.   Did you make any notation of your discussion

Page 82

Dewanjee

16      Q.    Okay.  But yet the ankle sprain is what

17   you're alleging caused the problem with her knees; is

18   that correct?

19      A.    The ankle sprain caused the problem with the

20   knee, but the Achilles injury was a result of a direct

21   blow from the laceration and the trauma.

22           So two different things happened in that

23   injury.  The first one was direct trauma of an object

24   hitting the back of her ankle, which apparently damaged

25   part of her tendon and cut her skin.  At the same time,

                                                          100

1   she twisted her ankle, which sprained the ligaments,

2   and that's what caused the problem with the knee.

3      Q.    Okay.  Now, you noted in your report, in your

4   first report, that -- on the first page, that she had a

5   superficial laceration.  Is that -- did you ever see

6   the laceration that occurred three years before you --

7      A.    No, I had never seen it.

8      Q.    Did you see any scarring or disfigurement as

9   a result of the laceration?

10      A.    She may have had a small scar, but it wasn't

11   significant enough to me that I put it in my notes.

12      Q.    So the doctor who saw her did note it as a

13   superficial laceration; is that correct?

14      A.    Yes.

15      Q.    I'm sorry.  I didn't hear you.

16      A.    Yes, that is correct.

17      Q.    Okay.  Just about done.  Never trust a lawyer

18   when they say they're almost done, but I am almost

19   done.

20           Can you say that, but for the incident at

                          Page 84

Dewanjee

21  Christiana Hospital, Ms. Criswell would not have

22  developed RSD?

23      A.  Yes.

24      Q.  And why is that?

25      A.  Barring any other trauma to her ankle,

101

1   there's no reason to have RSD just spontaneously occur.

2       Q.  Okay.  Can you say that, but for the incident

3   at Christiana Hospital, she would not have developed

4   Achilles tenosynovitis?

5       A.  That is not a hundred-percent accurate.  It

6   is possible to get Achilles tendinitis with -- if

7   you're a basketball player or something like that where

8   you do a lot of jumping sports.

9       Q.  Would you say that, but for the incident at

10  Christiana Hospital, she would not have developed the

11  Achilles -- partial Achilles tendon tear?

12      A.  Yes.  That's from the trauma.

13      Q.  Have you expressed all the opinions that you

14  will testify to at trial regarding Ms. Criswell's

15  medical issues?

16      A.  Yes.

17      Q.  Is there any further material that you need

18  to form an opinion?  And, if so, what?

19      A.  Just Ms. Criswell's opinion on her surgeries,

20  whether she believes, at this point, she's ready to

21  have that; which problem is bothering her more, her

22  ankle or her knee at this point.

23      Q.  Okay.  Is there anything else you expect to

24  do in connection with this case before trial in a

25  month?

Page 85

Dewanjee

102

1     A.     No.  I do not expect to do anything else.

2     Q.     Have you, here today, expressed all of the

3  opinions that you will testify to at trial regarding

4  Ms. Criswell and the injuries she allegedly sustained

5  as a result of the May 23rd, 2002, incident at

6  Christiana Hospital?

7     A.     Yes.

8     Q.`    I have no further questions.

9                         EXAMINATION

10 BY MR. LEVIN:

11    Q.     Just a couple, Doctor.

12           The Achilles tendinitis, is that -- Doctor,

13 do you have an opinion, to a reasonable degree of

14 medical certainty, whether or not the Achilles

15 tendinitis was caused by the X-ray machine running over

16 the back of her ankle at Christiana Hospital?

17    A.     Yes, that was caused by --

18    Q.     What is your opinion?  What is it?

19    A.     The cause of her tendinitis was the partial

20 tear and the trauma.

21    Q.     And, Doctor, earlier, you said, in

22 questioning, that if she was a basketball player, she

23 may have developed tendinitis.  You have nothing in the

24 history that she was having any repetitive, up-and-down

25 stress to the tendon; is that correct?

103

1     A.     No.  What I meant to say was that, if she

2  didn't get hurt at the hospital, if she were to go on

3  and play basketball or do something, it is possible

4  that that could give you a tendinitis.

Page 86

Dewanjee

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

105

1                    CERTIFICATE OF REPORTER

2

3    STATE OF ARIZONA      )
                            )    ss:
4    COUNTY OF MARICOPA    )

5

6         I, MICHAEL H. DIPPEL, a certified reporter, do
     hereby certify that the foregoing deposition was taken
7    before me in the County of Maricopa, State of Arizona;
     that the witness, before testifying, was duly sworn by
8    me to tell the whole truth; that the questions
     propounded to the witness and the answers of the
9    witness thereto were taken down by me in shorthand and
     thereafter reduced to typewriting; that the foregoing
10   pages, numbered 1 through 104, inclusive, constitute a
     true and accurate transcript of all the proceedings had
11   upon the taking of said deposition, all done to the
     best of my skill and ability; and that pursuant to Rule
12   30(e), Arizona Rules of Civil Procedure:
          Upon request, the witness or his/her attorney
13   was notified that the transcript was available for
     review and signature.
14        I FURTHER CERTIFY that I am in no way related to
     any of the parties nor am I in any way interested in
                          Page 88

Dewanjee

15    the outcome hereof.
         IN WITNESS WHEREOF, I have set my hand in my
16    office in the County of Maricopa, State of Arizona,
      this 29th day of March, 2007.

17

18    _____

19    MICHAEL H. DIPPEL, RPR, CR NO. 50716

20

21

22

23

24

25

# EXHIBIT B

# EXHIBIT 1

JAN-22-2007(MON) 15:43    Katz, Jamison, Van Der Veen    (FAX)215 396 8388    P. 003/004

01/19/2007 FRI 15:20    FAX 602 254 8835 MEDPRO ORTHO ADMIN DEPT    ☒002/003

# Sumit Dewanjee, MD

**OFFICE ADDRESS**
Maricopa Health System
Department of Orthopaedics
2601 E. Roosevelt St.
Phoenix, AZ 85008

**E-MAIL**
onepoint1@att.net

**VOICE MAIL/CELL**
602 540 7512

**PERSONAL ADDRESS**
7301 E 3rd Ave #413
Scottsdale, AZ 85251

## EDUCATION & TRAINING

**Cornell University**, Ithaca NY
  Undergraduate, Anatomy and Physiology Major, Philosophy Minor
**University of Miami School of Medicine**, Miami, FL
  Medical School, MD, May 8, 1998
**Southern Illinois University School of Med. Orthopaedic Residency**, Springfield, IL
  Orthopaedic Surgery Resident, July 1, 1998 – June 30, 2000
**Phoenix Orthopaedic Residency Program**, Phoenix, AZ
  Orthopaedic Surgery Resident, July 1, 2000 – June 30, 2003
**OASIS Sports Fellowship**, San Diego, CA
  Orthopaedic Sports Surgery Fellow, completed July 31, 2004
  assistant team physician for San Diego Chargers, OMBAC Rugby, Riptide Arena Football, USD Soccer
  and Basketball, Point Loma N. University, multiple local high school football teams in San Diego County

## RESEARCH ACTIVITY

1. "Effectiveness of Donor Site Grafting in Preventing Patella Infera Following Patellar Tendon Harvesting in a Rabbit Model." Selected for *Housestaff Achievement Grant*, MIHS, 2001.
2. "Semitendinosus Allograft in Coracoclavicular Reconstruction following Acromioclavicular Dislocations." Ongoing research, MIHS, Phoenix, Arizona
3. "Widespread hemodynamic depression and focal platelet accumulation after fluid percussion brain injury: a double-label autoradiographic study in rats." *Journal of Cerebral Blood Flow and Metabolism*, May 1996, pp. 481-489.
4. "Acadesine Reduces Indium-Labeled Platelet Deposition After Photothrombosis of the Common Carotid Artery in Rats." *Stroke*, January 1995, Vol. 26, pp. 111-116.
5. "Transient Platelet Accumulation in the Rat Brain After Common Carotid Artery Thrombosis: An In-111 Platelet Study." *Stroke*, October 1993, Vol. 24, pp. 1554-1539.
6. "Distribution of Indium-111 Labeled Platelet Emboli in the Rat Brain Following Common Carotid Artery Thrombosis." *University of Miami School of Medicine Summer Student Poster Presentation*, August 1992.

## HONORS & AWARDS

| | |
|---|---|
| July 2003 | Silver Award for performance in Musculoskeletal Anatomy of upper & lower extremity |
| December 2001 | Silver Award for performance in Musculoskeletal Anatomy of lower extremity |
| December 2002 | Gold Award for performance in Musculoskeletal Anatomy of upper extremity |
| | Phoenix Orthopaedic Residency Training Program |
| August 2001 | MIHS Residency Housestaff Achievement Grant recipient |
| July 1997 | Honors for performance on USMLE Step I, |
| | University of Miami School of Medicine |
| Summer 1995 | Summer Research Fellow Award. University of Miami School of Medicine. Grant for study of cerebral reperfusion injury. |
| Summer 1992 | Outstanding Research Project Award, University of Miami School of Medicine, *Summer Student Research Poster Session*, Miami, Florida. |
| Spring 1989 | National Merit Finalist, Miami Palmetto Senior High School |

JAN-22-2007(MON) 15:43    Katz, Jamison, Van Der Veen      (FAX)215 396 8388          P. 004/004

01/19/2007 FRI 15:21  FAX 802 254 8835 MEDPRO ORTHO ADMIN DEPT                    ☒003/003

## WORK EXPERIENCE

| | |
|---|---|
| Assistant Team Physician for: | Fall 2000, 2001,2002 |
| Arizona Thunder Pro Soccer Team, Carl Hayden Varsity Football Team, | |
| Central High School Varsity Football Team.  Phoenix, Arizona. | |
| Personal Trainer, Pure Fitness Gyms | Fall 2000 – 2001 |
| Teaching Assistant, Gross Anatomy. | September 1997 |
| University of Miami School of Medicine | |
| Tutored medical students in anatomy of the back and extremities. | |
| Volunteer Preceptor, Clinical Skills, | September 1997 |
| University of Miami School of Medicine | |
| Tutored medical students in obtaining patient history and performing physical examination | |
| Clinical Assistant, Department of Orthopaedic Surgery, | Summer 1995 |
| University of Miami School of Medicine, Division of Joint Replacement | |
| Completed initial patient interviews, completed post-operative assessments. | |
| Research Assistant, Department of Neurology, Div. of Research | Summer 1993 – |
| Studied effects of brain trauma on cerebral blood flow and thrombosis | Fall 1994 |
| in a rat model. | |
| Research Associate, Department of Neurology, Div. of Research | Summer 1992 |
| Localized regions of brain susceptible to embolic stroke in a rat model. | |
| VHS Outpatient Clinics, Phoenix, AZ | August 2004 – |
| Staff orthopaedic surgeon, Abrazo Healthcare System | August 2006 |
| MedPro, Phoenix, AZ | July 2005 – |
| Staff orthopaedic surgeon | present |

## EXTRACURRICULAR ACTIVITIES/ HOBBIES

| | |
|---|---|
| 1976 – present | Classical and Contemporary Piano, Alpine skiing, Windsurfing, Target Practice |
| 1994 – 1995 | Dean's Cup Athletic Competition.  2nd in 200m and 400m dash events in annual competition between University of Miami Schools of Medicine & Law |
| 1996 – 1997 | Eastern Student Research Forum Committee.  Organized annual oral and poster sessions for medical and graduate students in the Eastern U.S. |
| Spring 1995 | Florida Keys Health Fair.  Participated in community outreach project |
| Spring 1997 | to provided health care to underserved populations in the Florida Keys. |
| 1991 – '93 | Intercollegiate Rugby Club, Cornell University |
| 2005 – present | Active member of American MENSA, Ltd. |

## BACKGROUND

| | | |
|---|---|---|
| Languages spoken: | English, Spanish, Bengali | |
| Place of Birth: | Boston, MA | |
| Primary School: | Herbert Hoover Elementary School | Rochester, MN |
| | John Adams Junior High School | Rochester, MN |
| Secondary School: | John Marshall Senior High School | Rochester, MN |
| | Miami Palmetto Senior High School | Miami, FL |

## STANDARDIZED TEST RESULTS AND PROFESSIONAL LICENSURE

American Board of Orthopaedic Surgery Certified as of July 28, 2006

| | | | | |
|---|---|---|---|---|
| USMLE Step I: | 227,pass | MCAT: Physical Sciences | | 11 |
| Step II: | 224,pass | Biological Sciences | | 11 |
| Step III: | 208,pass | Reading Comprehension | | 11 |
| SAT  Mathematics: | 750 | AZ Medical License #32018 (current) | | |
| Verbal reasoning: | 700 | CA Medical License #A 82775 (current) | | |

# EXHIBIT 2

**SUMIT DEWANJEE, M.D.**
**LEGAL FEE SCHEDULE**

### ALL FEES ARE TO BE PRE-PAID 14 DAYS IN ADVANCE

| | |
|---|---|
| <u>Conferences:</u>    (Telephone or in person) | $400.00/hr |
| | Minimum $200.00/30 minutes |
| *After hours; i.e. evenings/weekends | $500.00/hr |
| | Minimum $250.00/30minutes |
| <u>Depositions:</u> | $650.00/hour*Min 1 hr |
| *After hours; i.e. evenings/weekends/or outside location | |
| <u>Video Depositions:</u> | $ 850.00/hour**/Min 1 hr |
| After hours; i.e. evenings/weekends/or outside location | $1,000.00/hour*Min 1 hr |
| <u>Arbitration Hearings:</u> | $ 650.00/hour**+travel time |
| | (Travel time is 1 hr of time allowing for time |
| | out of office & actual travel of $350.00/hr) |
| <u>Trial Appearance:</u> | $2,600.00/half day** |
| | Plus travel expense |
| <u>Records Review</u> without report: | $ 350.00/hr (pro-rated) |
| With report (includes $50.00 Transcription Fee) | $ 500.00 |
| <u>IME:</u> (includes $50.00 Transcription Fee) | $ 700.00/IME** |
| (Includes 1 hour records review) | |

Patient examination with report on causation, Impairment.
Additional record review (over 1 hr billed at $350.00/hr)
All records must be received in our office one-week before scheduled IME.

| | |
|---|---|
| <u>Narratives:</u> (includes $50.00 Transcription Fee) | $ 500.00 |
| <u>Impairment Ratings</u> (forms only) | $ 100.00/page |
| <u>Impairment Ratings</u> (Exam by Treating Physician) | $1,000.00 |
| (Includes $50.00 Transcription Fee) | |
| <u>Impairment Rating</u> (Exam by Nontreating Physician) | $2,000.00 |
| (Includes $50.00 Transcription Fee) | |

## **CANCELLATION POLICY**

Conferences 72 hour or more notice for refund.

Depositions & Arbitration Hearings:  5 working day notice for refund

Trial Appearance:      11 or more working days notice, $550.00 scheduling fee withheld
8-10 working days notice, ½ of fee retained + $550.00 scheduling fee
7 or less working days notice no refund of fees.

IME:    5 working days no refund
6 or more working days refund of ½ fees ($350.00).
Revised 2/27/07